## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE:** ) | **Case No.** 20-21595-GLT |
| Majestic Hills, LLC, ) | |
| **Debtor,** ) | **Chapter** 11 |
| Christopher Phillips and Elizabeth ) | |
| Phillips, ) | **Adversary No.** 20-02090-GLT |
| **Plaintiffs,** ) | |
| **vs.** ) | **Related to Document No.** 1 |
| NVR, Inc. d/b/a Ryan Homes, ) | |
| **Defendant,** ) | **Document No.** 3 |
| **vs.** ) | |
| Majestic Hills, LLC; Joseph N. DeNardo ) | |
| d/b/a J.N.D. Properties; Shari DeNardo; ) | |
| Pennsylvania Soil and Rock ) | |
| Incorporated; Mark R. Brashear; Alton ) | |
| Industries, Inc.; and Strnisha Excavation ) | |
| Inc., ) | |
| **Additional Defendants.** ) | |

### EXHIBIT "A" TO NOTICE OF REMOVAL OF
### STATE COURT CIVIL ACTION TO BANKRUPTCY COURT

Attached is the Complaint for Declaratory Judgment against NVR, Inc. d/b/a Ryan

Homes filed by Christopher Phillips and Elizabeth Phillips in the Court of Common Pleas

of Washington County on January 22, 2019.

**Respectfully Submitted,**

**DATE:** June 2, 2020

**BY:** /s/ Donald R. Calaiaro
**Donald R. Calaiaro, PA I.D. #27538**
**dcalaiaro@c-vlaw.com**

**CALAIARO VALENCIK**
**938 Penn Avenue, Suite 501**
**Pittsburgh, PA 15222-3708**
**(412) 232-0930**

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

WASHINGTON _____ County

| For Prothonotary Use Only: |
|---|
| Docket No: |
| 2019 - 379 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N   A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Transfer from Another Jurisdiction
- ☐ Writ of Summons
- ☐ Petition
- ☐ Declaration of Taking

| Lead Plaintiff's Name: CHRISTOPHER AND ELIZABETH PHILLIPS | Lead Defendant's Name: NVR, INC. d/b/a RYAN HOMES |
|---|---|

**Are money damages requested?** ☒ Yes ☐ No

Dollar Amount Requested: (check one) ☐ within arbitration limits ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: JOSHUA D. BROWN, ESQUIRE

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**S E C T I O N   B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE**. If you are making more than one type of claim, check the one that you consider most important.

**TORT** (do not include Mass Tort)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (does not include mass tort)
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** (do not include Judgments)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☒ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

| | |
|---|---|
| **CHRISTOPHER AND ELIZABETH PHILLIPS,** | **CIVIL DIVISION** |
| Plaintiffs, | No. ౽౦|౯ – ౩౭౯ |
| vs. | **DECLARATORY JUDGMENT ACTION AND COMPLAINT IN EQUITY** |
| **NVR, INC. d/b/a RYAN HOMES,** | |
| Defendant. | **Filed on behalf of Plaintiffs:** Christopher and Elizabeth Phillips |

**Counsel of Record for this Party:**
Jeffrey P. Myers, Esquire
Pa. I.D. No. 90677

Joshua D. Brown, Esquire
Pa. I.D. No. 315339

Myers Law Group, LLC
17025 Perry Highway
Warrendale, PA 15086
724-778-8800 (Telephone)
724-779-9650 (Facsimile)

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

**CHRISTOPHER AND**
**ELIZABETH PHILLIPS,**

**CIVIL DIVISION**

No.  2019 - 3791

                    Plaintiffs,

vs.

**NVR, INC. d/b/a RYAN HOMES,**

                    Defendant.

## <u>NOTICE TO DEFEND</u>

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITHIN FORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
523 Washington Trust Building
Washington, PA 15301
Telephone: (724) 225-6710

Southwestern Pennsylvania Legal Aid Society
10 West Cherry Avenue
Washington, PA 15301
Telephone: (724) 225-6170

By:_____
Jeffrey P. Myers, Esquire
Joshua D. Brown, Esquire
*Counsel for Plaintiffs*

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

**CHRISTOPHER AND**
**ELIZABETH PHILLIPS,**

**CIVIL DIVISION**

No. 2019 - 379

Plaintiffs,

vs.

**NVR, INC. d/b/a RYAN HOMES,**

Defendant.

## PETITION FOR DECLARATORY JUDGMENT AND
## COMPLAINT IN EQUITY

AND NOW, come the Plaintiffs, Christopher and Elizabeth Phillips, by and through their undersigned counsel, Jeffrey P. Myers, Esquire and Joshua D. Brown, Esquire of Myers Law Group, LLC, in the above-captioned case and files this Petition for Declaratory Judgment and Complaint in Equity averring as follows:

1.      Plaintiffs, Christopher and Elizabeth Phillips, are adult married individuals residing at 1021 Oakwood Drive, Canonsburg, PA 15317 (Parcel ID 520-012-04-00-0036-00) and within the Planned Community of Majestic Hills.

2.      Defendant, NVR, Inc. d/b/a Ryan Homes ("NVR") is a Virginia corporation with its principal place of business at 11700 Plaza America Drive, Suite 500, Reston, Virginia 20190. NVR is in the business of constructing and selling new homes in newly constructed home developments. NVR routinely works with, sets standards, and oversees these newly constructed developments over third party developers.

3.      This Honorable Court has jurisdiction over this matter as the contract at issue is in regard to property located within Washington County.

4.      Based on information and belief, the Phillips' home located at 1021 Oakwood Drive, Canonsburg, Pennsylvania 15317 was built on or about July 14, 2010.

5.     On or about July 14, 2010 when Mr. Joseph Mowood originally purchased the property from Defendant; Mr. Mowood was provided a New Home Manual and Orientation packet, which contained multiple warranties. A copy of the applicable Homeowners Manual is attached hereto as **Exhibit A**.

6.     Included within the original warranties, was an express ten year limited warranty against major structural defects against the home, which stated:

> "Builder warrants that the Home will be free from major structural defects in the materials or workmanship of the original construction which appear any time within ten (10) years after the Warranty Date, and which significantly affect the load-bearing functions of the Home or otherwise render it unsuitable for residential purposes."

7.     BUILDER is defined as: "NVR, Inc., a Virginia Corporation trading as Ryan Homes, NVHomes, or Fox Ridge Homes, or acting through a wholly-owned subsidiary under the trademark Rymarc Homes," (Exhibit A, Page 54).

8.     Under the Homeowners Manual, the OWNER is defined as "the original purchaser(s) **and all subsequent owners** (if any) who take both title and possession of the designated home within the applicable warranty periods for residential purposes," (Exhibit A, Page 55).

9.     Additionally, the warranty specifically states that persons protected is "extended to the original purchaser(s) identified above and to all subsequent owners (if any) who take both title and possession of the designated home (the 'Home') within the applicable warranty periods for residential purposes (the 'Purchaser')," (Exhibit A, Page 56).

10.     The ten year warranty further defines STRUCTURAL DEFECTS as: "any defect in the load-bearing portions of a new home that adversely affects its load-bearing function to the extent that the home becomes or is in serious danger of becoming unsafe, unsanitary, or otherwise uninhabitable," (Exhibit A, Page 55).

11.    It is noted that the warranty limits structure defects to not include, "damage caused by movement of soil… earth movement **not attributable to negligence on the part of us or its subcontractors or employees**," (Exhibit A, Page 55). In this instance, NVR, Inc. constructed and was responsible for the grading establishment around the Phillips' home fundamental to its structural integrity as well as the construction of the interior and foundation walls of the home.

12.    The warranty period is defined as "the period of warranty coverage commencing on the Warranty Date," (Exhibit A, Page 55). The Warranty Date is the first day that the original Purchaser occupies the new home, settles on the new home, and/or makes the final contract payment on the new home.

13.    Accordingly, the applicable warranty date is July 14, 2010; therefore, the applicable ten year warranty ceases on July 13, 2020.

14.    On or about June 27, 2014, Christopher and Elizabeth Phillips purchased the home from Joseph Mowood. A copy of the deed can be produced upon request.

15.    On or about June 27, 2014 Christopher and Elizabeth Phillips purchased the home at 1021 Oakwood Drive, Canonsburg, Pennsylvania 15317 in the amount of $305,000.00.

16.    When Plaintiffs purchased the home, they were provided a copy of the Homeowners Manual, including the applicable warranties.

17.    Plaintiffs are considered owners as defined under Section VI (I) Owner, as they are subsequent owners who took both title and possession of the designated home within the applicable warranty period for residential purposes, as further clarified under Section 1, Persons Protected on Page 56 of the Homeowners Manual, Exhibit A.

18.    On or about February 23, 2015, Christopher Phillips reported to NVR that a major crack appeared throughout his home overnight. At the time, Steve Peloza, PGS Service Manager

45.     Accordingly, NVR constructed the Phillips' foundation not on hard compacted soil but rather soft uncompacted soil easily subject to nearby earth movement in addition to the incorrect angle (as stated in Exhibit B). In layman's terms, NVR built the Phillips' home on a "marshmallow."

46.     The Phillips have been forced to leave their home due to safety concerns and the water, gas, and electric have been shut off by North Strabane Township as it is "unsuitable for residential purposes."

47.     Furthermore, the Phillips' home has a Structural Defect as defined under the 10-year warranty as its "load-bearing function…is in serious danger of becoming unsafe, unsanitary, or otherwise uninhabitable."

48.     Furthermore, the earth movement IS attributable to negligence, believed at least in part (and subject to additional discovery), of NVR, its subcontractors or employees" as NVR was responsible for the grade establishment on the Phillip's steep slope, for wall checks, and for the final lot survey which would have accounted for the incline (and therefore necessity of fill) underneath the Phillips' home, as further stated within Exhibit B.

49.     Had NVR provided adequate grade establishment and a final lot survey, the Phillips' home could have remained structurally sound despite the ongoing nearby landslide.

50.     Furthermore, had NVR properly investigated and accounted for the Engineer Report and submitted to them in October 2017 they could have pre-emptively saved the Phillips' home.

51.     Furthermore, had NVR correctly evaluated the Phillips' home in conjunction with information related to the landslide on the neighboring lot in 2015-2016, NVR could have secured the Phillips' home.

52.    For two years, NVR has refused to properly honor the 10-year warranty and Plaintiffs now bring this Declaratory Judgment action for a final determination as to their rights under the said 10-year warranty. NVR has informed the Plaintiff's that the 10 year warranty is inapplicable to the facts at issue.

53.    Finally, under the 10-Year Warranty, NVR must "repair, replace, or pay the reasonable cost of repairing or replacing the defective component." See **Exhibit A**, Section, 8, p. 58.

54.    NVR has yet to repair or replace the defective foundation of the Phillips' home, accordingly if NVR cannot repair or replace the same, it must pay the reasonable cost to replace the foundation not in excess of the purchase price of the home. See **Exhibit A**, Section 10(c), p.58.

55.    If NVR decides to repair the Structural Defects, it may be subject to "reasonable shelter expenses during the term of repair…" See **Exhibit A**, Section 11, p. 59.

56.    This Declaratory Judgment Action is necessary and appropriate as NVR, Inc. has informed Plaintiffs that the Warranty is not applicable for two reasons: 1.) The Phillips are subsequent homeowners; 2.) The Structural Defect is not the fault of NVR, Inc. For the above-stated reasons, the Plaintiffs pray this Honorable Court rule that the 10-year Warranty is applicable to the above-stated facts.

57.    Further, Arbitration is not appropriate because the Plaintiffs are not questioning whether they "obtain[ed] satisfactory performance" under the Warranty but rather seeking Declaratory Judgment as to whether it applies at all and refute NVR's contention that it is inapplicable. Therefore this Honorable Court has jurisdiction over this matter.

## COUNT I: DECLARATORY JUDGMENT

58.    The above paragraphs are incorporated by references that are set forth fully herein.

59.    Under 42 Pa.C.S. § 7532, "Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree."

60.    The express 10 year warranty states as follows:

"Builder warrants that the Home will be free from major structural defects in the materials or workmanship of the original construction which appear any time within ten (10) years after the Warranty Date, and which significantly affect the load-bearing functions of the Home or otherwise render it unsuitable for residential purposes."

61.    The Plaintiffs are properly an Owner under the express terms of 10-year warranty and within the 10 year warranty period.

62.    The Phillips' foundation has substantial cracking which continues to grow, of which constitutes a Structural Defect under the 10-year warranty.

63.    Furthermore, the home is presently unsuitable for residential purposes. The Township has turned off the water, sewage, and heat. See Exhibit J.

64.    NVR, Inc. is responsible for the foundation and the surrounding fill subject to their duties under the Purchase Agreement, which include the duty to "Grade Establishment" of the lot, to finish fine grading the lot, wall checks, and the final survey.

65.    More specifically, NVR designed the Phillips home to sit upon a steep slope and effectively built their home on a "marshmallow", as further stated within Exhibit B.

66.    Furthermore, a recent compaction report of the Phillips' home reveals poor compaction for which at least a portion of the report is believed to be within NVR's control and responsibilities and subject to their negligent construction.

67.    Accordingly, as the 10-warranty applies, the Phillips are entitled to have their property, "repair[ed], replace[d], or [to be paid] the reasonable cost of repairing or replacing the defective component." If NVR cannot repair or replace the Phillips' foundation then they are entitled to the replacement value up to the $305,000 in which they paid for the property.

68.    Should NVR seek to repair the Phillips' property, the Phillips are entitled to reasonable shelter expenses until the repairs are complete.

WHEREFORE, the Plaintiffs pray this Honorable Court and issue Declaratory Judgment that NVR, Inc. is bound to honor the 10-year warranty subject to the facts presented and either immediately repair or replace the Phillips' foundation or pay for its replacement in the amount up to $305,000.

## COUNT II: PRELIMINARY AND PERMANENT INJUNCTION

69.    The above paragraphs are incorporated by references that are set forth fully herein.

70.    Preliminary injunction is appropriate where the moving party establishes that:

a.    relief is necessary to prevent immediate and irreparable harm, which cannot be compensated by damages;

b.    greater injury will occur from refusing an injunction than from granting it;

c.    the injunction will restore the parties to the status quo;

d.    the alleged wrong is manifest and that the injunction is reasonably suited to abate it; and

e.      the Plaintiffs' right to relief is clear. *Berger v. West Jefferson Hill School District*, 669 A.2d 1084 (Pa. Commw. 1995).

71.     A preliminary injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. The Plaintiffs are entitled to have their home repaired or replaced under the 10-year warranty and NVR has refused to do so until this point in time, claiming that the Warranty is inapplicable.

72.     Irreparable harm will result from refusing a preliminary injunction rather than from granting it. If a preliminary injunction is not granted, the Plaintiffs may permanently lose their home.

73.     Any harm to Defendant would be minimal if the preliminary injunction is granted as they are obligated to fulfil the terms of the warranty.

74.     A preliminary injunction is reasonably suited to abate the offending activity, namely ordering the Defendant to honor and fulfill its obligations under the warranty.

75.     Plaintiffs' right to relief is clear. A preliminary injunction is not whether the moving party is "guaranteed to prevail," but instead whether there is sufficient evidence to show that "substantial legal questions must be resolved to determine the rights of the respective parties." *Ambrogi v. Reber*, 932 A.2d 969, 980 (Pa. Super. 2007).

76.     Defendant is obligated to fulfill its obligations under the 10-year warranty and repair or replace the Phillips' home, or in the alternative pay for the replacement up to $305,000 as stated hereinabove.

77.     With respect to prejudice to the public interest, issuance of a preliminary injunction will protect the public interest and the rights of other interested parties, namely those of the neighboring properties who may be similarly situated with the same 10 year warranty.

WHEREFORE, Plaintiff requests this Honorable Court:

a.      Issue a declaratory and final judgment that NVR must repair, replace, or pay to replace the Phillips' foundation under the 10-year warranty subject to the facts at issue.

b.      Issue a permanent injunction ordering Defendant, his agents, affiliates and any and all other persons to immediately commence repairs of the Phillips' home or pay up to its full replacement amount of $305,000.00. If NVR elects to repair the Phillips' home it must pay reasonable shelter expenses.

c.      Award Plaintiff attorney's fees, costs of suit, and such other relief as the court shall deem just and proper.

Respectfully submitted,

MYERS LAW GROUP, LLC

Jeffrey P. Myers, Esquire
Joshua D. Brown, Esquire
Counsel for Plaintiffs

# Homeowner's Manual

## Table of Contents

To Our Customers ................................................................................................ 1
Manager's Message ........................................................................................... 2

## Selecting Your Home

Seeing the Models.............................................................................................. 3
Color Coordinated Exterior Schemes ............................................................. 3
Pricing of the Home and Homesite .................................................................. 3
Home Setting....................................................................................................... 3
Construction Schedule....................................................................................... 3
Substitutions ....................................................................................................... 4
Questions ............................................................................................................ 4
Pre-Settlement Demonstrations....................................................................... 5
Closing................................................................................................................. 5
Utility Obligations.............................................................................................. 5
Service and Final Review ................................................................................. 5
Easements & Restrictive Covenants .............................................................. 6

## Service and Maintenance Guide

I.   INTRODUCTION ......................................................................................... 7
II.  NATURALLY OCCURRING GASES ....................................................... 7
III. SOUND ATTENUATION ............................................................................ 7
IV. HOMEOWNER RESPONSIBILITIES........................................................ 7
    A. Landscaping............................................................................................ 8
    B. Homeowner Maintenance Tips ............................................................ 9
    C. Mold ......................................................................................................... 9
    D. Ice Damming ......................................................................................... 10
V.  PERFORMANCE STANDARDS.............................................................. 10
    A. ONE YEAR WARRANTY ITEMS ........................................................ 10
      1.0   GENERAL DATA ............................................................................ 10
      2.0   SITEWORK....................................................................................... 11
        2.1 Sub-Surface Drainage Materials .............................................. 11
        2.2 Surface Drainage......................................................................... 11
      3.0   CONCRETE & ASPHALT............................................................... 13
        3.1 Porches, Steps, and Driveways................................................. 13
        3.2 Foundation Walls......................................................................... 15
        3.3 Basement and Garage Floors ................................................... 16
        3.4 Welled Exits and Areaways ....................................................... 17
      4.0   MASONRY......................................................................................... 18
        4.1 Foundation Walls......................................................................... 18
        4.2 Brick Veneer................................................................................. 18
      5.0   METALS ............................................................................................ 19
        5.1 Porch/Areaway Rails ................................................................. 19
      6.0   WOOD & PLASTICS ....................................................................... 19
        6.1 Rough Carpentry ......................................................................... 19
        6.2 Trim Carpentry ............................................................................ 21
      7.0   THERMAL & MOISTURE PROTECTION...................................... 21



PLAINTIFF'S
EXHIBIT
A

of NVR, came to Mr. Phillips' home to inspect the same. Mr. Phillips was told that the cracks were merely cosmetic and not included under the Ten Year Warranty.

19.    Again, in approximately August 2017, Mr. Phillips discovered a structural crack running through his home believed to be dated back to 2015. Mr. Phillips informed NVR who in turn requested that he obtain an engineer's opinion. On October 11, 2017, Mr. Phillips retained the service of JL&A Structural Engineers, LLC to evaluate the source of the cracks in the home.

20.    On or about that same day, a representative from JL&A Structural Engineers, LLC toured the home and stated that the crack was in fact within the foundational wall. It was concluded that "preliminary work by the Architect and/or Engineer, contractor or township authorities did not pay any attention to the development of that subdivision in [the nearby] hills nor location of the homes or roads on the edge of the angle of repose." A copy of the letter received by JL&A Structural Engineers, LLC, dated October 11, 2017, attached hereto as **Exhibit B**.

21.    It was further found that the angle of the hill cut too close to the road, creating a horizontal angle too severe for the loose fill just in front of the Phillips driveway. It was stated that this was done in a hazardous fashion creating problems in the home and that the land near the Phillips home had not ceased settling. The report suggested that helical piles be installed to firm and stabilize the soil or other type pile or bedrock. It was also found that the foundation should be jacked up to remove the strain imposed on the entire structure. Finally, it was stated that the cracks were symptoms of deformation in the soil and that the entire structure can go into "total deterioration."

22.    This information was provided to NVR on or about October 25, 2017 requesting that they take immediate remedial action. This letter was sent in accordance with the procedure for adjudicating claims contained within Section 11, Page 58 of the Homeowners Manual. A copy of the letter is attached hereto as **Exhibit C**.

23.    On or about November 8, 2017, NVR came to the Phillips' home and performed an inspection as to the cause of the structural defects located at the residence. The parties in attendance were Steve Peloza, the PGS Service Manager of NVR, in addition to Avbel Engineering, LLC.

24.    On or about December 1, 2017, Avbel Engineering drafted a report for NVR based upon the inspection of the home on November 8, 2017. The Report indicated that "the most likely cause of the foundation wall and exterior brick veneer cracking along with the basement slab crack located below the first floor and basement stair landing is settlement during the life of the structure." The report then recommended monitors to be installed for six months. A copy of the letter dated December 1, 2017 is attached hereto as **Exhibit D**.

25.    On or about December 14, 2017, Plaintiff's counsel responded to the Avbel Report wherein, Plaintiff's counsel informed NVR that they continued to ignore and not address the core findings of the JL&A Structural Engineering Report, namely: 1.) that the home was built too close to the edge of the angle of repose; 2.) that the foundation should be jacked up to remove the strain imposed on the entire structure; and 3.) that the soil compaction should be analyzed. A copy of the letter dated December 14, 2017 is attached hereto as **Exhibit E**.

26.    Additionally, within the same letter, Plaintiff advised NVR that it recently came to the Phillips' attention that on or about 2016 at landslide occurred at 505 Orchard View Drive, Canonsburg, PA. This is the Phillips' neighbor and requested that NVR consider this in analyzing whether to accommodate the Phillips' home based upon JL&A's recommendations.

27.    On January 4, 2018, NVR responded to Plaintiff's counsel's letter stating that NVR did not concur with the concerns of JL&A Structural Engineering but the monitors should definitively determine whether a cause for concern existed. A copy of the letter dated January 4, 2018 is attached hereto as **Exhibit F**.

28.     Plaintiff responded by way of letter dated January 9, 2018, wherein the Plaintiffs agreed to allow NVR to monitor its home for six months but asked for clarification as to why NVR was disregarding the concerns of JL&A Structural Engineering. More specifically, Plaintiff asked NVR, through its engineer, to "provide [a] rationale for their belief that the home was not built too close to the edge of the angle, and their belief of jacking up the foundation and examining compact soil will not be necessary." No response to this question was ever received. A copy of the January 9, 2018 letter is attached hereto as **Exhibit G**.

29.     On or about June 18, 2018, massive landslides occurred across the street from the Phillips' home. Three nearby homes were demolished as result of the landslides. These landslides are subject to the litigation filed in the Western District at 2:18-cv-01335-MRH.

30.     Despite landslides occurring nearby Mr. Phillips' property in 2016 and on June 18, 2018, on or about August 23, 2018, NVR, by and through their engineer, informed the Phillips that the cracks in their home were "cosmetic" and "no evidence was discovered to indicate any structural problems with the home." A copy of the letter dated August 23, 2018 is attached hereto as **Exhibit H**.

31.     On or around this time, Mr. Phillips discovered a report from 2006 that is believed to have been known to NVR which stated that compaction problems existed throughout the community.

32.     As a result, on or about September 6, 2018, counsel for Mr. Phillips informed NVR of these findings and once again demanded that NVR account for the concerns originally raised by JL&A Structural Engineering. A copy of the letter dated September 6, 2018 is attached hereto as **Exhibit I**.

33.     Once again, NVR ignored Mr. Phillips concerns and ignored the JL&A Structural Engineering findings. But instead, by letter dated September 20, 2018, NVR offered to send an engineer to the location to consider performing additional tests.

34.     On or about October 4th, 2018, a third significant landslide occurred, this one directly across the street the Phillips' property.

35.     As a result of the October 4th, 2018 landslide, the roadway leading to the Phillips' home was shut down by the Township and deemed unsafe to travail.

36.     Significant cracks began to form at the base of Mr. Phillips drive, large enough a fist could fit into. This roadway has since completely collapsed. A copy of the photographs are attached hereto as **Exhibit J**.

37.     A spring emerged on the Phillips' property shortly after this landslide that did not occur before and a tree located on the Phillips' property changed directions.

38.     On or about October 10, 2018, an engineer on behalf of NVR analyzed the property's foundational stability and would not confirm that the home was stabile given the recent landslides and the changes that were occurring underfoot.

39.     On or about October 11, 2018, Plaintiff's counsel received a phone call from NVR offering $2000 per month for relocation costs for the Phillips family to leave the property until it could be stabilized. This number was ultimately raised for a total of $10,000 for moving expenses and rental expenses. The Phillips, their three minor children and two dogs immediately left their home at 1021 Oakwood Drive. NVR, Inc. has not provided any clarity as to whether relocation costs will continue to be paid beyond January 2019. However, NVR, Inc. has indicated that the relocation payments are not being made pursuant to the Warranty.

40.     Had NVR abided by the initial findings of JL&A Structural Engineering in October 2017, these problems could have been caught early prior to the landslides in June 2018 and October 2018.

41.     Had NVR followed the findings in the JL&A Structural Engineering Report, the homes identified within 2:18-cv-01335 MRH and the roadway at Oakwood drive may not have been in peril. Most importantly, the Phillips' home could have been stabilized in advance and estopped the Phillips from being removed from their home.

42.     Additionally, on or about October 15, 2018, two core samples were performed on or near the Phillips's property by the PennDOT. The reports revealed significant wetness in the soil near the Phillips's home and low "Blow Count" numbers. Based upon information and belief, the low ""blow count" numbers revealed significant lack of compaction, especially within Boring B-102. A copy of the Boring Report is attached hereto as **Exhibit K**.

43.     NVR, Inc. maintained the responsibility of Grade Establishment for the Phillips' lot, House Stakeout, Final Lot Survey, and to finish fine grading the lots. Given the angle upon which the Phillips' home sits (as stated within Plaintiff's Engineer's Report), NVR, Inc. was directly responsible for the fill and poor compaction underneath the Phillips' home and the poor angle upon which it was built. Please see a copy of Purchase Agreement detailing NVR, Inc.'s obligations in reference to the Phillips' home, attached hereto as **Exhibit L**.

44.     Furthermore, the Purchase Agreement contains numerous conditions for which the soil, grading, and other specifications require Majestic Hills to be completed by third parties as more fully stated within a Civil Action No. 2018-6037 (outside of the grading evaluation), exemplifies that the building requirements were subject to NVR, Inc.'s review, control, and specifications.

7.1 Damp Proofing ....................................................... 21
7.2 Insulation ............................................................. 22
7.3 Roofs, Gutters and Downspouts................................. 23
7.4 Louvers & Vents ..................................................... 24
7.5 Siding & Trim .......................................................... 25
7.6 Stucco ................................................................... 26
7.7 Caulking ................................................................ 26
8.0   DOORS & WINDOWS ............................................ 27
8.1 Condensation & Humidity ......................................... 27
8.2 Doors (Exterior & Interior)......................................... 28
8.3 Garage Doors......................................................... 29
8.4 Windows ................................................................ 30
9.0   FINISHES ........................................................... 31
9.1 Drywall (Walls & Ceilings) ........................................ 31
9.2 Ceramic Tile (Walls & Floors) ................................... 31
9.3 Finished Wood Flooring............................................ 33
9.4 Resilient Floors ....................................................... 33
9.5 Painting ................................................................. 35
9.6 Carpeting................................................................ 36
9.7 Hardware ............................................................... 37
10.0 SPECIALTIES ...................................................... 38
10.1 Fireplaces (Wood Burning) ..................................... 38
10.2 Fireplaces (Direct Vent) ......................................... 39
11.0 KITCHEN CABINETS, VANITIES AND COUNTER TOPS .......... 40
11.1 Counter Tops/Surfaces .......................................... 40
12.0 PLUMBING........................................................... 42
12.1 Water Supply, Sewers, Fixtures & Drains ................. 42
12.2 Water Heater......................................................... 43
12.3 Wells ................................................................... 44
13.0 HVAC.................................................................. 45
14.0 ELECTRICAL ....................................................... 47
14.1 Electrical Systems................................................. 47
B.  TWO YEAR WARRANTY ITEMS............................... 49
15.0 PLUMBING........................................................... 49
15.1 Water Supply, Sewers, Fixtures & Drains ................. 49
15.2 Septic System ...................................................... 50
15.3 Piping .................................................................. 51
15.4 Sewers, Fixtures and Drains ................................... 51
16.0 HVAC.................................................................. 52
17.0 ELECTRICAL ....................................................... 53
17.1 Electrical Systems................................................. 53
18.0 FIRE SUPPRESSION SPRINKLER SYSTEM.............. 53
VI.  APPENDIX A - DEFINITIONS .................................. 54
APPENDIX B - BUILDING CODES................................... 55

# Homeowner Limited Warranty

**Ryan Homes**

## To Our Customers

Welcome to your new home. We are pleased you have taken the time to review your home, which has been built with quality materials, products and skilled workmanship.

Our decentralized building operation allows our local field operations staff to carry on the day to day building activities. To aid them with technical matters we provide assistance and back up with our own finance company, NVR Mortgage, our manufacturing facilities, and skilled staff to assure that the product we deliver is all that you hoped it would be.

Before taking possession of your new home, you will be asked to attend a pre-settlement demonstration with the Project Manager who has been in charge of the construction of your home. The purpose of this pre-settlement meeting is to familiarize you with the operation of all equipment, to review all owners' maintenance responsibilities, and to demonstrate the quality of your home. Any items that are not up to industry standards of workmanship will be noted for correction.

A Company representative will schedule a final review within ten months after the pre-settlement closing. Issues related to the original construction, if any, should have become apparent by this time. Please keep a list of any such issues, and we will take care of them after the final review in accordance with the "Homeowner Limited Warranty" which is set forth in the back of this booklet.

Normally, final repairs and adjustments can be completed within ten (10) business days, weather permitting. Emergency items, those that make living in the home unsafe, will be addressed immediately upon notification and repaired as quickly as possible.

We urge you to read this booklet carefully and to review it from time to time. We believe it will help you protect your investment.

We wish you many happy years in your new home.

Sincerely,


Paul C. Saville
President Chief and Executive Officer
NVR, Inc.

1

**Ryan Homes**

## Manager's Message

The information in this booklet is presented to help you in selecting and maintaining your new home. The purchase of a new home may be the biggest single expenditure you will make in your lifetime. We intend that it be a happy and satisfying experience for your family. We encourage you to ask questions about anything that you don't completely understand.

In the first section of this booklet, we describe the process of viewing models, selecting options, signing the purchase agreement, obtaining a mortgage, reviewing the completed home closing, and moving into your new home. It is important that you understand this process so that you get the product that you are expecting.

The next portion of this guide deals with the maintenance of your home so that you may obtain maximum enjoyment from it. We stress that a good home does require maintenance. From the day you move in, your home will undergo wear and tear like any other product which is subject to use. However, if the instructions in this guide are carefully followed, you should be able to prevent many issues and take care of most of the maintenance with only occasional reliance on professional service personnel over the years you live in your home.

In most locations, the construction of each home includes our Standard Energy Package (S.E.P.). This construction process has evolved over several years and several thousand homes. The intent of the S.E.P. construction process is to give you a well insulated home and to reduce air infiltration, a significant detail that most builders overlook.

In the final pages of this booklet, you will find our homeowners limited warranty. Please read it thoroughly and make certain you understand it before you execute a purchase agreement.

A very high percentage of our customers come from the recommendation of our current homeowners. We look forward to serving you and hope that you will be so enthusiastic about your home that you in turn will recommend us to others.

2

## Selecting Your Home

### Seeing the Models

Our Homebuilding Operations build different types of homes in a number of geographically separated communities. The locations of these communities are selected in order to provide you with a choice of educational systems, convenient shopping, easy access to transportation and a variety of price ranges. Our models let you see different architectural designs, floor plans, exterior color combinations and material usages. Because of our wide variety of options, all available options cannot be shown on one model. If you don't see a type of design or an option in which you are interested, ask if it is available. For various reasons options on a home may vary from community to community and from home to home.

### Color Coordinated Exterior Schemes

In most locations, we have a color selection guide from which you may select the exterior colors of your home. The guide has been carefully planned by professional designers to create the most pleasing blend of coordinated exterior color schemes. The result is a more beautiful home for you and a more attractive neighborhood, which not only protects but also enhances your investment.

### Pricing of the Home and Homesite

Similar models may sell for different prices in different communities for various reasons. The cost of land, building permits, sewer and water fees and local building code requirements all have an effect on selling prices. Despite spiraling material and construction costs, the purchase price of your new home does not change after you have signed the purchase agreement and specified the options and selection sheet items you want. For pricing information see the price list published for the community in which you are interested or your Sales and Marketing Representative.

### Home Setting

The location of your home on the homesite is determined by many factors. Some of them are:
   1) Municipality requirements for set back, front, rear and side yards
   2) Soil conditions and topography
   3) House type
   4) Drainage
   5) Easements
   6) Sewer tap elevation
   7) Driveway gradient

We use both professional engineers and our Project Managers to properly "site" your home on the homesite. In some cases, governmental agencies require a detailed home location plan or a "plot plan". We must then be sure the home is situated according to that plan. Home setting is a critical issue. We have the responsibility to set your home professionally. Sometimes additional trees must be removed to correctly establish swales so that your yard drains properly.

We will build your home either "per plan" or "reverse plan". One is the mirror image of the other. The contour of the homesite itself dictates which way the home is built. This allows us to minimize the driveway slope and properly move water around the house. In all matters pertaining to home setting, we have sole discretion and responsibility. We will make every effort to set your home on the homesite so that as many trees as are practical can remain for your enjoyment.

### Construction Schedule

When you sign your purchase agreement the Sales and Marketing Representative will refer to our long-range schedule and give you a tentative delivery date. Prior to the start of construction, there

3

are several things that are necessary for you to do. At a minimum, the selection sheet for your home must be completed, the mortgage approval must be obtained, and the balance of the down payment, as may be required by the purchase agreement, must be turned over to us.

When these items have been completed and we are in a position to start construction, the home is put on our production schedule. Construction time may vary depending on the size of the home you have purchased, the area of the country in which we are building and other circumstances. At the time we begin construction, we will inform you of the scheduled tentative delivery date and within approximately 30 days of the anticipated completion of construction, we will be in touch with you to coordinate the date of pre-settlement and closing.

The completion of your home is not entirely under our control. The delivery date may vary due to development of the community, weather, suppliers, and governmental process and procedures. Therefore, allow some time between our scheduled delivery date and the date you have to be out of your current residence.

Since you cannot move into your new home prior to final settlement, make your moving arrangements flexible. You should not establish a firm moving date until you have been informed of the exact closing date by our division office. We cannot be responsible for any interim or transition living arrangements.

**Substitutions**
We are faced with the responsibility of constantly and continually evaluating our home plans and making changes to improve them or to meet governmental building code requirements as they change.

Sometimes the tile, countertop or vanity coverings, paint, electrical fixtures, or other items selected by you may be unavailable when we are ready to order and use them. There are also times when there is a variation in color or composition from one tile, brick or paint, etc. to another by the same manufacturer. These variations cannot always be controlled because subsequent production runs may have small differences. Because of our desire to avoid delay in completion of your home, we may have to make minor substitutions. We will stay as close to the original selection as possible.
Major substitutions, i.e., floor tile, siding color, etc. will not be made without notifying you. In all cases, substituted items will be of similar quality.

**Questions**
There are literally thousands of details that are involved in the building of your home and it is impossible for us to tell you all of the things that may arise before, during and after construction. If you have any questions that you would like answered or clarified, please ask them.

Questions about construction of your home should be discussed with your Sales and Marketing Representative or the Project Manager. It may be necessary for an appointment to be scheduled. Our Project Managers are often responsible for several communities. Because of their schedule, it may take them up to 24 hours to return your call. Homes under construction contain many potential hazards. For insurance reasons, you are not allowed to visit the home while it is under construction.

4

**Pre-Settlement Demonstrations**
During all the steps previously mentioned and until the completion of your home, your Project Manager is constantly inspecting your home. You should be aware that there are different levels of inspections from local to state to federal.

Before taking possession of your home, a presettlement demonstration will be scheduled with the Project Manager who has been in charge of the construction of your home. The purpose of this meeting is to familiarize you with the operation of all equipment, to review owner's maintenance responsibilities and to demonstrate the quality and features of your home. Any items that are not up to industry standards of workmanship will be noted for correction.

Please review kitchen cabinets, plumbing fixtures, lighting fixtures, flooring, siding, carpet and other visible items very carefully for scratches, chips or flaws, because these items will not be replaced or repaired after you have occupied the home. It must be assumed that any such damage resulted from your use of the home if not identified during the pre-settlement demonstration.

We also ask that you pay close attention to all of the Project Manager's instructions, particularly on how to care for the kitchen cabinets, countertops, appliances, furnace and water heater. All agreed upon items for correction will be noted on the pre-settlement form, a copy of which will be given to you. Items noted should be attended to within ten (10) business days, weather permitting. When all noted items are completed, you will be asked to sign the demonstration form that the work has been completed.

**Closing**
Closing will take place at NVR Mortgage or another designated closing office. You will be given possession of the home following satisfactory completion of pre-settlement and closing, including transfer of funds.

You may not move your family or any of your furniture into the home before the final settlement takes place and the occupancy permit has been issued by the local municipality. You will receive the keys to your new home at your closing.

**Utility Obligations**
In most communities you personally must apply for activating telephone, water, electrical and (where applicable) natural gas service. In some cities, utility companies require advance notice in order to service you in the time frame you require.

Also, in some cases, deposits may be required. You are required to remove our name as of date of closing.

**Service and Final Review**
A final review will be scheduled with you by phone or letter (in advance) to take place during the ten months immediately after you occupy the home. The purpose of this review is to identify at one time any and all conditions which have developed during the early months of occupancy. When the items noted during the final review are addressed, you will be asked to sign the review form indicating that they have been completed. It is very unlikely that any further adjustments, concerns or conditions will occur which are the result of deficiencies in the original construction. If you maintain your home carefully, it should remain in excellent condition for many years.

5

In emergency situations (anything that may make the premises uninhabitable or cause lasting damage) you should telephone directly to those companies listed on the emergency phone list you received at the pre-settlement demonstration. If you are unable to cope adequately with the problem, call our division office for assistance between the hours of 8:00 a.m. and 5:00 p.m. during normal business days.

**THE LIMITED WARRANTY PROVIDED FOR IN THIS BOOKLET INCLUDES BINDING ARBITRATION IN THE EVENT OF A DISPUTE WHICH IS NOT SETTLED BETWEEN YOU AND THE BUILDER.  YOU SHOULD READ THE ARBITRATION PROCEDURES AND BE FAMILIAR WITH YOUR RIGHTS AND RESPONSIBILIITIES IN THE EVENT ARBITRATION IS USED.**

### Easements & Restrictive Covenants

It is very likely that easements on or adjacent to your lot have been granted to municipalities or utility companies. They typically include right-of-way areas for street, line of site, and sidewalk, as well as electric, telephone, sewer, water and gas utility lines. In some cases drainage easements have been established to control water run-off.

The easements are normally included on your plot plan, the community map, and/or the recorded plot plan. This may not always be the case, however, because easements can be created at any time. They are, however, a matter of record and can be found on file in the land records at the local Court House. Please remember that the use of land within recorded easements is at the discretion of the municipality or utility companies. Therefore, transformers or other utility boxes may be located within these areas without our knowledge.  We have paid careful attention to these easements in locating your home on the lot and in the grading of your homesite. It's important not to change any grades in your drainage easements or install any structures of a permanent nature in easement areas.

Sometimes restrictive covenants may have been recorded by the community in which your new home will be built. These covenants are designed to protect the value of your property by prohibiting, without approval, certain practices such as keeping of livestock, erecting of fences, etc.  The restrictions vary from community to community. Your Sales and Marketing Representative can supply you with a copy of these restrictions for your community.

In addition, there are zoning and community regulations that apply to your community. Such regulations govern building setback lines, side yard regulations, square footage regulations, and in some cases may cover the extent and type of alterations you can make to your property. Check with your local governmental authorities if you plan to alter your home or grounds.

6

## I.  INTRODUCTION

PLEASE READ THIS CAREFULLY. The following is intended to acquaint you with our responsibilities under this Limited Warranty. If a defect that results in actual physical damage to the home occurs, the Performance Standards will be used to determine our obligation under this Limited Warranty. If a specific defect is not addressed in the Performance Standards, one of the following standards will be used to determine our obligation under this Limited Warranty:

  a. Locally adopted codes; or
  b. Model codes covering building, mechanical, plumbing and electrical systems (Appendix A); or
  c. Codes of nearby jurisdictions; or
  d. Locally accepted building practices.

Also note that coverage on certain items varies within the Warranty Period and some items rely on proper maintenance and timely notification by the Homeowner. We reserve the right to review each warranty claim individually based upon the circumstances of the claim.

Any time that warranty service is performed during the Warranty Period, such service continues to be covered within the remaining original Warranty Period; however, there is not any extension to any service item beyond the original Warranty Period.

## II.  NATURALLY OCCURRING GASES

A small percentage of homes in the United States experience elevated levels of radon gas and/or methane gas or other naturally occurring gases.  These are naturally occurring gases which rise up and escape from the soil.  This phenomenon can occur in any home, regardless of the type of home or who builds it.  We claim no expertise in the measurement or reduction of these gases in homes, nor do we provide any advice to homeowners as to acceptable levels or possible health hazards of the gases.  As to radon, homeowners may wish to obtain a test kit that meets the EPA protocol for measuring the level of radon gas in their homes.  EPA publishes a list which provides information on EPA-approved suppliers of such test kits.  Further information is available through the U.S. Environmental Protection Agency or the applicable state environmental protection office. **WE MAKE NO WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE PRESENCE OF NATURALLY OCCURRING GASES, SUCH AS RADON AND/OR METHANE, AT OR IN THE VICINITY OF THE SUBJECT PROPERTY.**

## III.  SOUND ATTENUATION

Although our homes meet or exceed the code requirements for sound attenuation, there remains the possibility that you will be able to hear sounds from interior and exterior sources through the windows, floors and walls.  If noise is caused by a construction defect, such defect will be warranted as provided in this booklet; however, noise from whatever source cannot be excluded entirely.

## IV.  HOMEOWNER RESPONSIBILITIES

The home requires an active maintenance effort on the Homeowner's part to reduce the likelihood of damage due to neglect, improper maintenance, or abnormal use. Various regions of the country

7

have different local maintenance issues. Some specific Homeowner responsibilities are included under specific topics in the section on Performance Standards.

The following list of page and section numbers refer to specific home maintenance items which must be performed by the Homeowner.

Page 8,  Item A        Landscaping
Page 11, Item 2.2a     Surface
                       Drainage
Page 21, Item 7.1a     Damp Proofing
Page 23, Item 7.3a     Roofs, Gutters
                       and Downspouts
Page 26, Item 7.7a     Caulking
Page 31, Item 9.2a     Ceramic Tile
Page 42, Item 12.1a    Plumbing
Page 45, Item 13.0a    HVAC

**NOTE:** Damage caused or made worse by Homeowner negligence, improper maintenance, or improper operation is expressly excluded under this Limited Warranty.

## A. Landscaping

**To properly start your lawn, we recommend that you purchase a book on lawn and garden care. Your lawn and/or shrubs will need regular and consistent attention. After final settlement, we cannot be responsible for seeing that this work is done. Your lawn and/or shrubs will show the effort you have put forth.**

If you choose to install a sprinkler system we are not responsible for site conditions, such as rock, which may affect the cost of such system.

SEEDED LAWNS:

If your contract included a lawn package, you will receive a starter yard. The most important time for your yard will be the first thirty days. Begin to water immediately to establish a moist soil condition, preferably in the morning. After this, water every day to maintain a moist soil surface for 20 to 30 days. In hot weather, disease and fungus will attack wet grass, so you must allow time for the grass to dry off before nightfall. The amount of water your lawn requires will vary depending on the type of soil you have, temperature, humidity, wind, and amount of rain.

On new grass, it is important to keep the lawn mower blade sharp, so that the grass blades are cut, rather than pulled out or torn. Minimum cutting height of 3 inches should be kept in mind. Do not rake newly seeded lawns, if possible bag or collect clippings to encourage new growth. With starter lawns there will be areas that require you to spot seed. Also, stones which surface to the top are normal and should be removed by hand.

Your lawn will need to be fertilized and/or limed. Do not fertilize in hot weather, and always water after applying fertilizer. The most important item your new lawn will need is water, water, and more water. The Builder's Limited Warranty does not include the replacement of seeding, or sod.

SODDED LAWNS:

8

Sod must be kept moist until the sod is well established (roots have grown into soil). This will usually take 3-4 weeks. After turf begins to grow, reduce watering to 2-3 times a week. Leave sprinkler in the same spot for 1 hour or until the ground is fully saturated. Then cut, water, and fertilize as you would an established lawn.

Your lawn will need to be fertilized and/or limed. Do not fertilize in hot weather, and always water after applying fertilizer. The most important item your new lawn will need is water, water, and more water. The Warranty does not include the replacement of seeding, or sod.

TREES AND SHRUBS:

Water every other day for the first week, then once a week if temperatures are below 85 degrees, twice a week if above 85 degrees. It is important to soak the plants, not sprinkle the top of the mulch. Watering should continue through the fall of the first year. Trees need 5 gallons of water per week, more if it is hot. Shrubs and trees will need pruning and fertilizing. Again, we recommend that you purchase a book on garden and lawn care for more detailed instructions as there are too many variables to be specific.

Trees and shrubs are not warranted by us, whether pre-existing or planted by us.

## B. Homeowner Maintenance Tips

Your new home has been carefully designed and constructed to provide you and your family with a safe, comfortable home. However, in order to maintain your home in top condition, some periodic attention on your part is necessary. In this Manual, we have incorporated maintenance ideas that we hope will be helpful to you.

## C. Mold

Mold is a naturally occurring fungus which is spread by microscopic spores. Homes cannot be designed to exclude the possibility of mold spores circulating within the house and the subsequent development of mold. In order to grow, mold requires both a food source (i.e. fabric, carpet, drywall, and wood, among others) and moisture. A homeowner can and should minimize moisture within the home in order to reduce or minimize mold growth. There are many possible sources of moisture within a home including, but not limited to, humidity, condensation, leaks, spills and overflows. Some or all of these sources of moisture can be prevented through good maintenance and housekeeping practices. It is important to note that if the source of moisture is not minimized within 24-48 hours, that it can prove to be the basis upon which mold may develop.

In light of the above, a homeowner has a continuing obligation to minimize the potential for mold growth and minimize mold when and if it develops. This can be effected by some or all of the following:

1. Regular vacuuming and cleaning of the house, following manufacturer's recommendations for specific products.
2. The use of exhaust fans, the air conditioner and taking other steps to evaporate or facilitate the evaporation of moisture during seasons of high humidity, such as late spring, summer and early fall, to minimize the humidity within the home. If the home has a humidifier, make sure it is turned off during these seasons.

9

3.  Inspection for leaks on a regular basis within the house and, in that regard, looking for wet spots, discoloration, musty odors and any visible signs of mold. Particular care should be given to the inspection of condensation pans in refrigerators and air conditioners. All leaks should be repaired promptly.
4.  Any spills, puddles or other sources of moisture should be cleaned up and dried as soon as possible. Under no circumstances should water be allowed to pool or stand in your home. Any materials that cannot be thoroughly dried, including drywall, insulation, padding or carpeting, should be replaced promptly.
5.  Use of exhaust fans while cooking or using shower.

If, notwithstanding all of these preventive measures, mold should develop, the affected area should be cleaned with proper cleaning solutions. Materials that cannot be cleaned effectively should be discarded. If the mold growth is severe, the services of a professional cleaner should be utilized.

As your builder, we should only be contacted where the source of moisture is a direct result of a building defect or mechanical problem within the applicable warranty period. Such notification must be given within 24 hours in order to minimize the possibility that the source of moisture will lead to mold development. We will not be responsible for any damages caused by mold or by any other agent arising from or connected with the mold for property damage, personal injury, emotional distress, death or adverse health effects.

## D. Ice Damming

During prolonged severe winter weather conditions, ice and snow build-up is likely to occur at the eaves of a roof. This condition occurs when snow and ice accumulate and gutters and downspouts freeze.

It is important to check the gutters in the spring and fall, since the most serious damage to your home will result in the winter if gutters and downspouts are obstructed. It is the Homeowner's responsibility to keep gutters and downspouts clear of tree limbs, leaves, balls and other obstructions which can stop the downspout from functioning properly.

In the winter, ice build-up at gutters can pull gutters loose from the home. Ice build-up can also cause water to back up under the shingles and leak into the home. The installation of gutter guards may aggravate ice damming problems.  Also, we will not remove ice damming from the roof.  You may want to discuss coverage for this kind of possible damage with your insurance agent when selecting a homeowner's insurance policy.

## V.  PERFORMANCE STANDARDS

## A.  ONE YEAR WARRANTY ITEMS

## 1.0 GENERAL DATA
*Coverage*: 1st Year Only As Stated
*Area*: Workmanship & Materials as stated

The Performance Standards list specific items (defects) within each separate area of coverage. The first section covers Workmanship and Materials; the second section covers Systems. The

10

standards are expressed in terms of performance criteria. For easy comprehension, the format is designed as follows:

### a. Service & Maintenance Tips

### b. Problem Solving
1. **Possible Condition** - brief statement, in simple terms, of problems that may be encountered.
2. **Performance Standard** - a performance standard relating to a specific deficiency.
3. **Responsibility** - a statement of the corrective action required of the Builder to repair the condition or a statement of the Homeowner's maintenance responsibilities.

## 2.0 SITEWORK
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 2.1 Sub-Surface Drainage Materials

### a. Service & Maintenance Tips
We have damp-proofed the outside of the foundation below grade with a high-quality damp-proofing material. In most locations, we have installed interior and/or exterior perimeter drainage to redirect any water that may accumulate at the base of the foundation. It is important that you keep the ends of these drain relief pipes clear, so that the water flowing from around the foundation is not blocked. We have established the grade around the outside of the home to carry the water away from your home. (See "Landscaping")

Your sump pump (if your home is equipped with one) should be checked periodically, and if there is a float, check to see that it is operating freely. The sump crock should be flushed periodically to keep sediment from building up. For ease of operation, use silicone spray on the float and other moving parts.  Power outages will affect the operation of the sump pump.  Battery back-ups are available at local retail stores.

## 2.2 Surface Drainage

### a. Service & Maintenance Tips
Proper grading is essential to provide and maintain a dry basement. We have provided proper drainage around your home in general conformance with the approved site plan as determined by local requirements. In some cases, the addition of swales and mounding around the outside of the foundation wall may have been necessary. It is important that the established grades be maintained, and the swales remain clear, so that surface water may flow away from your home. Gutters, downspouts, and splash blocks should be kept unobstructed and maintained to divert water away from the foundation.

Within the first year, we will provide on a one-time basis, labor and material to fill any settled areas to include water, electric, sewer and gas lines.

We will replace or put back landscaping (sod, seed or bushes) which is disturbed by the filling activities but we do not warrant or guaranty such replaced landscaping.  In addition, the grass or sod may not match the existing yard.

11

**b. Standards**

### 1. Possible Condition
Settling of ground around foundation, utility trenches or other areas.

#### Performance Standard
Settling of ground around foundation walls, utility trenches or other filled areas should not interfere with water drainage from the home.

#### Responsibility
If we are required to provide final grading, we will fill settled areas affecting proper drainage, one time only during the first year.  We are responsible for removal and replacement of shrubs and other landscaping installed by us affected by placement of the fill. Grassed or landscaped areas which are disturbed during repair work will be restored. We are to restore, grade, seed, and landscape to meet proper conditions. Landscaping added by the Homeowner is not our responsibility for movement, maintenance, or replacement.

### 2. Possible Condition
Improper drainage of the site.

#### Performance Standard
The necessary grades and swales shall have been established by us to insure proper drainage away from the home. Standing or ponding water shall not remain for more than 48 hours in the immediate area after a rain; except in swales which drain other areas. The possibility of standing water after an unusually heavy rainfall should be anticipated. No grading determination shall be made while there is frost or snow on the ground, or while the ground is saturated.

#### Responsibility
We are responsible only for initially establishing the proper grades and swales in the areas disturbed by construction. The Homeowner is responsible for maintaining such grades and swales once they have been properly established by us.

NOTE: Ponding Water shall be defined as visible surface water standing in low points in the yard, (not identified as permanent erosion control measures) generally 24 hours after cessation of a hard rain, and more than 48 hours in swales and other drainage areas identified on the site plan.

Certain government restrictions, such as the Chesapeake Bay Act, the Clean Air Act, and local environmental protection guidelines, may prohibit us from entering onto undisturbed areas of the lot, therefore the areas must remain in their natural state regardless of providing otherwise positive drainage.

Ponding or drainage caused by clearing, grubbing, raking, etc., by the Homeowner or neighboring homeowners is not our responsibility.

## 3.0 CONCRETE & ASPHALT
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 3.1 Porches, Steps, and Driveways

### a. Service & Maintenance Tips

Most exterior concrete cracking is caused by frost or uneven sub-grade settlement at sewers, drains, and utility line crossings. Minor cracks are a normal expectation and are best left alone. If cracks exceeding established performance standards occur, we will inspect them.

Salt and other de-icing chemicals used to melt snow and ice cause pitting and discoloration of the concrete. Even if you do not use salt, it can be tracked on to concrete surfaces from the street on feet or tires. In order to protect concrete from surface deterioration, we recommend the application of a concrete sealant available at most hardware or masonry supply houses which will help retard the deterioration of concrete surfaces.

Low spots in concrete drives are normal and can be broom swept after rain.
For asphalt drives, we suggest that you apply a driveway sealer to help improve the durability and appearance of the driveway. Sealers should be applied every three (3) years. Asphalt driveways may be damaged by gasoline or oil spills or by sharp items, such as outdoor furniture legs, bicycle kickstands, etc. Vehicles parked in one position over a long period of time may cause wheel depressions. Similar damage may also be made by turning the wheels of an automobile while it is standing still during hot weather.

On asphalt drives, we will patch/fill sunken spots due to settlement of 2 inches or greater on a one-time basis during the first year of occupancy. We will not resurface the entire driveway because of sunken spots. Areas which are patched or filled may not match the existing driveway.

On a stone driveway, we will supply extra stone for sunken sewer line areas only in the first year after closing. We will not refill ruts resulting from the use of vehicles.

On driveways and garage slabs where Fiber-Mesh concrete is used, fibers may be seen on the surface of the concrete. This is an acceptable condition and we will take no action.

### b. Standards

#### 1. Possible Condition
Pitting, scaling or spalling of concrete work.

**Performance Standard**
Concrete surfaces should not disintegrate to the extent that the aggregate is exposed and loosened under normal conditions or weathering and use. However, surface spalling may occur during exceptionally cold conditions due to moisture saturation and freezing.

13

**Responsibility**

We will repair or replace defective concrete surfaces. We are not responsible for deterioration caused by salt, chemicals, implements used, and other factors beyond our control, including moisture saturation and freezing due to exceptional cold weather. Where a repair is made to the concrete surface,  color and finish of the repaired area may not match the adjacent surface.

## 2. Possible Condition

Cracking, settling, or heaving of stoops, steps, nonstructural patios, driveways, and leadwalks.

**Performance Standard**

Stoops, steps, driveways and leadwalks are not to settle or heave permanently in excess of one inch in relation to the house structure. Cracks in steps and driveways which exceed 1/4 inch in displacement between sections will be replaced. A separation of up to 1/2 inch is permitted where the stoop or steps abut the house or where an expansion joint has been installed.

**Responsibility**

We will repair or replace concrete (at our option) to meet standard. Where a repair is made to the concrete surface, matching the color and finish of the adjacent surface cannot be expected.

## 3. Possible Condition

Surface cracks.

**Performance Standard**

Surface cracks in driveways and leadwalks no greater than 1/4 inch in displacement and/or separation.

**Responsibility**

We will repair or replace concrete (at our option) to meet standard. Where a repair is made to the concrete surface, matching the color and finish of the adjacent surface cannot be expected.

## 4. Possible Condition

Standing water on stoops.

**Performance Standard**

Water should drain from outdoor stoops and steps. However, it is acceptable for some water to stand as it dissipates.

**Responsibility**

We will repair or replace concrete (at our option) to assure drainage of steps and stoops. Where a repair is made to the concrete surface, matching the color and finish of the adjacent surface cannot be expected.

## 5. Possible Condition

Cracks in structurally attached patios with footing or foundation systems.

14

**Performance Standard**

Cracks in excess of 1/4 inch in width or 1/4 inch in vertical displacement are considered excessive and unacceptable in structurally attached patios.

**Responsibility**

We will repair as required. Where cracks are caused by settlement or improper installation, we will replace that portion which has settled. Matching the color and finish of the adjacent surfaces cannot be expected.

**6. Possible Condition**

Stains on concrete caused by curing/sealing agents, lawn fertilizer or other chemicals.

**Performance Standard**

These products can stain concrete, but usually fade with exposure to sunlight and weather.

**Responsibility**

None.

## 3.2 Foundation Walls

**a. Service & Maintenance Tips**

Our homes have either poured concrete or concrete block foundations.

The foundation walls are subject to a wide variety of stresses and strains. The base of the wall, being in the ground, maintains a fairly constant temperature; while the top portion extending out of the ground is subject to extreme temperature changes from summer heat to winter cold causing concrete and masonry to expand and contract.

The soil on which the foundation rests may settle slightly creating stress. Don't be alarmed if you see cracks in your foundation walls. Minor cracks normally require no action. If a large crack appears, please inform the Division Office and we will inspect it.

For additional information on foundation care see the sections on grading and waterproofing.

**b. Standards**

**1. Possible Condition**

Basement or foundation wall cracks.

**Performance Standard**

Shrinkage cracks are not unusual in concrete foundation walls. Such cracks greater than 1/8 inch in width are to be repaired.

**Responsibility**

We will repair cracks in excess of 1/8 inch width by pointing, patching or other methods we determine.

15

## 3.3 Basement and Garage Floors

### a. Service & Maintenance Tips

Concrete will contract and expand due to changing temperatures. Cracks are normal and are best left alone. Because of the nature of the concrete materials, some minor low spots may occur on your basement floor. Therefore, some sections of the floor may have to be broom swept to remove water during cleaning. Cracks or low spots will not affect the overall strength of the floor. Color variation of concrete is normal. Color will become more uniform with age.

Occasionally, basement floors will collect water as a result of condensation of warm, moist air on the cold basement floor. For an explanation of this condition, see "Condensation". Mildew may also result from this condition. You should be selective about what you store on a basement floor. Items that are susceptible to moisture should not be stored on concrete floors.  Also, dehumidifiers can help maintain moisture at the desired level.

### b. Standards

#### 1. Possible Condition

Separation or movement of concrete slabs within the structure at joints.

**Performance Standard**

Concrete slabs within the structure are designed to move at joints.

**Responsibility**

None

#### 2. Possible Condition

Cracking of basement floor and house slab.

**Performance Standard**

Minor cracks in concrete basement floors are normal. Cracks which exceed 3/16 inch in width or 1/8 inch in vertical displacement shall be repaired.

**Responsibility**

We will repair cracks exceeding maximum tolerances by surface patching or other methods as we determine.

#### 3. Possible Condition

Cracking of slab in attached garage.

**Performance Standard**

Cracks in garage slabs in excess of 3/16 inch in width or 1/8 inch in vertical displacement shall be repaired.

**Responsibility**

We will repair cracks exceeding maximum tolerances by surface patching or other methods as determined by us.

16

**4. Possible Condition**
Uneven concrete floors/slabs.

**Performance Standard**
Except for basement floors or where a floor or portion of floor has been designed for specific drainage purposes, concrete floors in rooms designed for habitability shall not have pits, depressions or areas of unevenness exceeding 1/4 inch in 32 inches.

**Responsibility**
We will correct or repair to meet the performance standard. When applicable, surface patching is an accepted method of repair. We will re-install or replace any finish flooring materials originally provided  by us as necessary.

**5. Possible Condition**
Cracks in concrete slab-on-grade floors with vinyl "sheet goods" finish flooring.

**Performance Standard**
Cracks which rupture the finish flooring material shall be repaired.

**Responsibility**
We will repair cracks, as necessary, so as not to be readily apparent when the finished flooring material is in place. We will, at our option, repair, reinstall, or replace any finished flooring materials originally provided by us as necessary.  We do not guarantee color matches of repaired floors due to die lots, age and normal wear and tear.

## 3.4 Welled Exits and Areaways

**a.  Service and Maintenance Tips**
Welled exits or area drains must be kept clear of debris and periodically cleared to avoid water migration into the basement.

If your home is equipped with a sump pump, the welled exit will be connected to the floor crock.  (see additional information regarding sump pumps in  Section 2.1a.)

**b.  Standards**

**1. Possible Condition**
Welled exit floods

**Performance Standard**
Welled exit should not flood if kept clear of debris

**Responsibility**
We are not responsible for flooding if the welled exit is not kept clear of debris

17

# 4.0 MASONRY
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 4.1 Foundation Walls

### a. Service & Maintenance Tips
Whether surface parged and painted block or concrete, the grade adjacent to foundation walls has a tendency to settle and expose some portion of the wall. (See Surface Drainage)

### b. Standards

#### 1. Possible Condition
Basement or foundation wall cracks.

**Performance Standard**
Small cracks not affecting structural stability are not unusual in mortar joints of masonry foundation walls. Cracks greater than 1/8 inch in width shall be repaired.

**Responsibility**
We will repair cracks in excess of 1/8 inch by pointing or patching. These deficiencies shall be reported and repairs made during the first year of the warranty period.

## 4.2 Brick Veneer

### a. Service & Maintenance Tips
The brick selected for your home has been professionally color coordinated with your exterior siding package to provide a visually pleasing exterior scheme as integrated with your surrounding neighborhood.

Please refrain from planting ground cover or ivy which could creep up the foundation wall, and as a result, dilute the strength of the mortar. We cannot be held responsible for the appearance of cracks resulting from vegetation, efflorescence (i.e., a white film which forms on brick in cold weather and disappears as warm weather returns) or other Homeowner maintenance items.

### b. Standards

#### 1. Possible Condition
Cracks in masonry walls, veneer, brick steps, or stoops.

**Performance Standard**
Small hairline cracks due to shrinkage are common in mortar joints in masonry construction. Cracks greater than 1/8 inch in width are considered excessive.

**Responsibility**
We will repair cracks in excess of performance standard by pointing or patching. We will not be responsible for color variation between old and new mortar. These repairs should

18

be made toward the end of the first year warranty period to permit the home to stabilize and for normal settlement to occur.

## 5.0 METALS
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

### 5.1 Porch/Areaway Rails

#### a. Service & Maintenance Tips
Ornamental iron rails, due to their location, are often exposed to severe climate conditions which can cause rusting. Inspection of railings should be made annually (in the Spring) to identify potential rust problems and repair as part of a normal maintenance schedule.

Extended periods of rust on these rails, when left untended, often lead to unsightly rust wash/drip down on concrete and masonry surfaces.

#### b. Standards

**1. Possible Condition**
Rust shows through exterior areaway or porch rails.

**Performance Standard**
No rust should be visible at the final service inspection.

**Responsibility**
We will spot sand unacceptable rust areas only, seal with red oxide metal primer, and paint to match one time only during the first year warranty period. Rust stains are not covered by this Warranty beyond that stated above.

## 6.0 WOOD & PLASTICS
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

### 6.1 Rough Carpentry

#### a. Service & Maintenance Tips
Like other building materials, wood is affected by heat and cold. It may contract or expand with weather changes. It may shrink under extreme dryness or swell under extreme humidity.

Your new home has been built with top quality lumber, which has been dried in a kiln to help restrict the wood's movement. However, some shrinkage and swelling is unavoidable. The areas that are primarily affected by lumber movement will be floors, ceilings, moldings, doors, baseboards, resilient floors, hardwood, ceramic tile, and drywall (see Section 9.4 for warranty coverage for resilient floors).

#### b. Standards

**1. Possible Condition**
Floor squeak or subfloor appears loose.

19

**Performance Standard**
Floor squeak and loose subfloor are often temporary conditions common to new home construction, and a squeak-proof floor cannot be guaranteed.

**Responsibility**
We will correct the problem if caused by faulty construction within reasonable repair capability. The method of corrective action to be taken shall be at our discretion.

Where necessary, we will remove the finished floor materials to make the repair and reinstall or replace if damaged.

## 2. Possible Condition
Wood floor is uneven.

**Performance Standard**
Floors shall not have more than a 1/4 inch ridge or depression within any 32 inch measurement.  Allowable floor and ceiling deflections are governed by the local building codes.

**Responsibility**
We will correct or repair to meet performance standard.

## 3. Possible Condition
Wood floor is out of level

**Performance Standard**
No point on the surface of a wood floor shall be more than ½ inch higher or lower than any other point on the surface within 20 feet, or proportional multiples of the preceding dimensions.

**Responsibility**
We will make the necessary modifications to any floor which does not comply with the performance standard for levelness. Allowances should be made for shrinkage, cantilevers and concentrated loads.  Excessive loads added by the Homeowner are not our responsibility and will not be covered under the Performance Standard.

## 4. Possible Condition
Bowed walls or ceilings.

**Performance Standard**
All interior and exterior walls have slight variations on their finished surfaces. Bowing of walls should not be visible so as to detract from the finished surfaces. Walls or ceilings bowed more than 1/4 inch within any 32 inch horizontal or vertical measurement is a deficiency.

**Responsibility**
We will repair the bowed area to meet performance standard.

## 5. Possible Condition
Out of plumb walls.

20

**Performance Standard**
Walls should not be more than 1/4 inch out of plumb for any 32 inch vertical measurement.

**Responsibility**
We will repair the area to meet performance standard.

### 6. Possible Condition
Floor deflection, vibration.

**Performance Standard**
With drywall construction, the allowable floor vibration deflection is 1/240th of the clear span between bearing points - or slightly more than 5/8 inch on a twelve (12) foot clear span.

*NOTE*: Floor deflection due to vibration occurs as live loads (people) move about over a wood framed floor; and some floor movement will occur.

**Responsibility**
None.

## 6.2 Trim Carpentry

### a. Service & Maintenance Tips
Possible consequences of wood shrinkage and swelling due to the settlement of the home may be seen in slight cracks around doorways or windows and nail pops around baseboards and on outside corners.

### b. Standards

#### 1. Possible Condition
Separation of wood joints of interior trim.

**Performance Standard**
Joints in moldings and adjacent surface shall not result in open joints exceeding 1/8 inch in width.

**Responsibility**
We will repair separated joints, as defined, one time only during the first year. Caulking defective joints is an acceptable practice.

## 7.0 THERMAL & MOISTURE PROTECTION
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 7.1 Damp Proofing

### a. Service & Maintenance Tips

21

Your basement is protected against leakage (leakage is defined as: actual trickling of water through the walls and onto the basement floor or seeping through the floor) for a period of one year.  Leaks caused by changes in the landscaping installed by the Homeowner, or failure of the Homeowner to maintain proper grades are not covered by this Warranty.

We suggest that you avoid planting shrubbery too close to the foundation. Soil in shrub beds should be packed and banked so that the water will drain away from your home.

## b.  Standards

### 1. Possible Condition
Leaks in basement or in foundation/crawl space.

**Performance Standard**
Leaks resulting in actual trickling of water shall be repaired. Leaks caused by improper landscaping or failure to maintain proper grades are not covered by this Limited Warranty. Dampness of the walls or floors may occur in new construction and is not considered a deficiency.  Ground water is a naturally occurring phenomenon which may fluctuate during certain seasons and weather conditions.  In crawl space construction, we install a positive drain through the foundation or into a sump crock to help evacuate the collection of the water within the crawl space.  We also install a polyethylene vapor barrier over the ground to help prevent the development of excessive humidity in the crawl space.

**Responsibility**
We will take such action as necessary to correct basement and crawl space leaks, except where the cause is determined to be the result of action or Homeowner negligence. Conditions contributing to water penetration will be repaired.  It is the Homeowner's responsibility to maintain the systems installed in the home to minimize water infiltration.  The Homeowner should periodically inspect the positive drain in the crawl space for obstructions, such as debris.  The Homeowner should do the same for the drain overflow and/or the sump pump.  The Homeowner should also inspect the vapor barrier in the crawl space to insure it is not damaged.

## 7.2 Insulation

### a.  Service & Maintenance Tips
Your home has been provided with an insulation package designed to meet or exceed applicable building codes.

Special attention has been paid to the type and size of insulation available within the construction envelope, quality of installation and perimeter seal.

### b.  Standards

#### 1.  Possible Condition
Insufficient insulation.

22

Insulation shall be installed in accordance with applicable energy and building code requirements.

**Responsibility**
We will install insulation in sufficient amounts to meet the Performance Standard.

## 7.3 Roofs, Gutters and Downspouts

### a.  Service & Maintenance Tips

If the roofing material on your new home is composition shingles, they will be a "seal down" shingle. These shingles have a mastic applied to the underside of the shingle, and once the sun hits the roof, the mastic seals the upper shingle to the one beneath it.

Special care should be taken to avoid damaging your roof when installing television or radio antennas or satellite dishes. A careless job can cause serious leaks. Excessive traffic (walking) on the roof can cause damage. If shingles become loose, consult us or a reputable roofing contractor to effect the repair.  Also, roof trusses are not designed as storage space.

Special care should be taken when metal standing seam roofs have been installed.  A professional roofing contractor should be consulted for maintenance issues.

NOTE: All roofing and flashing should be checked twice a year in order to maintain a good watertight condition. Homeowners should take care when checking flashing and vents for cracked sealant, wind damage, and protruding nails. Shingles should be checked for loose or damaged sections. It is especially important to maintain sealant where flashing meets the brick.

### b.  Standards

#### 1.  Possible Condition
Roof or flashing leaks.

**Performance Standard**
Roofs or flashing shall not leak under normally anticipated conditions, except where cause is determined to result from ice build-up, high winds, or Homeowner action or negligence.

**Responsibility**
We will repair any verified roof or flashing leaks not caused by ice build-up or Homeowner action or negligence.

#### 2.  Possible Condition
Standing water on roof.

**Performance Standard**
A properly pitched roof is to drain water except for minor ponding. Flat roofs will retain a certain amount of water. Excessive ponding of water which causes roofing material to leak is a deficiency.

23

**Responsibility**
We will take corrective action to assure proper drainage of roof and repair all leaks due to or caused by standing water.

### 3. Possible Condition
Water standing in gutters.

**Performance Standard**
When gutter is unobstructed by debris, the standing water level shall not exceed 1 1/2 inches in depth. Industry practice is to install gutters approximately level. Consequently, it is entirely possible that small amounts of water will stand in certain sections of gutter immediately after a rain.

**Responsibility**
We will correct to meet the Performance Standard.

### 4. Possible Condition
Gutters and/or downspouts leak.

**Performance Standard**
Gutters and downspouts shall not leak but gutters may overflow during heavy rain.

**Responsibility**
We will repair leaks.

### 5. Possible Condition
Leaks due to snow or rain driven into the attic through louvers or vents.

**Performance Standard**
Attic vents and/or louvers must be provided for proper ventilation of the attic space of the structure. However, snow and rain can enter the attic through these vents and louvers when certain negative pressure conditions exist.

**Responsibility**
None.

## 7.4 Louvers & Vents

### a. Service and Maintenance Tips
Soffit and ridge vents must be kept clear/open to minimize build-up of humidity which could cause movement of certain framing members within the structure.

### b. Standards

#### 1. Possible Condition
Inadequate ventilation of attics and unconditioned crawl spaces.

**Performance Standard**
Attic and crawl spaces shall be ventilated as required by the approved building code.

24

**Responsibility**
We shall provide for adequate ventilation. We will not be responsible for alterations to the original system.

## 7.5 Siding & Trim

### a. Service & Maintenance Tips

All exterior materials on your home require periodic maintenance. Some materials such as prefinished siding should be washed to maintain their appearance and remove airborne materials that can damage the finish. Other materials such as synthetic siding and trim must be maintained (repainted and/or restained) periodically. The durability of paint finishes will vary depending upon climate, exposure, and other factors. Paints or stains extend the life of the surfaces, reduce mildew, and help you achieve the color effect you desire from your siding and trim. Failure to maintain the painted surfaces on your home can result in stain damage from mildew.

The aluminum or vinyl siding on your home is characterized by its maintenance saving finish. The finish reduces costly priming and painting. You may occasionally want to wash your siding. If you do, use a mild detergent (no bleach) and a soft brush or cloth.

The shutters on your home may be washed in the same manner as the siding.

We will not be responsible for damage to the siding caused by high winds, severe storms, or lack of maintenance. All wood/composition exterior materials must be inspected for wear and maintained by the Homeowner.

### b. Standards

#### 1. Possible Condition
Siding is bowed

**Performance Standard**
Bows exceeding ½ inch in 32 inches are unacceptable.

**Responsibility**
We will install additional nails in siding to meet nailing schedules which are standard in the industry and will replace any siding that does not meet the standard.   Note: some waviness in siding is to be expected because of bows in studs.

#### 2. Possible Condition
Poor quality of exterior trim workmanship.

**Performance Standard**
Joints between exterior trim elements, including siding and masonry, should not result in open joints in excess of 3/8 inch. In all cases the exterior trim, masonry, and siding should be capable of performing its function to exclude the elements.

**Responsibility**
We will repair open joints and touch up finish coatings where repaired to match existing as close as possible. Caulking is acceptable for joints less than 3/8 inch in width.

### 3. Possible Condition
Delamination of plywood veneer siding or joint separation.

**Performance Standard**
All siding shall be installed according to the manufacturer's and industry's accepted standards. Separation and delaminations shall be repaired or replaced.

**Responsibility**
We will repair or replace siding as needed unless caused by the Homeowner's neglect to maintain siding properly. Repaired area may not match in color and or texture. For surfaces requiring paint, we will paint only the new materials. The Homeowner can expect that the newly painted surface will not match original surface in color.

### 4. Possible Condition
Delamination or deterioration of exterior lap siding.

**Performance Standard**
Siding should not delaminate or deteriorate within manufacturer's specifications. Natural wood siding can be expected to weather and change color as it ages.

**Responsibility**
We will repair or replace as needed unless caused by Homeowner's neglect to maintain siding properly. Repaired area should match as closely as possible in color and/or texture. The Homeowner should be aware that the new finish may not exactly match the original surface texture or color.

## 7.6 Stucco

### a. Service and Maintenance Tips
Stucco needs to be painted at regular intervals to maintain color and water permeability as per manufacturer's recommendation.

### b. Standards

### 1. Possible Condition
Cracks in exterior stucco wall surfaces.

**Performance Standard**
Cracks are not unusual in exterior stucco wall surfaces. Cracks greater than 1/8 inch in width shall be repaired.

**Responsibility**
We will repair cracks exceeding 1/8 inch in width, one time only, during the first year of the warranty period.

## 7.7 Caulking

### a. Service & Maintenance Tips

26

Caulking around all exterior openings should be inspected by the Homeowner every spring and fall. Caulking can easily be repaired with caulking compound which can be purchased from most hardware stores.

### b. Standards

#### 1. Possible Condition
Leaks in exterior walls due to caulking.

#### Performance Standard
Joints and cracks in exterior wall surfaces and around openings shall be properly caulked to exclude the entry of water.

#### Responsibility
We will repair and/or caulk joints or cracks in exterior wall surfaces as required to correct deficiencies once, during the first year of the Warranty Period. Properly installed caulking will shrink and must be maintained by the Homeowner during the life of the home.

## 8.0 DOORS & WINDOWS
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 8.1 Condensation & Humidity

### a. Service & Maintenance Tips
Relative humidity is the percentage of water vapor in the air compared to the maximum amount of water vapor that could possibly be present in the air at a given temperature. As temperature increases, the capacity of air to hold moisture increases. For example, there is considerably more actual moisture in 70 degrees air with 40% relative humidity than there is in 0 degrees air with 40% relative humidity.

In older homes, it is possible for great volumes of colder air, with lower quantities of moisture, to leak into the structure. In the winter, if moisture was not added to these older homes often, the air feels dry.

With your new home, we have attempted to prevent any significant quantity of outdoor air from entering, and therefore, the relative humidity should remain in a comfortable range.

On the other hand, although the proper humidity level will make your home comfortable, the creation of excess moisture can create problems.

The "tightness" of the home restricts outdoor air from entering and lowering the relative humidity. Because of the restriction of outside air flow, moisture introduced into the home has less chance to escape and may create a high humidity condition in the home. As moisture levels increase, condensation could form on windows, glass doors, basement walls, or pipes in the basement.

It is recommended that the windows are locked when not in use and that the Homeowner keep the window weep holes clean and open.

27

**b. Standards**

### 1. Possible Condition
Condensation and/or frost on windows.

**Performance Standard**
Windows will collect condensation on interior surfaces when extreme temperature differences and high humidity levels are present. Condensation is usually the result of climatic/humidity conditions created by the Homeowner.

**Responsibility**
No corrective action required.
The Homeowner can usually correct condensation by properly venting the clothes dryer to the outside, using an outside air source, such as an open window when cooking, and operating the exhaust fans when showering or bathing.

### 2. Possible Condition
Condensation between glass.

**Performance Standard**
Should not occur within manufacturer's warranty.

**Responsibility**
We will replace the glass during the first year. After the first year, the Homeowner must contact the window manufacturer to obtain the replacement glass as allowed within the manufacturer's product warranty. The Homeowner is responsible for the replacement of the glass.

## 8.2 Doors (Exterior & Interior)

### a. Service and Maintenance Tips
Your new home is equipped with a variety of door types. These will react differently under various weather and humidity conditions. The exterior doors are equipped with a weather-stripping which provides maximum seal against air filtration.

Occasional spraying of graphite into key slots of lock sets, tightening of lock set screws, and keeper adjustment will assure you of proper operation of your door locks. The sweep weather-stripping at the bottom of the door may require periodic adjustment or replacement as the material wears.

Your sliding glass doors, if selected, will give you many years of service if you follow these suggestions: Periodic cleaning of the bottom track will allow the sliding panels to move freely. An occasional application of ordinary household "3-in-One" oil or silicone spray along the bottom track is also recommended. Be sure the drain holes are clear, so that rainwater can flow out of the track. Sliding doors are not designed to be waterproof if hosed off with direct high pressure from a hose.

On interior wood doors, a certain amount of expansion and contraction in width is normal due to the changing temperature and humidity. Doors will be wider in summer and in humid periods and narrower in dry weather conditions. Therefore, do not be hasty in adjusting, planing or cutting your door, as it will tend to correct itself.

28

Bifold doors will need to be adjusted from time to time. The Supervisor or the Project Manager will instruct you in this operation procedure at the presettlement demonstration. Keep tracks, pivots and guides free of paint and dirt. A little wax or silicone spray applied to the guide edges of the tracks, or silicone spray applied to the same area, will allow the doors to operate smoothly.

## b. Standards

### 1. Possible Condition
Warpage of exterior and interior doors.

### Performance Standard
Doors will warp to some degree. However, they should not warp to the extent that they become inoperable or cease to be weather resistant. The maximum allowable warpage is 1/4 inch when measured from top to bottom vertically and diagonally.

### Responsibility
We will correct defective doors.

### 2. Possible Condition
Warpage of interior passage and closet doors.

### Performance Standard
Interior doors (full openings) shall not warp in excess of National Woodwork Manufacturers Association Standards (1/4 inch, measured diagonally from corner to corner).

### Responsibility
We will correct or replace and refinish defective doors to match existing doors as nearly as possible, during the first year of the Warranty Period.

### 3. Possible Condition
Sticking, binding doors.

### Performance Standard
Doors should not stick or stay open due to hinge bound condition.

### Responsibility
We will reset sticking hinge bound doors one time only during the first year of the Warranty Period.

## 8.3 Garage Doors

### a. Service and Maintenance Tips

The moving parts of garage doors should be oiled and the torsion spring greased, about once every three months. The screws that tighten the hardware to the door should be tightened about once a year, or as necessary. Garage door handles should be regularly inspected by the Homeowner as to possible jagged or sharp edges so that cuts and other injuries can be avoided.

29

Garage door openers added after closing may affect the operation of the garage door and may void the Warranty.

### b. Standards

1. **Possible Condition**
   Garage doors fail to operate properly under normal use.

   **Performance Standard**
   Garage doors shall operate properly.

   **Responsibility**
   We will correct or adjust garage doors as required during the first year of the Warranty Period.

2. **Possible Condition**
   Garage doors allow entrance of snow or water.

   **Performance Standard**
   Garage doors shall be installed as recommended by the manufacturer. Some entrance of the elements can be expected under abnormal conditions.

   **Responsibility**
   We will adjust or correct garage doors to meet manufacturer's recommendations.

## 8.4 Windows

### b. Service and Maintenance Tips
The windows should be maintained by keeping the sill and side tracks clean and spraying any side tracks with silicone spray. Vinyl liners and jambs should not be painted.

**Window Screens**

**WARNING: The window screens, frames, and fastening systems have been designed by the window and screen manufacturers only to keep most insects out of your home. The manufacturers have not designed the system to support any weight other than that of the screen itself, therefore, the screen system will not prevent children or pets from falling through open windows to the ground below. Parents should be careful to prevent children and pets from leaning against the screens.**

### c. Standards

1. **Possible Condition**
   Malfunction of windows.

   **Performance Standard**
   Windows should operate with reasonable ease, as designed.

   **Responsibility**
   We will correct or repair as required.

30

**2. Possible Condition**
Broken Glass.

**Performance Standard**
None.

**Responsibility**
Broken glass not reported to us prior to closing is the Homeowner's responsibility.

## 9.0 FINISHES
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

### 9.1 Drywall (Walls & Ceilings)

**a. Service & Maintenance Tips**
Drywall is used to cover your interior walls. Drywall can take the normal hard wear of family life, but if damage occurs it can easily be repaired with spackling compound and fine sandpaper.

**b. Standards**

**1. Possible Condition**
Cracks in interior wall and ceiling surfaces.

**Performance Standard**
Hairline cracks are not unusual in interior wall and ceiling surfaces. Cracks greater than 1/8 inch in width are to be repaired.

**Responsibility**
We will repair cracks exceeding 1/8 inch in width one time only during the first year of the Warranty Period.

**2. Possible Condition**
Defects seen in natural light which appear during the first year of the Warranty Period such as nail pops, blisters in tape, or other blemishes.

**Performance Standard**
Slight "imperfections" such as nail pops, seam lines and cracks are common in gypsum wallboard installations.

**Responsibility**
We will repair drywall defects one time only during the first year of the Warranty Period. It is your responsibility to initiate the one-year drywall review.

### 9.2 Ceramic Tile (Walls & Floors)

**a. Service & Maintenance Tips**

**Ceramic Tile, Tub, and Shower**

31

A separation between the tub and the wall tile and/or cracking of joints between ceramic tile and tub and shower stall corners may occur because of moisture and normal settlement in these areas. The weight of water and a bather also contribute to such separation. This is a normal homeowner's maintenance function, and you can remedy these situations by simply removing the old grouting and filling the crack with new grouting compound available at hardware stores. This situation may develop periodically depending on living habits and maintenance. Grout should be inspected every three months.

Normally, a wipe with a damp cloth will keep the tub/shower surface clean. Heavy accumulations of film can be removed with a detergent or tile cleaner. In all cases, use a nonabrasive cleaner. An automotive pump spray wax may be used to bring out the luster in these products.

**Ceramic Tile Floors**

If you have chosen ceramic tile flooring in your new home, we suggest the following maintenance hints.

Some cracking or chipping of the grout is considered normal, due to shrinkage and normal deflection of the subfloor. You can repair simply by filling with a commercial grouting of the same color. Although durable, some caution must be exercised to avoid cracking tiles with heavy objects.

It is recommended that you install a "Ceramic Seal and Finish" product immediately after you move into your new home, and a minimum of every two years thereafter. This sealing will reduce stains and discoloration of the grouting.

**b. Standards**

**1. Possible Condition**
Ceramic tile cracks or becomes loose.

**Performance Standard**
Ceramic tile should not crack or become loose.

**Responsibility**
We will replace cracked tiles and resecure loose tiles except when caused by Homeowner neglect. In addition, we will correct the cause of the loose or cracking tile condition. We will not be responsible for discontinued patterns or color variations in ceramic tile but will match as closely as possible.

**2. Possible Condition**
Cracks appear in grouting of ceramic tile joints

**Performance Standard**
Cracks in grouting or ceramic tile joints are commonly due to shrinking condition.

**Responsibility**

32

We will repair grouting as necessary, one time only during the first year. We will match as closely as possible. Regrouting of these cracks is a maintenance responsibility of the Homeowner after the first year of the Warranty Period.

## 9.3 Finished Wood Flooring

### a. Service and Maintenance Tips

Because of the natural characteristics of wood products, some squeaks in the flooring area can be expected. If hardwood is used as a flooring material in your home, some minor separations between the boards may occur due to shrinkage of the material which is a common occurrence and will vary with temperature and humidity levels. Some color fading or irregularities may occur due to exposure to sunlight. It is widely accepted within the industry that vertical displacement between the boards be no greater than the thickness of a credit card. The hardwood finished surface can be scratched. Care must be taken to protect the surface, especially in high traffic areas. Chair and table legs and high heel shoes will cause damage to the surface. You should take precautions to protect flooring and follow recommended cleaning procedures.

### b. Standards

#### 1. Possible Condition
Gaps developing between floor boards.

**Performance Standard**
Gaps in excess of 1/8 inch in width shall be corrected.

**Responsibility**
We will repair gaps in excess of 1/8 inch within the first year of the Warranty Period, by filling or replacing, at our option. We are not responsible for discontinued flooring or different graining or color variations in the wood. We will match the existing floor as closely as possible. Also, face nailing on wood floors is commonly used along walls and for repairs.

## 9.4 Resilient Floors

### a. Service and Maintenance Tips
We have chosen these floors for their design, availability, and resistance to wear. Some items that you should be aware of are:

1. Raised nail heads are caused by movement of the floor joist because of shrinkage and deflection. We have attempted to minimize this problem by using special nails or screws and by gluing the plywood to minimize the number of fasteners required.

2. Seam separation or lifting is normally caused by water seeping between the joints during floor cleaning. Floors should be damp mopped, but not flooded with water, during cleaning.

3. Resilient flooring often separates near heat registers or at the outside walls of a room. The heat from the registers softens the glue (mastic) and causes the flooring to move when stepped on or when a chair is pushed against the tile area.

33

Expansion and contraction of underlayment (where used) or subflooring may also cause separation. We have sanded the underlayment joints and filled them to minimize the possible problem of ridges showing through your floor. Minor ridging may occur due to shrinkage of the underlayment.  A maintenance booklet supplied with the Homeowner's package provides directions for proper floor care.

## b.  Standards

### 1.  Possible Condition
Nail pops appear on the surface of resilient flooring.

**Performance Standard**
Readily apparent nail pops shall be repaired.

**Responsibility**
We will correct nail pops which have broken the surface. We will repair resilient floor covering in the affected area with similar material. We will not be responsible for discontinued patterns or color variations in the floor covering. Replacement of the floor will only be done in our sole discretion.

### 2.  Possible Condition
Depressions or ridges appear in the resilient flooring due to subfloor irregularities.

**Performance Standard**
Readily apparent depressions or ridges exceeding 1/8 inch shall be repaired. The ridge or depression measurement is taken at the gap created at one end of a six-inch straightedge placed over the depression or ridge with three inches of the straightedge on one side of the defect, held tightly to the floor.

**Responsibility**
We will take corrective action as necessary to bring the defect within acceptable tolerance so that the affected area is not readily visible. We will not be responsible for discontinued patterns or color variations in floor covering. Replacement of the floor will only be done in our sole discretion.

### 3.  Possible Condition
Resilient flooring loses adhesion.

**Performance Standard**
Resilient flooring shall not lift, bubble, or become unglued.

**Responsibility**
We will repair the affected resilient flooring as required. We will not be responsible for discontinued patterns or color variation of floor covering. Replacement of the floor will only be done in our sole discretion.

### 4.  Possible Condition
Seams or shrinkage gaps show at resilient flooring joints.

**Performance Standard**

34

Gaps shall not exceed 1/16 inch in width at resilient floor covering joints. Where dissimilar materials abut, a gap not to exceed 1/8 inch is permissible.

**Responsibility**
We will repair the affected resilient flooring as required. Tears, cuts, or scrapes in the finished surface are not our responsibility unless such defects are identified prior to the Homeowner taking occupancy of the home. We will not be responsible for discontinued patterns or color variation of floor covering.  Replacement of the floor will only be done in our sole discretion.

## 9.5 Painting

### a. Service and Maintenance Tips
Maintenance of all exterior materials on the home (wood, siding, trim synboard, etc.) should be done by the Homeowner as a routine program. Paints or stains extend the life of the painted components on the exterior of the Home. Your local paint or hardware store can assist you in the selection of the proper paint for your home.

Mildew or fungus will form on almost any surface if the structure is subject to high humidity and/or high moisture conditions. The formation of mildew or fungus is a condition we cannot control and is your maintenance responsibility.

### b. Standards

#### 1. Possible Condition
Exterior paint peels, deteriorates, or fades.

**Performance Standard**
Exterior paints should not peel during the first year of the Warranty Period. However, fading is normal and the degree is dependent on climatic conditions.

**Responsibility**
If paint is defective, we will refinish affected areas, matching color as close as possible, in areas where the finish deterioration affects the majority of the wall area.

#### 2. Possible Condition
Painting required as a corollary repair because of work other than drywall nail pops, seams and corners.

**Performance Standard**
Necessary repair of a painted surface required under this Warranty is to be refinished to match surrounding areas as closely as possible.

**Responsibility**
We will finish repair areas as indicated.  Only the repaired area will be repainted which may not include an entire wall.  We do not guarantee any color match.

#### 3. Possible Condition
Deterioration of varnish of lacquer finish.

35

**Performance Standard**
Natural finishes on interior woodwork should not deteriorate during the first year of ownership.

**Responsibility**
We will refinish affected areas of natural finish interior woodwork, matching the color as closely as possible.

### 4. Possible Condition
Mildew or fungus on painted surfaces.

**Performance Standard**
Mildew or fungus will form on a painted surface if the surface is subject to excessive exposures to a food source (i.e., fabric, carpet, drywall, wood and insulation, among others) and to moisture.

**Responsibility**
Mildew or fungus formation is a condition we cannot control and is a Homeowner maintenance item.

## 9.6 Carpeting

### a. Service and Maintenance Tips
Carpet maintenance should be tailored to the specific fiber used in the carpet. Generally, carpet care includes vacuuming and prompt attention to spills. Our carpets were selected for their ability to withstand normal wear and tear with minimum care. When available, a booklet will be given to you at your presettlement demonstration which will prescribe a carpet care program for your specific carpet pile fiber.

Seams and color variations (shading) may be evident depending on the style of carpeting and the pile fiber you have chosen. Some color fading may occur due to constant exposure to direct sunlight. Closing the drapes during certain times of the day will help prevent such fading.

We will not be responsible for stains, color variation or damage due to Homeowner neglect, including , but not limited to, pet stains. The Homeowner should clean these areas immediately after soiling, as required.

### b. Standards

#### 1. Possible Condition
Open carpet seams.

**Performance Standard**
Carpet seams will show. However, no visible gap is acceptable.

**Responsibility**
We will correct visible gaps only.

#### 2. Possible Condition
Carpeting becomes loose, seams separate or stretching occurs.

36

**Performance Standard**
Wall to wall carpeting, installed by us as the primary floor covering, when stretched and
secured properly should not come up, become loose, or separate from its point of
attachment.

**Responsibility**
We will restretch or resecure carpeting as needed one time only during the one year
Warranty Period.

3. **Possible Condition**
Spots on carpet, minor fading.

**Performance Standard**
Exposure to light may cause spots on carpet and/or minor fading.

**Responsibility**
None.

## 9.7 Hardware

a. **Service and Maintenance Tips**
Certain types of interior and/or exterior hardware are painted or coated to take on an
appearance of brass or other colors. These types of finishes are commonly used for
electrical fixtures, plumbing fixtures, door knobs, kickplates, etc. and have a tendency to
fade, rub off, discolor, or tarnish. Brass finishes should be wiped down with a damp sponge
and care taken to avoid abrasive cleaners.

**IMPORTANT NOTE REGARDING BRASS, BRONZE AND OTHER ANTIQUE FINISH
PRODUCTS: The manufacturer applies a protective coating to the plated surface of
brass, bronze, and other antique finish products. In time the protective lacquer may
deteriorate either from exposure to weather, extremes of climate, frequency of use or
other factors. Care should be taken when cleaning these surfaces to use a non
abrasive type cleaner (soap and water) and coat with a non abrasive polish.**

**Tarnishing or excessive wear of these finishes is, therefore, not a defect, but a
normal process which is unavoidable. Under these circumstances, these finishes
cannot be guaranteed and, therefore, products will not be repaired or replaced under
this Warranty.  The manufacturer's warranty may exceed this Warranty.**

b. **Standards**

1. **Possible Condition**
Brass finish tarnishes during the first year.

**Performance Standard**
Brass finishes tarnish over time due to exposure to climatic conditions, human
perspiration and frequency of use.

37

**Responsibility**
None.

## 10.0  SPECIALTIES
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 10.1  Fireplaces (Wood Burning)

### a.  Service and Maintenance Tips
If your home is equipped with a wood burning fireplace, there are certain things that you should do to insure its proper operation. First, you should be sure before igniting a fire that the damper above the firebox has been opened. For the best burning results, we recommend that you buy a steel grate for holding the logs while burning.

When the fire is burning, the flue will be drawing not only the smoke from the fire, but the warm air from your room, and if the room is open to other rooms, it will cause much of the warm air throughout the home to be drawn up through the chimney.

Be sure to close the damper after the fire has been completely extinguished.

Avoid using manufactured paper logs in fireplaces. They may contain chemicals that can induce a flue fire.

### b.  Standards

#### 1.  Possible Condition
Fireplace or chimney does not draw properly.

**Performance Standard**
It is normal to expect that high winds can cause temporary negative draft situations. Similar negative draft situations can also be caused by obstructions such as large branches of trees too close to the chimney.

**Responsibility**
We will determine the cause of the malfunction and correct if the problem is one of design or construction of the fireplace.

#### 2.  Possible Condition
Chimney separation from structure to which it is attached.

**Performance Standard**
A newly built fireplace may incur slight amounts of separation. Separation should not exceed 1/2 inch from the main structure in any 10 foot vertical measurement.

**Responsibility**
We will determine the cause of separation and correct if standard has not been met. Caulking is acceptable.

#### 3.  Possible Condition
Brick firebox color changed.

38

**Performance Standard**
None.

**Responsibility**
None. Heat from fires as well as chemical additives will alter finish.

### 4. Possible Condition
Cracked firebrick and mortar joints.

**Performance Standard**
None.

**Responsibility**
None. Heat from fires may cause cracking.

## 10.2 Fireplaces (Direct Vent)

### a. Service and Maintenance Tips
If your home is equipped with a direct vent fireplace, there are certain things that you should do to insure its proper operation. You should insure that the pilot light is lit. Looking through the glass at the base of the logs you can see the pilot light. Instructions for lighting the pilot are provide in the area accessed through the cover below the firebox.

The homeowner will need to inspect the external vent cap on a regular basis to make sure that no debris is interfering with the airflow.

Because a Direct Vent fireplace is a sealed unit, when the fire is burning, the fire box will not be drawing heat from the inside of your home. The firebox becomes extremely hot and the homeowner should take care not to touch or have heat sensitive items next to the firebox.

There is no damper to operate with a direct vent fireplace.

When direct vent gas fireplaces are provided, improper adjustments, alterations, service or maintenance can cause injury or property damage. Refer to the manual for assistance or additional information consult a qualified installer, service agency or the gas supplier.

### b. Standards

### 1. Possible Condition
Vapors may condense and fog the glass.

**Performance Standard**
For the first few minutes after each lighting vapors may fog the glass and the flames may be blue. After a few minutes this moisture will disappear and within 10-15 minutes the flames should become yellow.

**Responsibility**
None.

39

**2. Possible Condition**
Fireplace may produce a (oil canning) noise.

**Performance Standard**
The oil canning noise is caused by the metals expansion and contraction as it heats up and cools down. This does not affect the operation or longevity of the fireplace.

**Responsibility**
None.

**3. Possible Condition**
Glass fronts may become dirty on the inside of the firebox.

**Performance Standard**
It is possible that a film may build up on the side of the glass which faces the firebox created by emissions from the gas or propane flames.

**Responsibility**
None. The Homeowner may be required to provide periodic cleaning to the glass surfaces. Refer to the manual for assistance.

WARNING: Turn off the gas valve located under the firebox prior to any servicing.

WARNING: DO NOT OPERATE THE UNIT WITH OUT THE GLASS FRONTS PROPERLY INSTALLED AND SEALED.

# 11.0 KITCHEN CABINETS, VANITIES AND COUNTER TOPS
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 11.1 Counter Tops/Surfaces

**a. Service & Maintenance Tips**
All laminated kitchen countertops, cultured marble vanity, ceramic tile, Corian and granite tops and walls should be wiped down with a non-abrasive cleaner and brought to "sparkle" with a cleaner and polish recommended by the manufacturer.

**b. Standards**

**1. Possible Condition**
Surface cracks and joint delaminations in high pressure laminates on vanity and kitchen cabinet countertops and cabinets.

**Performance Standard**
Countertops fabricated with high pressure laminate coverings will not delaminate or crack. However, it is recommended that water not be allowed to stand in the seams of counter tops.

40

**Responsibility**

We will replace delaminated or cracked coverings. We will not be responsible for chips, scratches, and cracks noted after the presettlement demonstration or for delamination from water which causes swelling of the base material.

2. **Possible Condition**

Kitchen cabinet malfunctions.

**Performance Standard**

Warpage not to exceed 1/4 inch as measured from face frame to point of furthermost warpage with door or drawer front in closed position.

**Responsibility**

We will correct or replace door or drawer fronts.

3. **Possible Condition**

Gaps between cabinets, ceilings and walls.

**Performance Standard**

Acceptable tolerance is 1/4 inch in width.

**Responsibility**

We will correct any gap over 1/4 inch by installing a trim piece.

4. **Possible Condition**

Variation in color between adjacent kitchen cabinets of the same style.

**Performance Standard**

Variations of grain pattern and color are normal in wood veneer and solid wood cabinets and doors.

**Responsibility**

None.

5. **Possible Condition**

Shrinkage of insert panels show raw wood edges.

**Performance Standard**

Panels will shrink and expand and may expose unpainted surface.

**Responsibility**

None. The Homeowner is responsible to touchup and maintain these areas to match the door color and finish.

6. **Possible Condition**

Split in door panel.

**Performance Standard**

Split panels shall not allow light to be visible through the doors.

41

If light is visible, we will fill the split and match the paint or stain as closely as possible, one time only in the first year of the Warranty Period.

## 12.0  PLUMBING
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

### 12.1  Water Supply, Sewers, Fixtures & Drains

#### a.  Service and Maintenance Tips

In preparing your home for occupancy, the sewers have been flushed and tested to work properly. Water supply systems and fixtures have been pressure tested to eliminate leaks. If however, clogging does occur due to our negligence, it should become apparent within the first 30 days after occupancy.

Should drainage from a tub, toilet, sink, or shower clog, you may attempt to relieve it by use of a plunger (available at most hardware stores). If the plunger does not work, a plumber's snake should be used to determine if a fixture or trap is blocked versus a system failure.

Temperature fluctuations may occur with the hot and cold water when other fixtures are being used at the same time. A "ticking" sound is sometimes noticeable when water pipes expand and contract.

Water pressure often varies by individual municipalities and is not controlled by us.

A series of maintenance tips should be employed by the Homeowner to minimize costly plumbing repairs:

1. Care should be observed to avoid disposal of paper towels, heavy tissue, sanitary products, and other such materials into plumbing fixtures in order to minimize the possibility of clogging. After thirty (30) days of occupancy, we will not be responsible for sewer clogs unless it is determined that faulty materials or workmanship have been employed or the original installation was improperly completed.

2. Winterize your exterior hose bibs and plumbing lines by closing the valve to each faucet inside the house and opening the hose connections at each exterior location. The water at the bleeder valve inside should be drained.

3. Each plumbing fixture in your home has a drain "trap", a piece of drain pipe designed to provide a water barrier between your home and the possible odor of sewer gas. This "trap" holds water which prevents the airborne bacteria and odor of the sewer gas from entering the home. If a fixture is left unused, it should be turned on at regular intervals to replace evaporating water and to ensure that the trap barrier remains intact. Periodically refill the traps of unused fixtures.

4. Welled exit or areaway drains must be kept clear of debris and periodically cleaned in order to avoid water migration into the basement. (See Section 3.4).

42

### b. Standards

#### 1. Possible Condition
Defective plumbing fixtures, appliances, or trim fittings.

#### Performance Standard
Fixtures, appliances, or fittings will function as designed.

#### Responsibility
We will replace any defective fixture, fitting, or appliance which does not meet acceptable standards.

#### 2. Possible Condition
Faucet or valve leak.

#### Performance Standard
A valve or faucet leak due to material or workmanship is a deficiency.

#### Responsibility
We will repair or replace the leaking faucet or valve.

#### 3. Possible Condition
Noisy water pipes.

#### Performance Standard
There will be some noise emitting from the water pipe system, due to the flow of water.

#### Responsibility
None.

#### 4. Possible Condition
Cracking, chipping, or scratching of porcelain or fiberglass surfaces on tubs, showers lavatories, bar tops and sinks.

#### Performance Standard
Chips and cracks on surfaces of bathtubs and sinks can occur when surface is hit with sharp or heavy objects.

#### Responsibility
We will not be responsible for repairs unless damage has been reported to us prior to occupancy.

## 12.2 Water Heater

### a. Service and Maintenance Tips
The water heater in your home, whether electric or gas, is equipped with a temperature and pressure relief valve, which is designed to open in the event excessive pressure or temperature builds up within the tank. When this happens, water is allowed to flow from the

43

tank. As the temperature and/or pressure are reduced, the flow will stop. If a steady flow of water is coming from the pressure relief valve, the water main should be shut off.

Gas hot water tanks, normally have a temperature dial (hot, warm, mild) on the outside of the tank, and the temperature can be completely controlled by adjusting the dial.

On an electric hot water heater, because of the inherent danger in resetting the temperature, we suggest that you call a serviceman.

Refer to the manual provided with the water heater from the manufacturer for suggested maintenance of your hot water tank, in all cases, before making any adjustments.

Though we warrant the operation of the water tank appliance for one year, the manufacturer's warranty may exceed the our Warranty. Please refer to your Homeowner's Package for your exact coverage.

Under no circumstances should you turn on an electric water heater without water in the tank because the element will quickly burn out. *In the case of any emergency with water or hot water heaters, be sure to familiarize yourself with where and how to turn off the water supply.*

## 12.3 Wells

### a. Well Service and Maintenance Tips
A well water system utilizes groundwater contained in soil and rock pores and is susceptible to pollution from contaminants that move through the soil and filter down to the groundwater.

Do not store toxic or hazardous substances near your well.

Protect the well head from cars, mowers, or other traffic, which may damage it.

Have your well inspected and sampled regularly by your local heath department or qualified independent lab to assure it is properly protected.

Do not overuse or abuse pesticides, herbicides and fertilizers. Follow the package directions carefully.

Do not flush toxic or hazardous substances down the toilet or pour such substances into home drains, storm drains or onto the ground surface.

Many Health Departments recommend you have your well tested after any repairs are made to your well or if you notice a change in the taste or color of your well water. Your Health Department or independent lab can test your well for bacteriological quality and conduct chemical analysis for certain substances such as iron, acidity, or hardness.

### b. Standards

#### 1. Possible Condition
Well supply system fails to deliver water.

44

**Performance Standard**
All well systems shall be designed and installed in accordance with all approved building, plumbing, and health codes.

**Responsibility**
We will repair if failure is the result of defective workmanship or materials during the warranty period. If conditions beyond our control disrupt or eliminate the sources of the supply, we have no responsibility. This Warranty does not cover potability or quantity of well water provided the well water complies with all applicable permitting requirements at the time of settlement.

## 13.0   HVAC
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

### a.   Service and Maintenance Tips
A complete and correct understanding of your heating and cooling equipment can help you minimize your energy consumption.

Your home may be equipped with a gas or electric furnace, with or without air conditioning or an electric heat pump which provides both heating and cooling. One basic rule applies to all these systems: during the heating season the thermostat should be set to maintain the lowest temperature at which you are comfortable in your home. Each degree of higher temperature setting results in a marked increase in the fuel consumption. Likewise, during the cooling season, each degree of lower setting also increases fuel consumption by a significant amount.

All the HVAC systems utilize a furnace, ductwork, registers, filter, and a thermostat to control the temperature in the home.

**Thermostat**
The thermostat controls the temperature produced by the HVAC system. If your home is heated by a warm air system, your thermostat may also have controls for converting the system from heating to cooling and vice versa.

**Registers**
The registers in your home help to regulate the flow of air to maintain the desired temperature. Personal taste in comfort levels may require slight adjustments in the registers to keep each living area at the desired temperature.

If your lower level is too cool in the winter, start closing upper level registers until the desired results are obtained. If your upper level is too warm in the summer, close lower level registers until the desired results are obtained.

**Maintenance**
In all forced air heating systems, the basic requirement for maintaining economical operation of your furnace is to keep the air filter clean. Building activity in and around the home creates excessive amounts of dust and dirt, the filter should be checked and replaced monthly.

With outdoor heating/cooling units, it is important to keep leaves and snow from around the unit, and to keep the unit level for maximum efficiency. It is also recommended to have a qualified person annually clean the mildew that collects on the evaporator and condenser coils. The heat exchanger should also be checked regularly for damage or defects.

You might also notice steam rising from your outdoor heat pump unit during cold weather. This is a normal occurrence when the unit is completing its defrost cycle.

## Service

There are some things that you should check prior to calling for service.

1. If your system is operating but is not providing adequate heating or cooling, check the following:
   - Filter
   - Thermostat setting

2. If your system doesn't function at all, check the following:
   (a) In homes equipped with a gas furnace with a pilot light, it may go out. (It should be visible near the main burner). You may relight it by following the instructions printed on the unit.
   (b) With all systems, check the circuit breakers to see if they have tripped. Circuit breakers may be reset by switching all the way to "off" and then to "on".

   NOTE: Gas furnaces may have a separate switch located near the furnace unit inside the home.

   If the circuit breakers trip immediately after resetting, call a repairman for service. Interruptions of power (such as during electrical storms when lights blink) can cause a circuit breaker to trip. If your system malfunctions during or just after a thunderstorm, the circuit breaker would be the first item to check.

   Whatever system you have in your home, it should be checked and cleaned by a professional repairman. See your instruction manual for the recommended frequency of care for your system. You may wish to contact your HVAC contractor to establish a regular maintenance program.

## b. Standards

### 1. Possible Condition
Inadequate heating.

### Performance Standard
The heating system shall be capable of producing an inside temperature of 70 degrees F, as measured in the center of each room at a height of 5 feet above the floor, under local outdoor winter design conditions. Temperature at the thermostat will be plus or minus 3° F from the set point temperature. Federal, state, or local energy codes shall supersede this standard where such codes have been adopted.

### Responsibility
We will correct heating system to provide the required temperatures.

46

**2. Possible Condition**
Inadequate cooling.

**Performance Standard**
Where air conditioning is provided, the cooling system shall be capable of maintaining a temperature of 78 degrees F, as measured in the center of each room at a height of 5 feet above the floor under local outdoor summer design conditions. Temperature at the thermostat will be plus or minus 3° F from the set point temperature. In the case of outside temperatures exceeding 95 degrees F, a differential of 17 degrees F from the outside temperature will be maintained. Federal, state, or local energy codes shall supersede this standard where such codes have been adopted.

**Responsibility**
We will correct cooling system to meet temperature conditions, in accordance with specifications.

**3. Possible Condition**
Condensation lines clog.

**Performance Standard**
None.

**Responsibility**
Condensation lines will clog eventually under normal use. This is a Homeowner maintenance item. We shall provide unobstructed condensation lines at the time of first occupancy.

**4. Possible Condition**
Improper mechanical equipment operation of evaporative cooling system.

**Performance Standard**
Equipment should function properly at temperature standard set without unreasonable fuel consumption.

**Responsibility**
We will correct and adjust so that blower and water systems operate as designed.

## 14.0 ELECTRICAL
*Coverage*: 1st Year Only
*Area*: Workmanship & Materials

## 14.1 Electrical Systems

### a. Service and Maintenance Tips
To provide complete safety, high-quality electrical wiring, outlets and switches have been installed in your new home to meet both local and federal standards of safety. Part of the electrical system is located in the circuit breaker terminal box. It is here that electrical power enters and is distributed throughout the home.

Large appliances or too many small appliances on one circuit may cause the circuit breaker to trip. Other causes of a breaker tripping could be:

47

1. Worn-out cords
2. Defective plug connections
3. Defective appliances
4. Starting of electrical motors (motors require more current to start than they use while running)

To restore electrical power to its circuit:

1. Remove plug or plugs which may be causing the overloading.
2. Reset the circuit breaker by pushing it all the way to the off position, then push the switch to the on position. If the reset switch automatically switches off again, your circuit is still overloaded, or that particular circuit has a short. If one circuit continues to break, call a qualified electrician.

Light fixtures require various wattages of bulbs. The instructions on the fixture should be followed carefully.  In no event, should bulbs of higher than recommended wattage be utilized.

Problems with appliances should be directed to the appliance manufacturer involved.

Selected receptacles in kitchens, baths, garages, and outside of the home are covered by a ground fault interrupter or breaker. These GFI's sense low level ground faults and assure optimum protection for our homeowners. Due to the sensitivity of the GFI circuit, it may trip more frequently than other circuits. These receptacles are not to be used for appliances which demand high current usage; such as freezers, refrigerators, and other appliances with motors or compressors.

**WARNING**
**"Do it yourself" electrical wiring is dangerous and may void the Warranty. The electrical circuit in your home has been designed for trouble free service and safety. If you desire additional wiring, call a qualified electrician. Don't jeopardize your home and the lives of your family and yourself by installing unauthorized circuits.**

**b. Standards**

**1. Possible Condition**
Fuses blow or circuit breakers "kick out".

**Performance Standard**
Fuses and circuit breakers which deactivate under normal usage when reset or replaced are deficient.

**Responsibility**
We will check wiring circuits for conformity with local, state, or approved National Electrical Code requirements. We will replace wiring or breakers if they do not perform adequately or are defective.

**2. Possible Condition**
Malfunction of electrical outlets, switches or fixtures.

48

**Performance Standard**
All switches, fixtures, and outlets should operate as intended.

**Responsibility**
We will repair or replace defective switches, fixtures, and outlets.

3. **Possible Condition**
Ground fault circuit interrupter and arc fault trips frequently.

**Performance Standard**
Ground fault interrupters and arc faults are sensitive safety devices installed into the electrical system to provide protection against electrical shock. These sensitive devices can be tripped very easily. Ground fault interrupters are required in outlets located in the garage, kitchen, bath, and powder room along with all exterior outlets. Ground fault interrupters should operate as intended.

**Responsibility**
We will install ground fault interrupters in accordance with applicable electrical codes. We will replace the device if found to be defective.

## B. TWO YEAR WARRANTY ITEMS

## 15.0  PLUMBING
*Coverage*: 1st & 2nd Year
*Area*: Installation of Systems

## 15.1  Water Supply, Sewers, Fixtures & Drains

a. **Service and Maintenance Tips**
All water lines have been installed in your home in accordance with applicable building and plumbing codes.

In some municipalities water pressure is abnormally high, and regulators are installed to reduce the water pressure within the home so that appliance life may be maintained. Do not adjust this regulator once it is installed.

b. **Standard**

1. **Possible Condition**
Water supply system fails to deliver water.

**Performance Standard**
All on-site service connections to municipal water main and private water supply shall be our responsibility. Private systems shall be designed and installed in accordance with all approved building, plumbing, and health codes.

**Responsibility**
We will repair if failure is the result of defective workmanship or materials. If conditions beyond our control, disrupt or eliminate the sources of the supply, we will have no responsibility.

49

## 15.2 Septic System

### a. Service & Maintenance Tips

Septic systems are individual wastewater treatment systems that use the soil to treat small wastewater flows, usually from individual homes. They are typically used in rural or large lot settings where centralized wastewater treatment is impractical. There are many types of septic systems in use today. While all septic systems are individually designed for each site, most septic systems are based on the same principles.

The accumulated solids or sludge in the bottom of the septic tank should be pumped out every three to five years to prolong the life of your system. Septic systems must be maintained regularly in order to function properly.

Neglect or abuse of your septic system can cause it to fail. Failing septic systems can:
- cause a serious health threat to your family and neighbors,
- degrade the environment, especially lakes, streams and groundwater,
- reduce the value of your property,
- be very expensive to repair,
- put thousands of water supply users at risk if you live in a public water supply watershed and fail to maintain your system.

Be alert to these warning signs of a failing system:
- sewage surfacing over the drainfield (especially after storms),
- sewage back-ups in the house,
- lush, green growth over the drainfield,
- slow draining toilets or drains,
- sewage odors.

### b. Standards

#### 1. Possible Condition

Septic system fails to operate properly.

#### Performance Standard

Septic system will function adequately during all seasons, under climatic conditions normal or reasonably anticipated, based on local records, for the location of the home. Septic systems shall be designed and installed to comply with applicable laws.

#### Responsibility

We will repair, or otherwise correct, a malfunctioning or nonoperating system, if failure is caused by inadequate design, faulty installation, or other causes relating to ours actions or contractors or subcontractors under our control. We will not be responsible for system malfunction or damage which is caused by Homeowner negligence, lack of system maintenance, or other causes attributable to actions of the Homeowner or Homeowner's contractors, not under our control, including, but not necessarily limited to; the addition of fixtures, items of equipment appliances or other sources of waste or water to the plumbing system served by the septic system; and damage, or changes to the septic system installation or surrounding soil conditions critical to the system's functioning.

50

## 15.3 Piping

### a. Standards

#### 1. Possible Condition
Leakage from any piping.

**Performance Standard**
No leaks of any kind are to be present in any sanitary soil, waste vent, or water piping. Condensation on piping does not constitute leakage, and is not covered except where pipe insulation is required.

**Responsibility**
We will make repairs to eliminate leakage.

## 15.4 Sewers, Fixtures and Drains

### a. Standards

#### 1. Possible Condition
Stopped up sewers, fixtures, and drains.

**Performance Standard**
Sewers, fixtures, and drains shall operate properly.

**Responsibility**
We will not be responsible for sewers, fixtures, and drains which are clogged due to Homeowner negligence or lack of maintenance. If a problem occurs, the Homeowner should consult with us for a proper course of action. Where defective construction is shown to be the cause, we will assume the cost of the repair; where Homeowner negligence or lack of maintenance is shown to be the cause, the Homeowner shall assume all repair costs.

#### 2. Possible Condition
Plumbing pipes freeze and burst.

**Performance Standard**
Drain, waste, and water supply pipes are to be adequately protected to prevent freezing during normally anticipated cold weather.

**Responsibility**
We will correct condition responsible for pipes freezing, and repair damaged piping. It is the Homeowner's responsibility to drain or otherwise protect lines and exterior faucets commonly exposed to freezing temperatures, including closing and protection of foundation vents in crawl space foundation areas, when applicable. **The Homeowner is also responsible for maintaining suitable temperatures in the home as a safeguard against freezing pipes and in no event should a Homeowner turn off the home's service of heat while vacationing or otherwise being away from the home.**

51

## 16.0  HVAC
*Coverage*: 1st & 2nd Year
*Area*: Installation of Systems

### a.  Standards

**1.  Possible Condition**
Noisy ductwork.

**Performance Standard**
When metal is heated, it expands and when cooled, it contracts. The result is "ticking" or "crackling" which is to be expected.

**Responsibility**
None.

**2.  Possible Condition**
Oilcanning.

**Performance Standard**
The stiffening of the ductwork and the gauge of the metal used shall be such that ducts do not "oilcan". The booming noise caused by "oilcanning" is not acceptable.

**Responsibility**
We will correct to eliminate this sound during 2 year Warranty Period.

**3.  Possible Condition**
Ductwork separates or becomes unattached.

**Performance Standard**
Ductwork shall remain intact and securely fastened.

**Responsibility**
We will re-attach and re-secure all separated or unattached ductwork.

**4.  Possible Deficiency**
Refrigerant lines leak.

**Performance Standard**
Refrigerant lines shall not develop leaks during normal operation.

**Responsibility**
We will repair leaking refrigerant lines and recharge unit, unless damage was caused by the Homeowner.

## 17.0  ELECTRICAL
*Coverage:* 1st & 2nd Year
*Area:* Installation of Systems

### 17.1 Electrical Systems

#### a. Service and Maintenance Tips
Smoke detectors should be vacuum cleaned semi-annually and checked for replacement 5 years after settlement. Replace battery annually.

#### b. Standards

##### 1. Possible Condition
Failure of wiring to carry its designed circuit load to switches and receptacles.

**Performance Standard**
Wiring should be capable of carrying the designed load for normal residential use.

**Responsibility**
We will check wiring for conformity with local, state, or approved national electrical code requirements. We will replace wiring if it fails to carry the design load.

## 18.0 FIRE SUPPRESSION SPRINKLER SYSTEM
*Coverage:* 1st & 2nd Year
*Area:* Installation of Systems

#### a. Standards
The pipes are filled with water under pressure from the domestic water supply. In the unfortunate event of a fire, the heat from the fire will open the sprinkler head and water will spread over the fire. All sprinkler heads operate independently; therefore, not all heads will open at one time.

You should not install ceiling fans or other objects which might affect the spray pattern of the head without first contacting a qualified fire protection professional.

Sprinkler pipes have been installed in your attic and covered with insulation. You should use extreme caution when you enter your attic to avoid stepping on the pipe or removing insulation from around the pipe. We also recommend that you inform any workmen who may need to enter your attic of this also.

The sprinkler pipes are full of water so it is very important that you do not turn your heat off during cold weather. FROZEN SPRINKLER PIPES WILL CRACK.

Painting the sprinkler heads or hanging anything from them will violate the building code and could result in improper operation of the system.

A minimum monthly maintenance program should include the following:

53

1. Visually inspect all sprinklers to ensure against obstruction of spray.
2. Inspect all water supply valves to assure that they are open.
3. Test all waterflow devices if applicable.
4. Maintain and test all smoke detectors.

## VI.  APPENDIX A - DEFINITIONS

## DEFINITIONS

In general - In this subtitle the following words have the meanings indicated.

A. **Appliances, Fixtures, and Items of Equipment** -"Appliances, fixtures, and items of equipment" means furnaces, propane tanks and fittings, air purifiers, air handling equipment, ventilating fans, air conditioning equipment, water heaters, pumps, stoves, refrigerators, garbage disposals, compactors, dishwashers, automatic door openers, washers and dryers, bathtubs, sinks, toilets, faucets and fittings, lighting fixtures, circuit breakers, and other similar items.

B. **Builder** - NVR, Inc., a Virginia corporation trading as Ryan Homes, NVHomes, or Fox Ridge Homes, or acting through a wholly-owned subsidiary under the trademark Rymarc Homes.

C. **Electrical Systems** - "Electrical Systems" means all wiring, electrical boxes, switches, outlets and connections up to the public utility connection.

D. **Heating, Cooling and Ventilating Systems** - "Heating, cooling, and ventilating systems" means all duct work, steam, water and refrigerant lines, registers, convectors, radiation elements and dampers.

E. **Load-bearing portions of the Home** - "Load-bearing portions of the home" means the load-bearing portions of the:

1. Foundation system and footings;
2. Beams;
3. Girders;
4. Lintels;
5. Structural columns;
6. Load-bearing walls and partitions;
7. Floor framing systems; and
8. Roof framing system.

F. **Local Jurisdiction** - "Local Jurisdiction" means any local government entity having permit and inspection requirements for the construction of a new home.

G. **New Home**
1. "New Home" means every newly constructed private dwelling unit and the fixtures and structure that are made a part of a newly constructed private dwelling unit at the time of construction.
2. "New Home" does not include:
   (i)  Outbuilding, including detached garages and detached carports, except outbuildings that contain plumbing, electrical, heating, cooling, or ventilation systems serving the new home;
   (ii)  Decks;

54

(iii) Boundary walls;
(iv) Retaining walls not necessary for the structural stability of the new home;
(v) Landscaping;
(vi) Fences;
(vii) Off-site improvement;
(viii) Appurtenant recreational facilities, and
(ix) Other similar items.

**H. New Home Warranty** - "New Home Warranty" means a series of written promises made by a Builder that meets the requirements of this subtitle.

**I. Owner** - The "Owner" is defined as the original purchaser(s) and all subsequent owners (if any) who take both title and possession of the designated home within the applicable warranty periods for residential purposes.

**J. Plumbing Systems** - "Plumbing Systems" means:
1. Gas supply lines and fittings;
2. Water supply, waste, and vent pipes and their fittings;
3. Septic tanks and their drain fields;
4. water, gas, and sewer service piping and their extensions to the tie-in of a public utility connection; or
5. On-site wells and sewage disposal systems.

**K. Structural Defect**
1. "Structural Defect" means any defect in the load-bearing portions of a new home that adversely affects its load-bearing function to the extent that the home becomes or is in serious danger of becoming unsafe, unsanitary, or otherwise uninhabitable.

2. "Structural Defect" does not include damage caused by movement of the soil:
   (i) Resulting from a flood, earthquake, acts of God, or
   (ii) For which compensation has been provided.
   (iii) Accidental loss or damage from causes beyond the fault and control of us, including but not limited to the following: fire, explosion, smoke, water escape, windstorm, frost, hail, lightning, flood, blasting, mining, falling trees, changes in the underground water table not reasonably foreseeable and earth movement not attributable to negligence on the part of us or its subcontractors or employees.

**L. Warranty Date** - "Warranty Date" means the first day that the original Purchaser occupies the new home, settles on the new home, makes the final contract payment on the new home, or obtains an occupancy permit for the new home if the home is built on the owner's property, whichever is earlier.

**M. Warranty Period** – "Warranty Period" means the period of warranty coverage (1 year, 2 year or 10 year) commencing on the Warranty Date.

## APPENDIX B - BUILDING CODES

### BUILDING CODES

**Your home will be built according to the codes in force in your particular region during the time of construction.**

55

**Homeowner Limited Warranty**

Name(s) of Original Purchaser(s):

_____

_____

Lot No.: _____

Community: _____

Municipality: _____

Settlement Date: _____

Note: Special, incidental and consequential damages are excluded under paragraph 10a, and implied warranties are limited under paragraph 10b. **Please be sure to read this entire Homeowner Limited Warranty** (the "Warranty").

**SPECIAL WARNING REGARDING WINDOW SCREENS**
**The window and door screens, frames and fastening systems have been designed by the window, door and screen manufacturers only to keep most insects out of your Home. The manufacturers have not designed the system to support any weight other than that of the screen itself, therefore, the screen system will not prevent children or pets from falling through open windows to the ground below. Parents should be careful to prevent children and pets from leaning against the screens.**

1. **PERSONS PROTECTED**
   This Warranty of NVR, Inc. (the "Builder") is extended to the original purchaser(s) identified above and to all subsequent owners (if any) who take both title and possession of the designated home (the "Home") within the applicable warranty periods for residential purposes (the "Purchaser").

2. **WARRANTY DATE**
   The "Warranty Date" is the first day the original Purchaser occupies the new home, settles on the new home, makes the final contract payment on the new home, or obtains an occupancy permit for the new home if the new home is built on the owner's property, whichever is earlier.

3. **ONE YEAR LIMITED WARRANTY ON THE BASIC HOME**
   Builder warrants that the Home and driveway, walkways, steps, patios, porches, fences (if any) and decks (if any) supplied by Builder with the Home under the same purchase agreement will be free from defects in materials and workmanship of the original construction for a period of one (1) year from the Warranty Date.

4. **TWO YEAR LIMITED WARRANTY MECHANICAL SYSTEMS**
   Builder warrants that the installation of the plumbing, electrical, and HVAC systems will be free from defects in workmanship of the original installation which appear at any time within two (2) years after the Warranty Date.

5. **TEN YEAR LIMITED WARRANTY AGAINST MAJOR STRUCTURAL DEFECTS**

56

Builder warrants that the Home will be free from major structural defects in the materials or workmanship of the original construction which appear any time within ten (10) years after the Warranty Date, and which significantly affect the load-bearing functions of the Home or otherwise render it unsuitable for residential purposes.

**6. MANUFACTURERS' WARRANTIES**

Some appliances, equipment and other components included in the Home will be covered by separate written warranties of the manufacturers or suppliers of those items. These manufacturers' warranties are hereby assigned to the Purchaser as of the Warranty Date. All of the separate manufacturers' warranties represent the obligations of the manufacturers or suppliers of those components, and they are not warranties of the Builder. If and when any item covered by such a manufacturer's warranty is defective, the Purchaser must contact the manufacturer or supplier directly to seek the performance of the applicable manufacturer's warranty.

**7. EXCLUSIONS FROM WARRANTY COVERAGE**

a. Damage to real property that is not part of the Home covered by the Warranty or that is not included in the purchase price.

b. Bodily injury or damage to personal property.

c. Any defect in material supplied or work performed by anyone other than the Builder or the Builder's employees, agents or subcontractors.

d. Any damage that the Purchaser has not taken timely action to minimize or for which the Purchaser has failed to provide timely notice to the Builder.

e. Normal wear and tear or normal deterioration.

f. Insect damage, except where the Builder has failed to use proper materials or construction methods as required by local building codes.

g. Any loss or damage that arises while the Home is being used for nonresidential purposes.

h. Any damage to the extent it is caused or made worse by negligence, improper maintenance or improper operations by anyone other than the Builder or the Builder's employees, agents, or subcontractors.

i. Any damage to the extent it is caused or made worse by changes in grading or the ground by anyone other than the Builder, the Builder's employees, agents or subcontractors.

j. Any damage caused or made worse by the failure of the Purchaser to maintain adequate heat or air conditioning in the Home.

k. Any damage caused or made worse by a heavy item such as a waterbed or pool table. If Purchaser desires to use such an item, Purchaser should consult a structural engineer for advice on whether the floors of the Home can withstand the weight of the particular item desired to be used in the Home.

l. Any loss or damage caused by acts of God or natural occurrences.

57

m. Any loss or damage caused by naturally occurring gases such as radon and methane.

## 8. REMEDIAL ACTIONS TO BE TAKEN BY BUILDER

If and when a defect for which the Builder is responsible under Sections 3, 4 or 5 of this Warranty occurs, the Purchaser must give prompt and written notice to the Builder in the manner specified in Section 11. In that event, the Builder will repair, replace, or pay the reasonable cost of repairing or replacing the defective component. The Builder will have the right to decide in its own discretion which of those remedies it will provide. If the Builder voluntarily offers or furnishes any remedy not legally required of it in any one instance, that action will not create an obligation to do so in any other instance; nor will any remedial action taken by the Builder at any time extend the time periods or alter the scope or conditions of the Warranty relating to the Home.

## 9. SUBROGATION

If the Builder repairs, replaces or pays the cost of repairing or replacing under this Warranty any defect or component for which the Purchaser is covered by a manufacturer's warranty or by insurance, the Builder will be subrogated, automatically, to the rights of the Purchaser under that manufacturer's warranty or insurance coverage, to the extent of the costs paid or incurred by the Builder.

## 10. ADDITIONAL LIMITATIONS

a. Under no circumstances will the Builder be liable for special, incidental or consequential damages (including, but not limited to, bodily injury, death, loss of the use of the Home, damage to property of any kind not furnished by the Builder, or attorney's / expert's / consultant's fees and costs), regardless of the form of action or legal theory under which any claim is asserted against the Builder for breach of warranty, breach of contract, negligence or strict liability.

b. There is no express warranty of any kind, or implied warranty obligation (including, but not limited to, any implied warranty of merchantability, habitability, or fitness for a particular purpose) given or undertaken by the Builder in connection with the construction or sale of the Home, and relating to the quality or condition of any part of the Home, except for this Warranty. No officer, employee or agent of the Builder is authorized to grant any other express warranty or representation or undertake any implied warranty obligation beyond the provisions of this Warranty at any time.

c. The repair, replacement or payment remedy selected by the Builder will be the exclusive remedy for which the Builder will be liable with respect to the pertinent defect. In no event will the Builder be liable for repair costs or other Warranty obligations amounting in the aggregate to more than the purchase price of the Home.

## 11. PROCEDURE FOR ADJUDICATING CLAIMS

If you as the Purchaser believe that you have a claim under this Warranty you must first send written notice of the defect immediately after you discover it (but not later than the date on which the Warranty on the item expires) to the Builder's Customer Service Office. That address is:

Once you have sent this written notice to the Builder's Customer Service Office, the Builder has thirty (30) days in which to respond. You must make yourself and your Home available to the Builder for inspection at a mutually agreeable time during normal business hours during this thirty (30) day period.

If you believe that you have not been able to obtain satisfactory performance of the Builder's obligations under this Warranty within thirty (30) days of sending your initial notice, you must next send a copy of the notice you sent to the Builder's Customer Service Office to the Builder's corporate headquarters. That address is:

> NVR, Inc.
> 11700 Plaza America Drive
> Suite 500
> Reston, Virginia   20190

In all communications, be sure to include your full name, lot number, community name, address and daytime telephone number and be sure to describe clearly the nature of the defect for which you seek a remedy.

If after thirty (30) days of sending your notice to the Builder's Corporate Headquarters, you believe you have not been able to obtain satisfactory performance under this Warranty, you must notify, in writing, the Customer Service Office, at the address set forth above, of such dissatisfaction ("Dissatisfaction Notice") and request that the dispute be decided by binding arbitration between Purchaser and the Builder in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association (the "AAA") unless applicable law does not permit such arbitration to be binding upon the Purchaser. Arbitration shall be commenced by Purchaser filing a AAA Demand for Arbitration form with the AAA and the Builder. The Purchaser shall be responsible for payment of the filing (administrative) fees of the American Arbitration Association. Purchaser agrees to make the Home and premises and any alleged defects available for inspection by the Builder and its representatives during normal business hours upon reasonable notice.

The arbitrator shall consider only whether the Builder is responsible for correction of an alleged warranted item. The arbitrator shall not determine, or consider, any claim involving consequential damages, personal injury or death, rescission of contract or any remedy other than repair or replacement or payment of the reasonable cost of repair or replacement. The arbitrator shall give the Builder the option of satisfying an arbitration award either by performance of the required repair(s) or payment of a sum certain representing the cost of having such repair(s) performed by a third party. The arbitrator may, however, award actual, reasonable shelter expenses during the term of repair if the arbitrator makes the specific finding that repair activity renders the Home either unsafe or uninhabitable during the term of repair.

The non-prevailing party in any arbitration shall pay all cost of the arbitration and all attorneys fees.

## 12. EFFECT OF OTHER LAWS ON WARRANTY PROVISIONS

Notwithstanding any other provision of this Warranty, the Purchaser's rights and the Builder's obligations hereunder shall be without any force and effect and this Warranty shall be deemed

superseded by any U.S. Government required warranty or other third-party warranty provided
to Purchaser as required by local jurisdictions.

**13. NOTICE REGARDING DELIVERY OF HOMEOWNERS MANUAL AND WARRANTY
INFORMATION TO FUTURE PURCHASERS**
**In the event that you eventually decide to sell your Home, it is your responsibility to
deliver this Homeowner's Manual and the Warranty information which it contains to any
subsequent owner of the home.**

# JL & A - STRUCTURAL ENGINEERS-LLC
★★★★★

174 FIRWOOD DRIVE –BRIDGEVILLE, PA -15017-PHONE/FAX =412-221-7146
-A certified Structural Engineer is best qualified to establish building and ancillary's integrity-
e-mail = 17ivon26@comcast.net
www.jlandastructuralengineers.com
October 11,2017

MR and MRS CHRISTOPHER PHILLIPS
1021 OAKWOOD DRIVE
CANONSBURG, PA 15317

SUBJECT – SHEAR CRACK IN FOUNDATION.

DEAR FOLKS-

Thank you for inviting us into your beautiful home on October 11, 2017 to observe your concern about the vertical crack (this is a shear crack) in your foundation wall. After a grand tour of your home and neighborhood we have come to the conclusion that the preliminary work by the Architect and/or Engineer, contractor or township authorities did not pay any attention to the development of that sub-division in those hills nor location of the homes or roads on the edge of the angle of repose.

Supporting evidence to this theory is the sliding action experience on the neighbor's yard property, which fortunately did not occur under that neighbor's house, as is the case with the Phillips house. Observe the angle of the hill cut too close to the road creating an angle with horizontal too severe for that loose fill just in front of the Phillips home and driveway. It appears that amateurs in a haphazard fashion creating problems all around the Phillips residence did in their zeal to contour the land. That land has not stopped moving.

Our suggestion is that the Phillips folks retain a geological engineer to assess the problem for proper remedial work to guarantee the accuracy of this engineers suggestion. We suggest installing helical piles to firm stable soil or other type pile to bedrock. That foundation should be jacked up to remove the strain imposed on the entire structure. Interior walls are cracking, showing stress due to deformation in the soil allowing the entire structure into total deterioration.

From simple observation this engineer is of the opinion that any and all reshaping of the natural land contours and road locations was done without properly licensed professionals supervision. Proper compaction of most soil work is mandatory, absent that is what we are witnessing in the Phillips area.

Our added recommendation is not hesitate hiring a geological engineer immediately.

Respectfully submitted

*John Lokes Jr — P.E. 10-11-17*

JOHN LOKES, JR – P.E.- (DBA) JL & A STRUCTURAL ENGINEERS-LLC





PLAINTIFF'S
EXHIBIT
B

# MYERS LAW GROUP, LLC
*17025 Perry Highway*
*Warrendale, PA 15086*

Jeffrey P. Myers, Esq.
Kassie R. Gusarenko, Esq.
John A. Halley, Esq.
Joshua D. Brown, Esq.
Kate Cleary Lennen, Esq.
James Flinchum, Esq.
Kristine A. Grega, Esq.

Telephone: 724-778-8800
Fax: 724-779-9650
MyersLawGroupLLC.com

October 25, 2017

*Via email: customercare@nvrinc.com*
Attention: Tiffany
NVR, Inc.
Plaza America, Tower One
11700 Plaza America Drive
Suite No. 500
Reston, VA 20190

**RE:**     **Ten Year Warranty**
**1021 Oakwood Drive, Canonsburg, PA 15317**

To whom it may concern:

Please be advised, this firm has been retained to represent the homeowners of 1021 Oakwood Drive in Canonsburg, Pennsylvania, Christopher and Elizabeth Phillips. Based on information and belief, the home located at 1021 Oakwood Drive in Canonsburg was built on or about July 14, 2010. The home was thereafter sold to Joseph Mowood. On or about June 27, 2014, the home was purchased from Joseph Mowood by Christopher and Elizabeth Phillips.

The home located at 1021 Oakwood Drive in Canonsburg possessed multiple warranties, courtesy of Ryan Homes, who originally built the property. Included amongst the warranties is a Ten Year Structural Warranty that covers construction integrity of footers, foundation, load bearing framing, roof trusses, and other major structural defects within ten years of the warranty date.

On or about February 23, 2015, Christopher Phillips reported to NVR that a major crack appeared throughout his home overnight. At the time, Steve Peloza, PGS Service Manager of NVR, came to Mr. Phillips' home to inspect the same. Mr. Phillips was told that the cracks were merely cosmetic and not included under the Ten Year Warranty.

Approximately two months ago, Mr. Phillips discovered a structural crack running through his home believed to be dated back to 2015. Mr. Phillips informed NVR who in turn requested that he obtain an engineer's opinion. On October 11, 2017, Mr. Phillips retained the



service of JL&A Structural Engineers, LLC to evaluate the source of the cracks in the home. On or about that same day, a representative from JL&A Structural Engineers, LLC toured the home and stated that the crack was in fact within the foundational wall. It was concluded that "preliminary work by the Architect and/or Engineer, contractor or township authorities did not pay any attention to the development of that subdivision in [the nearby] hills nor location of the homes or roads on the edge of the angle of repose."

It was further found that the angle of the hill cut too close to the road, creating a horizontal angle too severe for the loose fill just in front of the Phillips driveway. It was stated that this was done in a hazardous fashion creating problems in the home and that the land near the Phillips home had not ceased settling. The report suggested that helical piles be installed to firm and stabilize the soil or other type pile or bedrock. It was also found that the foundation should be jacked up to remove the strain imposed on the entire structure. Finally, it was stated that the cracks were symptoms of deformation in the soil and that the entire structure can go into "total deterioration."

Accordingly, it is our opinion, based on the Structural Engineer Report, that the issues with the Phillips' home are structural in nature and, as such, are covered by the Ten Year Warranty with NVR. The Phillips request that NVR honor their obligation under the Ten Year Warranty and completely fix the structural issues within the home. Further, the Phillips demand that any loss in value of their home as a result of the structural damages is appropriately compensated to them.

Upon your review of this letter, and the enclosed Structural Engineering Report, please contact my office so that we may discuss this matter further. Thank you.

Sincerely,

Joshua D. Brown, Esquire

JDB/mc
Enclosure


**NVR**

Office of the
General Counsel

*James M. Sack, Esq.*
*jms@sacklaw.com*

December 1, 2017

<u>SENT VIA ELECTRONIC MAIL</u>
joshua@jpmyerslaw.com

Joshua Brown, Esq.
Myers Law Group, LLC
17025 Perry Highway
Warrendale, PA 15086

     Re:    Your client: Christopher and Elizabeth Philips
               Ryan Homes

Dear Mr. Brown:

     We received the engineer's report and it is attached. They have recommended that crack monitors be used for at least six months and checked periodically. Ryan Homes is prepared to install the monitors and act on the advice of the engineer. Based on the findings of the monitors, we can determine what, if any, repairs would be needed.

     Please let me know if this is acceptable and the local Ryan Homes folks will work out a convenient day and time to install the monitors.

                                  Very truly yours,

                                    James M. Sack
                                    Vice President & General Counsel

/van

Cc:   David Hilton (via email)
      Steve Peloza (via email)
      Jennifer Dennard (via email)


*8270 Greensboro Drive • Suite 810 • McLean, VA 22102 • 703-883-0102 • FAX 703-883-0108*


*"We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the nation. We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status or national origin."*


PLAINTIFF'S
EXHIBIT
D

November 28, 2017
Avbel Engineering, LLC
1019 Route 519
Building #6
Eighty Four, PA 15330

Mr. Steve Peloza
Ryan Homes – PGS
One Penn Center West
Suite 200
Pittsburgh, PA 15276

RE:    Venice Model
       Phillips Residence
       Majestic Hills – Lot MJ36
       1021 Oakwood Drive
       Canonsburg, PA 15317
       Site Visit Report

Attention: Mr. Peloza

I am writing this letter to present the results of my site visit to the above referenced house
model and home site on Wednesday, November 8, 2017. The purpose of this visit was to
inspect the existing structural condition of the home, specifically, the basement concrete
masonry foundation wall system as well as the basement floor slab in the home. The
home settled in October 2010 and the Phillips family is the second owner.

A visual inspection of the exposed basement concrete masonry left gable foundation wall
and adjacent basement floor slab was performed during the time of my visit. A vertical
crack was noted along the left gable wall of the home located directly below the first
floor and basement stair landing. The maximum crack width was noted to be
approximately 3/16 inch. A companion crack is also present in the brick veneer at the
exterior side of the left gable wall of the home. The brick crack is hairline in nature and
propagating in step-crack fashion from the top of the brick veneer and continuing to
finished grade. A basement slab crack was also noted beginning at the left gable wall, in
the same proximity as the wall crack, and extending into the finished basement area of
the home. It is unclear where the basement slab crack ends due to existing finished
flooring. Crack width was noted to be approximately 3/16 inch during the time of my
visit. Approximately 1/8 inch of vertical surface to surface displacement is also present.

A visual inspection of the exterior brick veneer located at the right gable wall of the home
was also performed during the time of my visit. A vertical crack was present in the brick
veneer located at the right gable foundation wall and rear garage and main house
common foundation wall intersection. Crack width was noted to be approximately 1/8
inch.

During my site visit, the homeowner directed me to two additional areas of concern. The first area of concern was a drywall crack located at the door arch leading from the second floor Owner's Bedroom to the closet. A diagonal drywall crack begins at the top corner of the door opening, propagating upward, toward the ceiling. The drywall crack in this non-bearing partition wall appears to be related to truss uplift issues and is cosmetic in nature.

The second area the homeowner directed me to was a basement slab crack located approximately 4 feet off the rear wall of the home. The crack began in the unfinished area of the basement at the right gable wall and continued towards the left gable wall of the home. It is unclear where the basement slab crack terminates due to existing finished flooring. The crack width was measured to be approximately 1/16 inch with minimal vertical surface to surface displacement.

The most likely cause of the foundation wall and exterior brick veneer cracking along with the basement slab crack located below the first floor and basement stair landing is settlement during the life of the structure. It is recommended that crack monitors be installed at brick veneer cracks along the left and right gable walls and the concrete masonry foundation wall crack below the first floor and basement stair landing. The monitors will determine if movement is still occurring. It is recommended that the monitors be in place for at least six months, monitored every two months. The monitors will provide direction as to what type of repairs are necessary.

If you have any questions or comments, or if I can be of any further assistance, please do not hesitate to contact me at the above address or call me at (724) 705-1400.

Sincerely, ·

AVBEL ENGINEERING, LLC

Vernon E. Smith, P.E.
President

# MYERS LAW GROUP, LLC

17025 Perry Highway
Warrendale, PA 15086

Jeffrey P. Myers, Esq.
Kassie R. Gusarenko, Esq.
Nicola Henry-Taylor, Esq.
Joshua D. Brown, Esq.
Kate Cleary Lennen, Esq.
James Flinchum, Esq.
Brook T. Dirlam, Esq.

Telephone: 724-778-8800
Fax: 724-779-9650
www.myerslawgroupllc.com

December 14, 2017

*Also via email: jms@sacklaw.com*
James M. Sack, Esq.
Vice President & General Counsel
8270 Greensboro Drive, Suite 810
McLean, Virginia 22102

> **RE:** **Ten Year Warranty**
> **1021 Oakwood Drive, Canonsburg, PA 15317**

Mr. Sack:

Thank you for your response dated December 1, 2017 in regard to the warranty claim as stated above. After reviewing the engineer report from Avbel Engineering, LLC, we ask that the following matters also be addressed as originally raised in the previously supplied JL&A Structural Engineering Report dated October 11, 2017.

Specifically, the JL&A Structural Engineering Report made three core finding: 1.) that the home was built too close to the edge of the angle of repose; 2.) that the foundation should be jacked up to remove the strain imposed on the entire structure; and 3.) that the soil compaction should be analyzed.

So far as we can tell the Avbel Engineering Report did not address any of these three concerns. Again the JL&A Report was obtained at the cost of my client, the Phillips, and at the request of NVR. We also have reason to believe that the Phillips' neighbor, located at 505 Orchard View Drive, Canonsburg, had his NVR home substantially remediated on or about April 2016 due to similar issues at play with the Phillips' home. It is believed that this information should be readily available to NVR.

Accordingly, we ask that NVR address these additional issues and provide us with a rationale why more prompt action cannot be taken, especially in light of the neighboring NVR home's recent remedial history.

Sincerely,

Joshua D. Brown, Esquire

JDB
cc: Christopher & Elizabeth Philips

PLAINTIFF'S
EXHIBIT
E

**NVR**

**Office of the
General Counsel**

*James M. Sack, Esq.*
*Jms@sacklaw.com*

January 4, 2018

SENT VIA ELECTRONIC MAIL
joshua@jpmyerslaw.com

Joshua Brown, Esq.
Myers Law Group, LLC
17025 Perry Highway
Warrendale, PA 15086

Re:   Your client:  Christopher and Elizabeth Philips
      Ryan Homes

Dear Mr. Brown:

We submitted your last letter to Avbel Engineering for comment.  Their response is that they have not seen any evidence that the home was built too close to the edge of the angle.  They do not believe it is necessary to jack up the foundation or to compact the soils.  However, if any of these are present or required, it will be conclusively determined from the monitors.

We are ready and willing to install the monitors which will give us a much better understanding of the condition of the house structure.

Very truly yours,

James M. Sack
Vice President & General Counsel

/van

Cc:   David Hilton (via email)
      Steve Peloza (via email)
      Jennifer Dennard (via email)



8270 Greensboro Drive • Suite 810 • McLean, VA 22102 • 703-883-0102 • FAX 703-883-0108



"We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the nation. We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status or national origin."



PLAINTIFF'S
EXHIBIT
F

## MYERS LAW GROUP, LLC

17025 Perry Highway
Warrendale, PA 15086

Jeffrey P. Myers, Esq.
Kassie R. Gusarenko, Esq.
John A. Halley, Esq.
Joshua D. Brown, Esq.
Kate Cleary Lennen, Esq.
James Flinchum, Esq.
Kristine A. Grega, Esq.
Teresa A. Cunningham, Esq.

Telephone: 724-778-8800
Fax: 724-779-9650
www.myerslawgroupllc.com

January 9, 2018

James M. Sack, Esquire
Vice President & General Counsel
8270 Greensboro Drive, Suite 810
McLean, VA 22102

   **RE:** **Ten Year Warranty**
     **1021 Oakwood Drive, Canonsburg, PA 15317**

Dear Mr. Sack:

  Please allow this letter to serve as our response to your letter dated January 4, 2018. We will consent to the installation of monitors on the Phillips' property over the next six months. Contingent upon this remediation effort we request copies of any and all findings made by NVR or Avbel Engineering.

  Further, we ask that Avbel Engineering provide rationale for their belief that the home was not built too close to the edge of the angle, and their belief of jacking up the foundation and examining compact soil will not be necessary.

  Please contact my office so that we may ensure that NVR is able to access the property to properly install the monitors. Thank you.

       Sincerely,

       Joshua D. Brown, Esquire

JDB/mll



PLAINTIFF'S
EXHIBIT
G

August 23, 2018
Avbel Engineering, LLC
1019 Route 519
Building #6
Eighty Four, PA 15330

Mr. Steve Peloza
Ryan Homes – PGS
One Penn Center West
Suite 200
Pittsburgh, PA 15276

RE:    Venice Model
       Phillips Residence
       Majestic Hills – Lot MJ36
       1021 Oakwood Drive
       Canonsburg, PA 15317
       Site Visit Report

Attention: Mr. Peloza

I am writing this letter to present the results of my site visits to the above referenced house model
and home site on Tuesday, April 10, 2018, Tuesday, June 12, 2018 and Tuesday, August 7, 2018.
The purpose of the visits was to read crack monitors installed on the foundation wall located
below the first floor and basement stair landing recommended in my original site visit report to
the home dated November 28, 2017. The crack monitors were installed on Thursday, February
1, 2018.

A visual inspection of the exposed basement concrete masonry left gable foundation wall,
basement floor slab and exterior brick veneer during the 11/8/17 (original site visit) noted slab
cracks in two locations, exterior brick veneer vertical cracks along the left and right gable walls
and vertical foundation wall crack below the first floor and basement stair landing of the home.
Maximum crack separation was noted to be 3/16 of an inch with minimal surface to surface
vertical displacement at the slab crack locations and 3/16 of an inch at the left gable foundation
wall. The exterior brick veneer cracks were noted to be hairline to 1/8 of an inch in width. It
was recommended that crack monitors be placed in three locations at the foundation wall
location to aid in determining if movement is still occurring in my original site visit report.

A visual inspection of the crack monitors was performed during my visits on 4/10/18, 6/12/18
and 8/7/18. Photos of the crack monitor readings were taken at the time the crack monitors were
placed and at all three monitor reading site visits. Based upon dimensions taken during my
original site visit and photos taken of the readings, no signs of any movement is evident in the
main foundation structure of the home.

The most likely cause of the brick veneer and foundation wall cracks observed is due to minor
differential settlement of the foundation early in the life of the structure. The most likely cause
of the basement floor slab cracks is shrinkage of the concrete during the curing process. The
National Association of Home Builders has established performance guidelines for the purpose
of evaluating such conditions presented in the publication titled Residential Construction
Performance Guidelines. The as-built conditions fall within the established guidelines.



PLAINTIFF'S
EXHIBIT
H

No evidence was discovered to indicate any structural problems with the home. The cracking noted only requires cosmetic repairs at this time. A proper cosmetic repair would be to remove or grind out the existing mortar in the masonry foundation wall cracks and replace/re-point along with replacing any cracked faces. This cosmetic repair will also help ensure against future water infiltration.

If you have any questions or comments, or if I can be of any further assistance, please do not hesitate to contact me at the above address or call me at (724) 705-1400.

Sincerely,

AVBEL ENGINEERING, LLC

Vernon E. Smith, P.E.
President

# MYERS LAW GROUP, LLC

**17025 Perry Highway**
**Warrendale, PA 15086**

Jeffrey P. Myers, Esq.
Kassie R. Gusarenko, Esq.
M. Farley Schlass, Esq.
Kate Cleary Lennen, Esq.
John A. Halley, Esq.
Joshua D. Brown, Esq.
James Flinchum, Esq.
Kristine A. Grega, Esq.
Teresa A. Cunningham, Esq.

*Telephone: 724-778-8800*
*Fax: 724-779-9650*
*MyersLawGroupLLC.com*

September 6, 2018

James M. Sack, Esquire
Vice President & General Counsel
8270 Greensboro Drive, Suite 810
McLean, VA 22102

    **RE: Ten Year Warranty**
       **1021 Oakwood Drive, Canonsburg, PA 15317**

Dear Mr. Sack:

  Please allow this to serve as our response to your letter dated August 27, 2018 in which you stated that NVR would not honor the agreed upon Ten Year Warranty on 1021 Oakwood Drive. Since the outset of monitoring Mr. Phillips' home, it has become apparent that the homes built on or near Lots MJ 38 and MJ 37 are unstable. These homes are directly across the street from Mr. Phillips' home. As you know, on or about June 18, 2018, significant landslides have occurred behind Lots MJ 38 and MJ 37. It is our understanding that these homes are now condemned. Based upon information and belief, one or both of the owners of Lots MJ 38 MJ 37 had previously reported cracks to NVR in the same manner as Mr. Phillips. It is our understanding that NVR deployed the same monitors used on Mr. Phillips' home on the cracks within Lots MJ 38 and 37 just prior to the landslides. NVR similarly denied any liability on Lots MJ 38/37 based upon these monitors which now appears grossly inaccurate. These landslides have greatly diminished the value of Mr. Phillips' home and community at large.

  Additionally, as we stated in our previous correspondence on December 14, 2017, another landslide occurred at 505 Orchard View Drive on an earlier date. Mr. Phillips' home is completely surrounded by unstable landslides making it impossible to sell his home. The JL&A Structural Engineering report originally referred to NVR stated that soil compaction should be analyzed at Mr. Phillips home. It is believed that NVR failed to do such tests behind MJ 38/MJ 37 prior to the landslides. NVR has similarly refused to analyze the soil compaction at Mr. Phillips' home to date. Accordingly, it is our belief that the same soil compaction at MJ 38/MJ 37 and at 505 Orchard View Drive are beneath Mr. Phillips' home and it is just a matter of time before a similar landslide occurs at 1021 Oakwood Drive. Further bolstering this allegation is a 2006 PS&R Report (attached hereto) which provides that improper compaction problems exist throughout the development. Accordingly, given the neighboring landslides in conjunction with the newly discovered PS&R Report, we believe Mr. Phillips' home is imperiled by the actions of NVR.



PLAINTIFF'S
EXHIBIT
I

We demand, at the expense of NVR, that a soil sample test be conducted on the Phillips' home immediately. Please advise by **September 21ˢᵗ, 2018**, or we will take necessary legal action.

Sincerely,

Joshua D. Brown, Esquire

JDB



# Pennsylvania Soil and Rock Incorporated

October 27, 2006

PS&R No. 05-202

Mr. Joe DeNardo
JND Properties, L.L.C.
3625 Washington Road
Bridgeville, PA 15017

<div align="center">

Fill Evaluation
Majestic Hills Plan of Lots
North Strabane Township, Washington County, Pennsylvania

</div>

Dear Mr. Denardo:

At your request, Pennsylvania Soil and Rock, Inc. (PS&R) has completed an evaluation of the fill placed as part of the Majestic Hills residential development in North Strabane Township, Washington County, Pennsylvania. The objectives of this evaluation were to assess the relative compaction and thickness of the fill within the development area; to evaluate the suitability of the materials for foundations and floor slab support; and to develop geotechnical recommendations pertinent to the construction of the proposed foundations.

<u>Site Location and Project Description</u>

The Majestic Hills Development is located along Walker Road approximately 800 feet west of the intersection with Linden Creek Road. The subject property study area included 80 lots with fill placed as part of the Phase I Development. The site is bounded by Lindenvue Drive to the east and mostly undeveloped property to the north.

Morris Knowles and Associates provided PS&R with a site grading plan showing the proposed development and associated features. The development consists of a main access off of Walker Road located along the southern portion of the property that will provide access to the single family residential structures. The grading proposed on the subject site consists of cuts up to 30 feet and fills up to 50 feet in height. In addition to the installation of the access roadway and

*Pennsylvania Soil and Rock Incorporated*

Majestic Hills Plan of Lots                    2                    October 27, 2006
PS&R 05-202

construction of the residential structures, the development will also require the installation of the driveway and the installation of the associated underground site utilities.

Field Exploration

On August 25, 2006, Suffern Contracting completed six (6) test pits on the site (TP-1 through TP-6) using a track-mounted excavator. The approximate locations of the six test pits are shown on *Figure 1, Test Pit Location Plan.*

Each of the test pits was extended to a depth of about 5 feet below existing grade. Field density tests using a nuclear densometer were performed on the subsurface soils in the test pits at depth intervals of 1, 2, 3 and 5 feet below existing grade. The results of the field density test were compared to laboratory Standard Proctor density tests to determine the maximum density of the soil present at the test pit locations. The test pits were backfilled upon completion.

An Engineer from PS&R monitored the test pit excavations on a full-time basis and classified the material encountered. Field classification sheets for the test pits are presented at the end of this report.

Additional test pits, TP-7, TP-8, TP-9 and TP-10 were completed on September 7, 2006 on Lots 31 and 32 to verify the thickness of the fill present below the structures.

Encountered Conditions

Fill was encountered at each of the test locations extending to the bottom of test pits TP-1 through TP-6 at a depth of about 5 feet below existing grades where the test pits were terminated. The fill extended to depths ranging from 4.5 feet in TP-8 to 10.5 feet in TP-9 where residual soil was encountered. The fill was found to be highly variable in composition, consistency and moisture content. The fill consists primarily of brown clay with varying amounts of rock fragments and shale. Samples were collected from each test pit location for laboratory Standard Proctor density testing.

Test pit logs and the results of the field nuclear densometer tests and laboratory Standard Proctor density tests are attached to this report.

Conclusions & Recommendations

*Existing Fill.* Based on the results of the field exploration, laboratory testing and our site observations, it appears that the present on the site did not consistently meet the typically accepted standard for compaction and may not be suitable for supporting the proposed structures without the risk of settlement and settlement related damage. Therefore, we recommend that the following measures be taken to reduce the risk of settlement and settlement related damage to structures.

*Pennsylvania Soil and Rock Incorporated*

Majestic Hills Plan of Lots                     3                          October 27, 2006
PS&R 05-202

Foundations.  Based on the results of the test pit investigation, the non-uniform fill does not
provide a consistent bearing condition for the structure foundations and results in a high potential
for differential settlement and settlement related damage. Therefore, we recommend that structures
with fill between the final grade and existing grade be supported on steel reinforced concrete grade
beam foundations. The grade beam section should be at least 24-inches wide by 18-inches deep and
it should be reinforced with two rows (top and bottom) of four 5/8-inch diameter steel reinforcing
bars tied at 24-inch centers with 3/8- inch diameter steel stirrups. The grade beams should be
continuous around the outside perimeter of the house and extended with interior cross-members to
support any isolated interior column loads.  The grade beam design is presented on Figures 2 and 3.
All foundations should bear a minimum of 3 feet below the adjacent exterior grade to minimize the
effects of frost.  See Table 1 for a summary of the foundation recommendations by lot number.

    Foundations that can be extended to bear on residual soil or with minimal overexcavation
and backfill can be constructed with standard spread line foundations as indicated on Table 1.

Floor Slabs.  Our evaluation indicated that the fill placed on the site did not consistently meet the
typically accepted standard for compaction and may not be suitable for supporting the proposed
structure floor slabs without the potential for settlement or settlement related damage.  We
recommend reworking the upper two feet of the fill within the floor slab locations to create an
engineered "mat" to provide a uniform bearing surface. The base of the overexcavation should then
be compacted with a large vibratory drum roller.  The base of the undercut should be proofrolled
under the observation of the geotechnical engineer or a technician under their supervision using a
fully loaded tandem axle dump truck to help detect any soft or yield zones.  If general instability is
observed during compaction or proofrolling, it may be necessary to place a separator fabric
followed by a single layer of geogrid in the base of the over-excavation prior to backfilling to
provide suitable bearing to begin fill placement. The subgrade should then be brought back to grade
with engineered fill. The engineered fill shall consist of cohesive material placed in maximum 8-
inch thick horizontal loose lifts and compacted with a vibratory-segmented wheeled roller.  If
smaller hand operated compaction equipment is used, the maximum loose lift thickness should be 4
inches.  Each fill lift should be compacted to a minimum of 100 percent of the maximum dry
density of the material as determined by laboratory Standard Proctor (ASTM D698).  It is highly
recommended that a qualified soils technician be on site to test the fill material for moisture content
and density during placement.

Review
    This evaluation has been conducted to assess the fill placed during earthwork operations at
the site and to provide foundation design recommendation associated with the fill placement within
the Majestic Hills residential development.  Its scope is limited to the specific project and location
described herein and represents our interpretation of the soil conditions encountered at the test
locations. Conditions at locations other than the test locations may vary.

*Pennsylvania Soil and Rock Incorporated*

Majestic Hills Plan of Lots                    4                    October 27, 2006
PS&R 05-202

We appreciate the opportunity to have provided our services to you on this project. If you have any questions regarding our findings or conclusions please call Kevin Hammer or Arnold Caffas at (412) 829-4676.

Very truly yours,
Pennsylvania Soil and Rock, Inc.

Kevin P. Hammer, P.E.
Project Engineer

Arnold Caffas
Project Manager

















**pennsylvania**
DEPARTMENT OF TRANSPORTATION

## ENGINEER'S LOG

Sheet _1_ of _4_

Boring **B-101**    ECMS _____

District: ___   County: _Washington_
SR _____ Section _____
Baseline: _____
Sta. _____ Offset _____
Segment _____ Offset _____
Coordinates:
Lat. _40° 14' 39.6564"_   Long. _-80° 8' 31.1316"_
E                N
Ground Elev. _1069.0 ft._
Water Level Elev./Elapsed Time:
▽ Initial _1046.6 ft._  Elapsed _0.0 hr._
▼ Final _NR_[1]   Elapsed _NR_
Driler: _T. Zilka_
Company: _Test Boring Services, Inc._

Drilling Start: _10/15/2018 1:00 pm_
Drilling Complete: _10/15/2018 4:30 pm_
Grouting Complete: _____
Rig: _CME 55 ATV_
Hammer Type: _Automatic_
SPT Hammer Efficiency:
    Assumed _0.8_   Measured _____
Hammer Calibration Date: _____
Hole Type: _Continuous SPT - Rock Core_
Casing Type: _Hollow Stem Auger_
Casing I.D.: _3.25 in._ Casing Depth: _22.1 ft._
Rock Core Method: _Double Tube Wire Line-NQ2_
Inspector: _Janet Folajtar_
Inspector Cert. No. _050-98_

PG/PE Seal, Signature and Date

Final Log Checked and Approved
By: _____
Date: _____

NOTE: N values and all graphical
plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE NO. | BLOW COUNTS (Blows/ 0.5ft) | N60 --- RQD % | REC (ft.) | REC (%) | ◊ RQD % ◊ 20 40 60 80 ⊙ Soil/Rock Rec % ▲ SPT (N60) ▲ 10 20 30 40 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAY, little Sand, little Gravel, soft to very stiff, moist, heterogeneous, dark brown, fill. | | | S-1 | 3-12-5 Pen=1.50 tsf | 23 | 1.0 | 67 | |
| | | | | 1.5 | S-2 | 2-2-2 Pen=0.75 tsf | 5 | 0.9 | 60 | |
| | | | | 3.0 | | | | | | |
| -1065 | | Coarse-grained, wet sand (poorly graded, 3.5-3.7'. | a-6/ cl | | S-3 | 4-5-13 | 24 | 1.5 | 100 | |
| | | | | 4.5 | S-4 | 8-4-4 Pen=0.50 tsf | 11 | 0.8 | 53 | |
| | | | | 6.0 | | | | | | |
| | | S-5, carbon and sandstone fragments. | | | S-5 | 3-6-8 | 19 | 0.6 | 40 | |
| | | | | 7.5 | | | | | | |
| | | | | | S-6 | 4-5-5 | 13 | 1.0 | 67 | |
| -1060 | | 9.0'/El. 1060.0 GRAVEL, some Clay, little Sand, very stiff, damp, fissured, yellow brown, residuum. | | 9.0 | | | | | | |
| | | | a-2-6 / gc | | S-7 | 4-7-11 Pen=4.00 tsf | 24 | 1.5 | 100 | |
| | | | | 10.5 | S-8 | 6-6-11 | 23 | 1.5 | 100 | |
| | | 12.5'/El. 1056.5 | | 12.0 | | | | | | |
| | | CLAY, some Sand, trace Gravel, very stiff to hard, damp, blocky, brown gray to gray, residuum, (decomposed claystone). | a-6 / cl | | S-9 | 6-16-25 | 55 | 1.5 | 100 | |
| -1055 | | | | 13.5 | S-10 | 8-9-11 | 27 | 1.5 | 100 | |

PENNDOT ENGINEERS LOG - PENNDOT GINT_VERSION_1.2.2.2 8-24-2016.GDT - 10/17/18 09:13 - L:\GINT\PROJECTS\2018\2018111.GPJ



PLAINTIFF'S EXHIBIT
K



**pennsylvania**
DEPARTMENT OF TRANSPORTATION

**ENGINEER'S LOG**

| Boring **B-101** | ECMS | District: | County: Washington | Sheet 2 of 4 |
|---|---|---|---|---|

SR _____ Section _____
Sta. _____ Offset _____

<u>NOTE:</u> N values and all graphical plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | $N_{60}$ --- RQD % | REC (ft.) | REC (%) | ◇ RQD % ◇ ⊙ Soil/Rock Rec.% ⊗ / ▲ SPT ($N_{60}$) ▲ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **CLAY,** some Sand, trace Gravel, very stiff to hard, damp, blocky, brown gray to gray, residuum, *(decomposed claystone). (Layer continued from the previous page.)* | a-6 / cl | 15.0 / 16.5 | S-11 | 10-12-18 Pen=2.50 tsf | 40 | 1.5 | 100 | |
| | | | | | S-12 | 8-11-7 Pen=4.00 tsf | 24 | 1.5 | 100 | |
| -1050- | | | | 18.0 | S-13 | 13-27-34 | 81 | 1.5 | 100 | |
| | | | | 19.5 | S-14 | 17-14-33 | 63 | 1.5 | 100 | |
| | | *Decomposed siltstone, 20.8-21.0'.* | | 21.0 | S-15 | 23-48-50/.1' | 131 | 1.1 | 100 | |
| ▽TOR 1046.9 | | 22.1'/El. 1046.9 **SILTSTONE,** yellow brown, very soft to medium hard, moderately weathered, narrow to moderate bedding with flat dip, jointed, wide to narrow spacing, sheer dip, *(RQD=45%).* | | 22.1 / 23.1 | R-1 | | 50% | 1.0 | 100 | |
| -1045- | | *Clay seams, 24.3-24.6', 24.8-25.0', 25.6-26.1'.* | | | R-2 | | 20% | 4.9 | 98 | |
| -1040- | | *Joint (RD=55), 29.0'.* | | 28.1 | | | | | | |
| | | 30.1'/El. 1038.9 **SANDSTONE interbedded with SILTSTONE,** light gray to dark gray, medium hard, weathered to slightly weathered, thin bedding with flat dip, *no apparent jointing, (RQD=60%).* | | | R-3 | | 66% | 5.0 | 100 | |
| | | 32.1'/El. 1036.9 **SILTSTONE,** dark gray, soft, moderately weathered to slightly weathered, narrow to moderate bedding with flat dip, *(RQD=73%).* | | 33.1 | | | | | | |
| -1035- | | | | | | | | | | |

PENNDOT ENGINEERS LOG - PENNDOT_GINT_VERSION_1.2.2.2_3-24-2016.GDT - 10/17/18 09:13 - L3_GINT\PROJECTS\2018\181181-11-GP2



**pennsylvania**
DEPARTMENT OF TRANSPORTATION

**ENGINEER'S LOG**

Boring **B-101**     ECMS _____     District: _____  County: _Washington_     Sheet _3_ of _4_

SR _____ Section _____

Sta. _____ Offset _____

NOTE: N values and all graphical plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | N₆₀ — RQD % | REC (ft.) | REC (%) | ◊ RQD % ◊ / SPT (N₆₀) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **SILTSTONE**, dark gray, soft, moderately weathered to slightly weathered, narrow to moderate bedding with flat dip, *(RQD=73%)*. *(Layer continued from the previous page.)* | | | R-4 | | 76% | 5.0 | 100 | |
| | | 38.0'/El. 1031.0 | | 38.1 | | | | | | |
| 1030 | | **SHALE**, brown gray to gray, very soft to soft, laminated bedding with flat dip, *(RQD=0%)*. | | | | | | | | |
| | | 41.0'/El. 1028.0 | | | R-5 | | 0% | 5.0 | 100 | |
| | | **CLAYSTONE**, dark gray, very soft to soft, moderately weathered to slightly weathered, indistinct bedding, *no apparent jointing*, *(RQD=0%)*. | | 43.1 | | | | | | |
| 1025 | | | | | R-6 | | 0% | 3.4 | 68 | |
| | | *Lost recovery, R-6, likely in weathered claystone.* | | | | | | | | |
| | | | | 48.1 | | | | | | |
| 1020 | | | | | R-7 | | 10% | 3.0 | 60 | |
| | | 52.5'/El. 1016.5 | | | | | | | | |
| | | **SILTSTONE interbedded with SANDSTONE**, black to gray, medium hard, slightly weathered, narrow bedding with flat dip, *no apparent jointing*, *(RQD=100%)*. | | 53.1 | | | | | | |
| 1015 | | 53.0'/El. 1016.0 | | | R-8 | | 0% | 2.0 | 67 | |

PENNDOT ENGINEERS LOG - PENNDOT_GINT_VERSION_1.2.2.2, 8-24-2016.GDT - 10/17/18.GPJ

**pennsylvania**
DEPARTMENT OF TRANSPORTATION

ENGINEER'S LOG

Boring **B-101** _____ ECMS

District: _____ County: Washington _____

Sheet 4 of 4

SR _____ Section _____ _____

Sta. _____ _____ Offset _____ _____

**NOTE:** N values and all graphical plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | $N_{60}$ — RQD % | REC (ft.) | REC (%) | ◇ RQD % ◇ ⊙ Soil/Rock Rec. % ⊙ / ▲ SPT ($N_{60}$) ▲ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *R-7, R-8, lost recovery, likely in Waynesburg coal based on previous borings.* **CLAYSTONE**, dark gray, soft, fresh, Indistinct bedding, *no apparent jointing, (RQD=0%).* *(Layer continued from the previous page.)* 56.1'/El. 1012.9 *Elevation and Latitude/Longitude based on Google Earth.* Bottom of boring. | | | | | | | | |
| | | | | | | | **¹24-hr. Water:** Boring backfilled with soil upon completion. | | | |
| 1010 | | | | | | | | | | |
| 1005 | | | | | | | | | | |
| 1000 | | | | | | | | | | |
| 995 | | | | | | | | | | |

PENNDOT ENGINEERS LOG - PENNDOT_GINT_VERSION - 2.2.2_8-24-2016.GDT - 10/17/18 09:13 - I:\_GINT\PROJECTS\2016\18111.GPJ

**pennsylvania**
DEPARTMENT OF TRANSPORTATION

**ENGINEER'S LOG**

Sheet 1 of 4

Boring **B-102** _____ ECMS _____

District: ____ County: Washington ____
SR _____ Section _____
Baseline: _____
Sta. _____ Offset _____
Segment _____ Offset _____
Coordinates:
Lat. _____ Long. _____
E _____ N _____
Ground Elev. 1080.0 ft. _____
Water Level Elev./Elapsed Time:
▽ Initial 1054.6 ft. Elapsed 0.0 hr.
⊼ Final NR[1] Elapsed NR
Driller: T. Zilka
Company: Test Boring Services, Inc.

Drilling Start: 10/15/2018 8:30 am
Drilling Complete: 10/15/2018 12:30 pm
Grouting Complete: _____
Rig: CME 55 ATV
Hammer Type: Automatic
SPT Hammer Efficiency:
Assumed 0.8 Measured _____
Hammer Calibration Date: _____
Hole Type: Continuous SPT - Rock Core
Casing Type: Hollow Stem Auger
Casing I.D.: 3.25 in Casing Depth: 34.7 ft.
Rock Core Method: Double Tube Wire Line-NQ2
Inspector: Janet Folajtar
Inspector Cert. No. 050-98

PG/PE Seal, Signature and Date

Final Log Checked and Approved
By: _____
Date: _____

NOTE: N values and all graphical
plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | $N_{60}$ --- RQD % | REC (ft.) | REC (%) | ◇ RQD % ◇ 20 40 60 80 ⊙ Soil/Rock Rec % ⊙ 20 40 60 80 ▲ SPT ($N_{60}$) ▲ 10 20 30 40 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **GRAVEL**, some Clay, some Sand, soft to medium, moist, heterogeneous, poorly graded, sub-angular, medium plastic fines, yellow brown, fill. | | | S-1 | 1-2-2 | 5 | 0.8 | 53 | |
| | | | | 1.5 | S-2 | 2-3-5 | 11 | 1.0 | 67 | |
| | | | a-2-6 / gc | 3.0 | | | | | | |
| | | S-2, S-3, little slag. | | | S-3 | 3-2-2 | 5 | 1.5 | 100 | |
| 1075 | | 5.0'/El. 1075.0 | | 4.5 | | | | | | |
| | | **SAND**, little Silt, trace Gravel, loose, wet, homogeneous, well graded, sub-angular, gray, fill. | a-2-4 / sm | | S-4 | 4-4-3 | 9 | 0.7 | 47 | |
| | | 6.0'/El. 1074.0 | | 6.0 | | | | | | |
| | | **CLAY**, little Sand, little Gravel, soft to very stiff, damp, heterogeneous, medium plastic fines, gray yellow brown, fill. | | | S-5 | 2-1-2 Pen=0.50 tsf | 4 | 1.0 | 67 | |
| | | | | 7.5 | S-6 | 2-3-6 | 12 | 0.8 | 53 | |
| 1070 | | S-7, plant fragments. | a-6 / cl | 9.0 | S-7 | 3-5-8 Pen=4.00 tsf | 17 | 0.9 | 60 | |
| | | | | 10.5 | S-8 | 6-6-5 Pen=3.00 tsf | 15 | 1.5 | 100 | |
| | | S-8, less gravel. | | 12.0 | S-9 | 3-6-8 Pen=3.75 tsf | 19 | 1.0 | 67 | |
| | | | | 13.5 | | | | | | |
| | | S-10, limestone fragments. | | | S-10 | 3-4-7 Pen=3.00 tsf | 15 | 1.5 | 100 | |

PENNDOT ENGINEERS LOG - PENNDOT_GINT_VERSION_1.2.2.2_6-24-2016.GDT - 10/17/18 09:13 - \\_GINT\PROJECTS\2019\61811\.GPJ

**pennsylvania**
DEPARTMENT OF TRANSPORTATION

ENGINEER'S LOG

Boring **B-102**          ECMS          District: __ __  County: Washington          Sheet 2 of 4

SR _____ Section _____

Sta. _____ Offset _____

NOTE: N values and all graphical plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | $N_{60}$ --- RQD % | REC (ft.) | REC (%) | RQD % / SPT (N60) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CLAY, little Sand, little Gravel, soft to very stiff, damp, heterogeneous, medium plastic fines, gray yellow brown, fill. (Layer continued from the previous page.) S-11, shale and coal fragments. | a-6 / cl | 15.0 16.5 | S-11 | 3-5-9 Pen=3.50 tsf | 19 | 1.5 | 100 | |
| | | | | | S-12 | 2-6-14 Pen=4.00 tsf | 27 | 1.2 | 80 | |
| | | Greenish-gray, moist clay with organic odor and plant fragments, 18.0-19.0' (bottom of fill). | | 18.0 | S-13 | 3-4-6 Pen=2.00 tsf | 13 | 1.5 | 100 | |
| 1060 | | 20.0'/El. 1060.0 | | 19.5 | | | | | | |
| | | GRAVEL, some Sand, trace Clay, medium dense, wet to damp, homogeneous, well graded, yellow brown, residuum. Wet zone, 21.5-21.7'. | a-1-a / gw | 21.0 | S-14 | 8-15-11 | 35 | 1.5 | 100 | |
| | | 21.7'/El. 1058.3 | | | S-15 | 5-5-6 | 15 | 1.5 | 100 | |
| | | GRAVEL, some Sand, little Clay, dense, damp, homogeneous, poorly graded, angular, gray, residuum. | a-2-6 / gc | 22.5 24.0 | S-16 | 6-12-24 | 48 | 0.8 | 53 | |
| | | (Decomposed siltstone with clay seams). | | | S-17 | 7-9-11 | 27 | 1.2 | 80 | |
| 1055 | | 25.5'/El. 1054.5 | | 25.5 | | | | | | |
| | | GRAVEL, some Sand, little Silt, dense to very dense, wet to damp, blocky, poorly graded, angular, brown gray, residuum. | a-4 / gm | 27.0 | S-18 | 6-39-27 | 88 | 1.5 | 100 | |
| | | | | | S-19 | 8-9-13 | 29 | 0.8 | 53 | |
| | | (Decomposed siltstone). | | 28.5 | S-20 | 5-17-20 | 49 | 1.2 | 80 | |
| 1050 | | | | 30.0 | S-21 | 7-12-15 | 36 | | | |
| | | 31.5'/El. 1048.5 | | 31.5 | | | | | | |
| | | CLAY, some Sand, trace Gravel, hard, moist to damp, homogeneous, residuum. | a-6 / cl | | S-22 | 9-16-37 | 71 | 1.2 | 80 | |
| | | (Decomposed claystone). | | 33.0 | S-23 | 18-15-50/.3' | 87 | 1.3 | 100 | |
| | | Carbonaceous shale seam, 33.8-34.0'. | | | | | | | | |
| 1045 | TOR | 34.7'/El. 1045.3 | | 34.3 34.5 34.7 | S-24 | 50/.2' | >67 | 0.2 | 100 | |

PENNDOT ENGINEERS LOG - PENNDOT_GINT_VERSION_1.2.2.2_8-24-2016.GDT - 10^17/18 09:13 - L3_GINT\PROJECTS\2016\16111.GPJ



**pennsylvania**
DEPARTMENT OF TRANSPORTATION

**ENGINEER'S LOG**

Boring **B-102**_____ ECMS _____

District: ____. County: _Washington_____

SR _____. Section _____

Sta. _____ Offset _____

Sheet _3_ of _4_

<u>NOTE:</u> N values and all graphical plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | $N_{60}$ --- RQD % | REC (ft.) | REC (%) | ◇ RQD % ◇ ⊕ Soil/Rock Rec.% ⊕ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1045.3 | | **CLAYSTONE**, olive brown to gray, very soft to soft, moderately weathered to weathered, indistinct bedding, *no apparent jointing, (RQD=0%).* (Layer continued from the previous page.) | | | R-1 | | 0% | 4.0 | 100 | |
| | | *R-2, blocked off.* | | 38.7 | R-2 | | 0% | 1.0 | 100 | |
| 1040 | | 39.7'/El. 1040.3 **SILTSTONE**, olive brown, soft to medium hard, highly weathered to moderately weathered, moderate to medium bedding with flat dip, jointed, wide spacing, sheer dip, open joints, (RQD=____%). | | 39.7 | R-3 | | 14% | 5.0 | 100 | |
| | | *Very broken, highly weathered, 40.2-42.7'.* *Joint (RD=55), 43.6'.* | | | | | | | | |
| 1035 | | 46.0'/El. 1034.0 | | 44.7 | | | | | | |
| | | **SANDSTONE**, brown to gray, medium hard, slightly weathered to fresh, medium bedding with flat dip, *no apparent jointing, (RQD=84%).* | | | R-4 | | 62% | 4.7 | 94 | |
| 1030 | | 49.7'/El. 1030.3 **SHALE**, dark gray, soft to medium hard, weathered to slightly weathered, laminated to thin bedding with flat dip, *no apparent jointing, (RQD=31%).* | | 49.7 | R-5 | | 28% | 5.0 | 100 | |
| | | *Sandstone, 53.6-53.9'.* | | 54.7 | | | | | | |

**pennsylvania**
DEPARTMENT OF TRANSPORTATION

**ENGINEER'S LOG**

Boring **B-102**      ECMS _____      District: _____  County: Washington _____      Sheet 4 of 4

SR _____ . Section _____ __

Sta. _____ . _____ Offset _____ __

NOTE: N values and all graphical
plots are for information only.

| ELEV. | GRAPHIC | MATERIAL DESCRIPTION COMMENTS - OBSERVATIONS | AASHTO / USCS | SAMPLE DEPTH | SAMPLE No. | BLOW COUNTS (Blows/ 0.5ft) | N60 --- RQD % | REC (ft.) | REC (%) | ◇ RQD % ◇ ⊙ Spoil/Rock Rec.% ⊙ ▲ SPT (N60) ▲ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **SHALE**, dark gray, soft to medium hard, weathered to slightly weathered, laminated to thin bedding with flat dip, *no apparent jointing, (RQD=31%).* *(Layer continued from the previous page.)* | | | R-6 | | 46% | 5.0 | 100 | |
| -1020- | | | | 59.7 | | | | | | |
| | | | | | R-7 | | 18% | 5.0 | 100 | |
| | | 64.7'/El. 1015.3 | | | | | | | | |
| -1015- | | *Note: Water could be heard flowing into the borehole upon completion.* *Elevation and Latitude/Longitude based on Google Earth.* *Bottom of boring.* | | | | ¹24-hr. Water: Boring backfilled with soil upon completion. | | | | |
| -1010- | | | | | | | | | | |

## LOT PURCHASE AGREEMENT

### MAJESTIC HILLS

THIS LOT PURCHASE AGREEMENT (the "Agreement") is entered into this ~~23rd~~ day of ~~December~~, 2004, by and between MAJESTIC HILLS, LLC, a Pennsylvania limited liability company (the "Seller") and NVR, INC., ~~a Pennsylvania limited liability company~~ d/b/a RYAN HOMES (the "Purchaser"). a Virginia Corporation *BM* *[initials]*

**WHEREAS,** Seller is the owner or contract purchaser of certain real property in North Strabane Township, Washington County, Pennsylvania, as more particularly described in Exhibit "A" attached hereto and made a part hereof (hereinafter, the "Property"); and

**WHEREAS,** Seller desires to sell, and Purchaser wishes to purchase, the Property in the form of one hundred seventy nine (179) developed single family lots of which ninety nine (99) will be ninety feet (90') wide (the "90' Lots") and eighty (80) will be sixty five feet (65') to seventy five feet wide (the 65' - "70' Lots"), (the 90' Lots and the 65' - 70' Lots, collectively the "Lots", individually a "Lot", pursuant to the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** for and in consideration of the mutual promises of the parties as set forth herein, Seller does hereby grant to Purchaser the right to purchase and Purchaser agrees to purchase in fee simple the Property pursuant to the following covenants, conditions, terms and obligations:

1. FEASIBILITY PERIOD. Purchaser shall have a thirty (30) day feasibility period, commencing upon the Effective Date (as hereinafter defined) (the "Feasibility Period"), to undertake at Purchaser's sole expense, such engineering, development, marketing and other studies as Purchaser may desire. Seller shall provide to Purchaser true and complete copies of any and all subdivision plans, plats and deeds, surveys, specifications, public works agreements, other architectural and engineering data, soil borings and environmental reports, current title reports with supporting documents and documentation relating to the Homeowners Association including articles, by-laws, declaration of covenants, supplemental declarations and builder's information package available at the time of execution. If Purchaser is not satisfied with the Lots for any reason or no reason at all, Purchaser may as a matter of right, terminate this Agreement at any time prior to the end of the Feasibility Period. Such termination shall be in writing and delivered to Seller by no later than the last day of the Feasibility Period.

2. ENVIRONMENTAL STUDY. Seller shall deliver to Purchaser within thirty (30) days from the Effective Date (as hereinafter defined) a Phase I Environmental Assessment of the Property which (i) has been prepared within the six (6) months prior to the Effective Date, (ii) has been prepared in accordance with ASTM standards, and (iii) includes a reliance letter to Purchaser from the certifying engineer (the "Environmental Study"). A copy of the Environmental Study shall be attached hereto and made a part hereof as Exhibit "B". In the event the Environmental Study produces results which are not acceptable to Purchaser in its sole discretion, Purchaser, at its option, may, within ten (10) days from the date Purchaser receives the Environmental Study, declare this Agreement to be null and void, receive back its Deposit (as hereinafter defined) and the parties hereto shall be relieved of further liability for performing hereunder. Notwithstanding the results of the Environmental Study, should Purchaser elect to proceed under this Agreement, Purchaser shall not be required to purchase any Lots which are identified in the Environmental Study as being affected by any environmental issue. In the event Purchaser terminates this Agreement because of the results of the Environmental Study, it covenants and agrees to treat the results of the Environmental Study as confidential and not to reveal the results either verbally or in writing to anyone other than Seller.

3. PURCHASE OF LOTS. Seller shall sell, and Purchaser agrees to purchase the Lots in accordance with the terms and schedule described more particularly below:

   (a) Purchaser agrees to purchase a minimum of five (5) 90' Lots and seven (7) 65'- 70' Lots per quarter, or such smaller number as may remain available subject to this


PLAINTIFF'S EXHIBIT
L

1

Seller's initials: _____
Purchaser's initials: _____

Agreement, the first quarter to commence upon receipt by Purchaser of written notice from Seller that the Lots are fully improved and finished in accordance with this Agreement, that building permits are available to be applied for the Lots in Phase I, and all utilities serving such Lots including, but not limited to, electricity, are complete and functional (the "Completion Notice") then continuing on a quarterly basis until all of the Lots are sold.  Quarters shall consist of ninety (90) consecutive calendar days.

(b)      At all times after the first quarter, Seller shall have met the Conditions Precedent to Closing, as defined in Paragraph 6, for no fewer than the number of Lots equal to the minimum number of Lots Purchaser is required to purchase over two quarters pursuant to Paragraph 3(a) above (the "Available Lots").  Purchaser may choose which of the Available Lots it will purchase to meet the quarterly Lot closing requirement.  Seller shall notify Purchaser of the location of the Available Lots upon completion of Seller's improvements to such Lots.  In the event Seller fails to meet the minimum Available Lot requirement above, Purchaser, in addition to the other rights and remedies available under this Agreement, shall have the option of postponing the minimum Lot settlement requirement and any increases in the Purchase Price for the period Seller is delayed.

(c)      Purchaser shall have the right in any quarter to settle on more than the minimum number of Lots required to be purchased in such quarter at the Purchase Price then in effect as stated in Paragraph 3(f).  Purchaser shall receive credits toward the minimum number of Lots required to be purchased in succeeding quarters in excess of the minimum required, and such credits shall be cumulative.

(d)      Purchaser shall be entitled to more than one (1) closing per month and shall further be entitled to settle on one (1) or more Lots at a time.  All closings shall be held at the offices of NVR Settlement Services, Inc., 300 Bilmar Drive, Suite 250, Pittsburgh, Pennsylvania 15205 (via overnight delivery if the parties so agree) or of a title company within the Pittsburgh metropolitan area as Purchaser shall choose, at such time or times as Purchaser shall designate.

(e)      Purchaser's option to purchase Lots hereunder shall be in full force and effect so long as Purchaser fulfills its obligations hereunder.  Should Purchaser fail to purchase the minimum number of Lots as required herein during any one quarter i.e. five (5) 90' Lots and seven (7) 65' – 70' Lots, then Seller shall give written notice to Purchaser that purchase of such number shall occur within fifteen (15) days of Purchaser's receipt of such written notice or Seller shall consider Purchaser to be in default hereof.  Purchaser may cure the default by electing to defer settlement on some or all of the Lots subject to the default provided, however that Purchaser may not defer settlement on the minimum required Lots to be purchased in any one quarter i.e. five (5) 90' Lots and seven (7) 65' – 70' Lots for more than two (2) 90-day periods ("Grace Periods") during any four (4) quarters.  In the event Purchaser has not cured the default within the Grace Periods, Purchaser may elect to continue deferral of the minimum Lot settlement requirement (the "Deferred 90' Lots" and the "Deferred 65' – 70' Lots," collectively the "Deferred Lots") by written notice to Seller (the "Deferral Election Notice").  Purchaser shall pay to Seller a deferral fee per Deferred 90' Lot of Six Hundred Dollars ($600.00) and a deferral fee of Four Hundred Fifty Dollars ($450.00) per Deferred 65' – 70' Lot (the "Deferral Fee") payable with the Deferral Election Notice and each month thereafter until such time as Purchaser settles on the Deferred Lots.  The Deferral Fee shall be due and payable the first of each quarter following the date of the Deferral Election Notice.  Purchaser shall not receive any pro rata reduction in the Deferral Fee if settlement on any number of the Deferred Lots shall occur during any one month but the total Deferral Fee which is due the next month shall be reduced for the number of Deferred Lot settled upon during such month.  During the period the Deferral Election Notice is in effect, Purchaser shall not be in default as to the Deferred Lots.  However, if Purchaser fails to settle on any Lots in addition to the maximum allowed Deferred Lots Purchaser shall be in default hereof and Seller shall have the right to terminate this Agreement and retain the Deposit as provided in Paragraph 9(a).

(f)      The total purchase price for each 90' Lot purchased hereunder shall be Fifty Six Thousand Dollars ($56,000.00) and Forty Three Thousand Dollars ($43,000.00) for each 65' – 70' Lot purchased hereunder (the "Purchase Price").  The Purchase Price shall increase three

Seller's initials: _____
Purchaser's initials: _____



percent (3%) simple interest per annum commencing one (1) year after the first (1st) closing hereunder.

(g) The sum of Four Hundred Forty Nine Thousand Two Hundred Dollars ($449,200.00) as a good faith deposit (the "Deposit") shall be delivered by Purchaser to Seller to be held and applied in accordance with this Agreement as follows: (i) Ten Thousand Dollars ($10,000.00) of the Deposit will be delivered within five (5) business days after the Effective Date (as hereinafter defined); (ii) Two Hundred Nineteen Thousand Six Hundred Dollars ($219,600.00) of the Deposit will be delivered within five (5) business days after receipt by Purchaser of written notice from Seller that the first phase of Lots has received non-appealable subdivision approval; and (iii) Two Hundred Nineteen Thousand Six Hundred Dollars ($219,600.00) of the Deposit will be delivered to Seller's settlement agent no more than five (5) business days prior to Seller's acquisition of the Property to be applied towards Seller's purchase price when settlement agent is in a position to record the Mortgage (as defined below).

The return of the Deposit, as provided herein, shall be secured by a mortgage on the Property, subordinate only to Seller's acquisition and development loan in the form attached hereto as Exhibit "C" (the "Mortgage"). The Mortgage shall provide for partial releases in the amount of the Deposit Credit (as hereinafter defined).

4.    SELLER'S DEVELOPMENT OBLIGATIONS.

(a)    Seller covenants and agrees to proceed with due diligence to develop and improve the Lots into fully improved building lots, all in accordance with the development plans approved by the North Strabane Township and/or Washington County, Pennsylvania, the Development Standards attached hereto as Exhibit "D-1", other required governmental and quasi-governmental agencies and this Agreement, including the installation of streets, curbs, storm and sanitary sewers, gutters, water lines, including fittings and hydrants, gas lines and all other public utilities, including underground electrical wiring, adjacent to the Lot lines , street signs and street lights. Seller further covenants and agrees that all improvements will be of good quality, installed in good and workmanlike manner and suitable for their intended purposes. Seller shall complete all of said work for the first section of Lots on or before August 31, 2005.

(b)    Seller covenants and agrees that each Lot, at the time of settlement hereunder, shall be buildable and abut and have access to a public street that is fully improved with a permanent surfacing; shall have available to each Lot a completed and operational public sanitary sewer main line, by a lateral that is installed to the property line; shall have available to each Lot a completed and operating public water supply distribution system by a lateral installed to the property line.

(1)    The sanitary sewer lateral shall be placed at a depth to allow Purchaser to construct gravity flow basement homes on each Lot in accordance with the Development Standards attached as Exhibit "D-1".

(2)    Each Lot shall be cleared in accordance with the grading and utility plan to be approved by North Strabane Township and/or Washington County in accordance with the Development Standards attached as Exhibit "D-1".

(c)    (i) Grading. Seller shall grade the Lot pursuant to the grading plan to be approved by the North Strabane Township and/or Washington County, which upon approval shall be attached hereto as Exhibit "D-2" (the "Grading Plan") in accordance with the Development Standards attached as Exhibit "D-1". Seller shall provide engineering certificates for all fill Lots. Seller shall guarantee that the main structure of each house, including attached/contiguous garages and detached garages, porches, patios and decks constructed by Purchaser, exclusive of outbuildings, shall be built on solid soil and not fill, provided the structure constructed by Purchaser has not less than eleven (11) course of block or a maximum basement depth of seven feet four inches (7'4").

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's initials: _____
Purchaser's initials: _____


(ii) Lots Cleared. Clearing shall be performed pursuant to the clearing plan to be approved by the North Strabane Township and/or Washington County, which upon approval shall be attached hereto as Exhibit "D-3" (the "Clearing Plan") in accordance with the Development Standards attached as Exhibit "D-1". Seller shall clear and grub each Lot, including removal of stumps and chips. Purchaser shall be responsible for the removal of all dirt excavated for the construction of the residential structure. Seller shall be responsible for the clearing related to any improvements within the common areas or other areas required by North Strabane Township and/or Washington County.

(d)     Seller covenants and agrees that Seller will pay for all of said improvements, that no mechanics' liens will be filed by reason of the development work to be performed by Seller. If any such liens are filed against the Lots, Seller will forthwith bond same in order to release the Lots from the operation and effect of such lien. On request, Seller will furnish evidence that all material and labor is paid for. Seller shall hold Purchaser harmless for any and all such claims, including reasonable attorneys' fees and any costs incurred by Purchaser to defend any such claims or liens.

(e)     Seller covenants and agrees that all improvements contemplated hereunder will be done in accordance with applicable requirements, statutes, ordinances and regulations of all applicable governmental and municipal bodies and agencies. Where applicable and customary, Seller will dedicate such improvements and cause them to be accepted for permanent maintenance by the applicable governmental or quasi-governmental bodies no later than twelve (12) months after the date of conveyance of the last Lot described herein. Seller will post and maintain all forms of surety bonds as may be required by the applicable governmental authorities for development of the Lots, whether such facilities are on or off the Lots.

(f)     Seller shall be responsible for landscaping and trees in all areas outside the parameters of the individual Lots. Seller shall be responsible for the design and installation of a permanent entry feature, including landscape, and maintenance until such time as the entry feature is dedicated to the Homeowners Association. The permanent entry feature shall be completed by the later to occur of one hundred twenty (120) days from the date Purchaser settles on the Model Lot or by the time of Purchaser's model grand opening. The cost of the permanent entry feature, including landscape, shall be no less than Twenty-five Thousand Dollars ($ 25,000. _____). Purchaser shall have the right to review and reasonably approve of the plans for the entry feature.

(g)     Seller shall remove all gas and other storage tanks located on the Property, such removal to be conducted in accordance with all applicable local, State and Federal laws.

(h)     If, after settlement on any Lot hereunder, Purchaser is unable to obtain a building permit for the construction of a detached single family dwelling on any lot due to any cause, fault or act of Seller, or Seller's lack of performance under this Agreement, Seller shall be required to accept a reconveyance of such Lot at Seller's sole cost and expense. Upon such reconveyance, Seller shall return all money paid by Purchaser to Seller hereunder for such Lot including the Deposit Credit (as hereinafter defined).

(i)     In the event Hazardous Materials (as defined below) are found on any of the Lots after conveyance of such Lot by Seller to Purchaser, Seller shall have the option of (i) remediating such Hazardous Materials in accordance with all applicable laws and regulations, or (ii) repurchasing such affected Lot(s) for the Purchase Price paid by Purchaser, plus the costs of such transaction, plus the costs of any improvements installed on such Lot by Purchaser. The term "Hazardous Materials" means (A) hazardous wastes, hazardous substances, and toxic materials prohibited or regulated by federal, state or local law, regulation or order, (B) asbestos, (C) oil petroleum products and their byproducts, and (D) Polychlorinated Biphenyls ("PCBs").

5.     INSPECTION - BONDED IMPROVEMENTS.

Upon completion of the items set forth in Paragraph 4 (except final course of paving on streets), Seller shall notify Purchaser, in writing.

Seller's initials: _____
Purchaser's initials: _____

Prior to closing on any of the Lots pursuant to this Agreement, representatives of Seller and Purchaser shall inspect the improvements relating to this Agreement and establish a list of deficiencies hereinafter referred to as the "Lot Inspection Report" (Exhibit "E-1"). Seller shall repair all deficiencies (except final paving) within thirty (30) days of said Lot Inspection Report or complete said deficiencies upon conclusion of Purchaser's house construction in a timely manner to insure issuance of occupancy permits as agreed by and between Purchaser and Seller. Subsequent to closing, Purchaser shall be responsible for damages to the improvements serving the Lot or Lots not detailed on the Lot Inspection Report. Upon completion of home construction activity in a given phase or section, Purchaser and Seller, upon notification of the other, shall meet to complete the Lot Completion Report (Exhibit "E-2") to list all deficiencies not listed on the Lot Inspection Report (Exhibit "E-1") for which Purchaser is responsible to repair. Upon request, Purchaser shall repair all deficiencies listed on the Lot Completion Report within thirty (30) days of notification, weather permitting, at its expense, or at such other time as shall be agreed upon between Purchaser and Seller. In the event Purchaser shall fail to make repairs so as to satisfy the City and Seller, then Seller shall make such repairs and charge Purchaser and Purchaser shall pay Seller's costs for such repairs.

6.    CONDITIONS PRECEDENT TO CLOSING. The obligations of Purchaser to purchase the Lots shall be conditioned upon the satisfaction of the following (the "Conditions Precedent to Closing"):

(a)    Permits must be available for immediate issuance upon proper application by Purchaser therefor for the construction of Purchaser's improvements on each of the Lots.

(b)    Purchaser must have completed its feasibility studies pursuant to Paragraph 1 hereof and notified Seller of the acceptability of the Lots.

(c)    Purchaser must have accepted the results of the Environmental Study pursuant to Paragraph 2 hereof.

(d)    Seller must have completed its improvements as to the Lots to be settled on by Purchaser as required by this Agreement. Purchaser and Seller must have completed a Lot Inspection Report, as defined above, prior to Closing.

(e)    All conditions of title have been met pursuant to Paragraph 7(b) hereof.

(f)    Neither Seller nor Purchaser is in material default of this Agreement.

(g)    The Homeowners Association (as hereinafter defined) shall be established pursuant to Paragraph 11.

(h)    The representations and warranties by Seller and Purchaser contained in this Agreement must be true, correct and valid as of the date of each closing.

7.    CLOSING, CONVEYANCE AND TITLE, DEPOSIT CREDITS.

(a)    The Purchase Price for each Lot shall be payable to the settlement agent by check or wire transfer of funds from Purchaser at the time of closing. Upon consummation of closing, the Purchase Price, less the Deposit Credit, shall be released and delivered to Seller. Purchaser shall receive a credit towards the Purchase Price of each 90' Lot at the time of closing in the amount of Two Thousand Eight Hundred Dollars ($2,800.00) and a credit towards the Purchase Price of each 65' – 70' Lot at the time of closing in the amount of Two Thousand One Hundred Fifty Dollars ($2,150.00) (the "Deposit Credit").

(b)    Seller covenants that at closing it will have, full legal, beneficial and equitable ownership of the Property, and that it has the right and power to convey the Property. Indefeasible fee simple title to the Lots is to be conveyed hereunder, free of liens, encumbrances, judgments, tenancies, reservations, easements and rights-of-way, subject, however, to those

Seller's initials: ___
Purchaser's initials: ___

easements, rights-of-way and restrictions required by public utilities and/or the local governmental authority. Title is to be marketable and insurable at standard rates by a recognized title insurance company of Purchaser's choice, licensed to do business in the Commonwealth of Pennsylvania, without exceptions except as provided herein. If Seller cannot convey title as aforesaid, this entire Agreement, or the portion thereof in connection with such Lot(s) whose title cannot be conveyed, may be declared null and void, at the option of Purchaser, unless title defects are such as may be readily remedied by legal or other action. If legal or other action is necessary to cure title defects, Seller must promptly undertake such action, at its own expense, whereupon the time for closings, running of quarters, payment escalation schedule, and all other items hereunder, shall be extended for the reasonable period of time necessary for such prompt action. If title defects are not cured within such reasonable period of time, Purchaser shall have the right to declare the sale null and void or Purchaser may elect to extend the time within which to cure title defects. In no event shall Purchaser be obligated to take title and pay the Purchase Price for any of the Lots if title thereto cannot be conveyed in accordance with the provisions hereof.

(c)     Examination of title, title insurance, and title certificate shall be at the expense of Seller. Preparation and filing of Deeds are to be at the cost of Purchaser. Cost of Lot transfer taxes are to be shared equally by Purchaser and Seller. Any filing and recording fees associated with Seller's financing are to be paid by Seller. Any escrow fee shall be equally shared between Purchaser and Seller. Any filing fees and costs associated with Purchaser's financing shall be at Purchaser's expense. Seller agrees to close at NVR Settlement Services, Inc. and shall pay a settlement fee not to exceed One Hundred Twenty Five Dollars $125.00 per settlement.

(d)     Seller shall be responsible for all real estate taxes, assessments or other charges accruing prior to the date of each Lot Closing and Purchaser shall be responsible for such real estate taxes, assessments and other charges accruing after the date of each Lot closing. Assessments for improvements to the Property prior to the date of Lot closing even if payable thereafter, shall be paid in full by Seller unless payment in annual or periodic installments is approved in writing by Purchaser.

(e)     At Closing(s), the Lots being acquired shall be conveyed by Seller to Purchaser or Purchaser's designee by General Warranty Deed, containing the usual covenants of title, in proper form for recording in Washington County, Pennsylvania. At Purchaser's option, Seller shall place the deeds into escrow at the time of settlement and Purchaser shall determine whether or not such deeds shall be recorded. In this event, at the time of settlement by Purchaser with a third-party homebuyer, such deeds shall convey title from Seller directly to the third-party homebuyer. However, for any deeds placed into escrow as provided under this Subparagraph, Purchaser shall have the option of recording any such deeds at any time until conveyance of the Lot(s) to the third party homebuyer(s).

(f)     Possession of the Lots shall be given to Purchaser at the time of closing.

(g)     All notices of violations of local ordinances or requirements issued by legal authorities or prosecutions in any Court on account thereof affecting, or against, any of the Lots, except for violations by Purchaser, shall be defended and complied with by Seller prior to the time of closing hereunder, and the Lots conveyed free thereof.

8.     POST CLOSING OBLIGATIONS.

The following obligations of the parties shall survive closing of the Lots by Purchaser:

(a)     Maintenance of the Property pursuant to Paragraph 12(b);

(b)     All of Seller's responsibilities pursuant to the organization and management of the Homeowners Association as required under Paragraph 11 which are not completed by the time Purchaser settles on the Lots;

(c)     Liability for bonded improvements pursuant to Paragraph 9(c);

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's initials: _____
Purchaser's initials: _____

(d)  Liability for brokerage commissions as set forth in Paragraph 9(b);

(e)  Seller's representations and warranties provided in Paragraph 10; and

(f)  Seller and Purchaser indemnifications as stated in Paragraph 9.

9.  <u>DEFAULT; LIABILITY OF PARTIES</u>.

(a)  In the event of any breach, failure or default by Purchaser under the terms of this Agreement (which breach, failure or default is not remedied or cured by Purchaser pursuant to any other provisions hereof), Seller's sole and exclusive right and remedy shall be to retain the Deposit, or so much as shall be remaining after application of the Deposit Credit(s), as full, fixed and liquidated damages, not as a penalty, whereupon this Agreement shall terminate and thereafter Purchaser and Seller shall be relieved of further liability hereunder, at law or in equity.  In no event shall Seller be entitled to specific performance of this Agreement, or any other equitable remedy.

(b)  Seller and Purchaser agree to indemnify and hold each other harmless from any and all liability, loss or damage, including reasonable attorneys' fees and related costs and expenses arising out of, or resulting from, any and all brokerage claims that may be made against Seller or Purchaser or their successors or assigns arising from this Agreement.  Purchaser warrants that it has made no commitments of any kind regarding brokerage fees, finder's fees or commissions relative to this Agreement which could incur liability to either party hereto.  Seller agrees to pay in full any and all real estate brokerage fees or commissions due licensed real estate brokers as a result of this Agreement.

(c)  The risk of loss, damage or destruction for bonded improvements or common area improvements installed by Seller shall be upon Seller until such time as the improvements are accepted and dedicated to the appropriate governmental jurisdiction or the Homeowners Association.

(d)  Seller agrees to indemnify and hold Purchaser harmless from any liability, loss, damage and expense including judgments, costs and attorneys' fees by reason of injuries to or death of any person or persons, expressly including therein employees of Purchaser, its subcontractors, employees and agents, or loss of or damage to their property or that of any person, firm, association or corporation, however the same shall occur or be caused or by reason of claim of any and every character whatsoever in any manner resulting from, arising out of, or connected with Seller's work, or undertaking, or acts or omissions of Seller or its employees and agents, whether such acts or omissions be claimed to be negligent or not, except that this indemnification provision shall not cover the negligence of Purchaser or its subcontractors, employees and agents. Seller shall maintain in full force and effect liability insurance covering damage to property and persons resulting from or connected with such activity.

(e)  Purchaser agrees to indemnify and hold Seller harmless from any liability, loss, damage and expense including judgments, costs and attorneys' fees by reason of injuries to or death of any person or persons, expressly including therein employees of Seller, its subcontractors, employees and agents, or loss of or damage to their property or that of any person, firm, association or corporation, however the same shall occur or be caused or by reason of claim of any and every character whatsoever in any manner resulting from, arising out of, or connected with Purchaser's work, or undertaking, or acts or omissions of Purchaser or its employees and agents, whether such acts or omissions be claimed to be negligent or not, except that this indemnification provision shall not cover the negligence of Seller or its subcontractors, employees and agents. Purchaser shall maintain in full force and effect liability insurance covering damage to property and persons resulting from or connected with such activity.

(f)  No failure or default by Purchaser or Seller, including failure to timely exercise options, shall result in the termination of limitation of any right hereunder or the exercise of any rights or remedies with respect to such failure or default unless and until Seller or Purchaser shall have been notified in writing and shall have failed to remedy said failure within fifteen (15)

Seller's initials: _____
Purchaser's initials: _____



days after the receipt of said written notice or if the cure thereof cannot be completed within fifteen (15) days, then a reasonable period of time not to exceed an additional thirty (30) days provided the party diligently and continuously pursues such cure.

10.     <u>SELLER'S REPRESENTATIONS AND WARRANTIES.</u>

Seller hereby represents, warrants and covenants to Purchaser that:

(a)     Seller has not made, and will not make, any commitments or representations to the applicable governmental authorities, or to adjoining or surrounding property owners, which would, in any manner, be binding upon Purchaser, or interfere with Purchaser's ability to improve the Lots with the construction thereon of residential dwellings built according to Purchaser's standard design for the same.

(b)     Seller has granted no person any contract right or other right to the use of any portion of the Lots, or the furnishing or use of any facility or amenity on, or relating to, the Lots.

(c)     Seller will, during the term of this Agreement, keep any mortgage(s) against the Property current and not in default, and pay taxes and other public charges against the Property so as to avoid forfeiture of Purchaser's rights under this Agreement.

(d)     Seller represents and warrants to Purchaser that Seller is a limited liability company, duly organized and validly existing, licensed under the laws of the Commonwealth of Pennsylvania, and qualified to do business in the Commonwealth of Pennsylvania, in good standing, and that Seller has the authority to execute and perform this Agreement.

(e)     Seller represents and warrants that it has done nothing to introduce any Hazardous Materials, as defined in Subparagraph 4(i), onto the Property. In addition, to the best of Seller's knowledge, no Hazardous Materials exist on the Property or affect the Property.

Seller agrees to indemnify Purchaser and its subsidiary and affiliated corporations and the directors, officers and employees of any of them (collectively called "Indemnitees") for, and to save all of them harmless against, any and all damages, costs, liabilities, judgments, proceedings and other obligations and claims of any kind which may be imposed on, or asserted against, any of the Indemnitees at any time because of, or in connection with, the ownership, condition and/or use of the Property, or of any portion of the Property, at any time prior to the closing of this transaction. The indemnity and save harmless obligations will include (without limitation) liabilities and obligations of any kind which may arise out of, or pertain to, alleged and/or actual environmental contamination of any kind which may exist in, or on, or which may affect any portion of the Property on and/or prior to the date of conveyance of the Lots from Seller to Purchaser, or which contamination may develop in the future as a result of any condition or substance existing in, on, or affecting the Property on or prior to the date of said conveyance. The indemnity and save harmless obligations will also include, without limitation, providing legal representation to defend against the liabilities provided above, and/or indemnification to Purchaser for its reasonable attorneys' fees incurred either in defense of any such claim, and/or in enforcing the provisions of this indemnity.

(f)     The warranties set forth above in Subparagraphs (a) through (e) will survive the conveyance of the Lots, and will be for the benefit of Purchaser and its successors and assigns. In addition to the other remedies available to Purchaser under this Agreement, Seller will indemnify Purchaser for, and will save it harmless from, all claims for damages, suits for injunctive relief, and other proceedings and costs of any kind which may be asserted or incurred at any time hereafter by reason of any breach of any of the warranties provided above, or any allegation or occurrence which is proven to be true.

All of the foregoing covenants, warranties and representations will be effective, repeated and true at the time of closing on each Lot.

Seller's initials: _____
Purchaser's initials: _____


11. <u>HOMEOWNERS ASSOCIATION.</u>

(a)    Seller shall establish an incorporated homeowners association, pursuant to applicable law, to own and maintain the common areas of the subdivision (the "Homeowners Association"). The documents prepared by Seller for the establishment of the Homeowners Association shall comply with all applicable requirements of the Veteran's Administration and Federal Housing Administration ("VA/FHA").

(b)    Seller shall, at Seller's sole expense, be responsible for the proper annexation of any Lots purchased pursuant to this Agreement into the Homeowners Association, if applicable, and to subject any Lots purchased hereunder to any protective covenants and declarations requested by Purchaser pursuant to this Agreement.

(c)    Seller, through its designees, shall administer the affairs of the Homeowners Association until such time as control is assumed by the individual members of the Homeowners Association who have purchased dwelling units from Purchaser. Purchaser shall have no liability for annual assessments during Purchaser's ownership of any of the Lots; Purchaser shall not make any capital contributions, which shall be assessed to Purchaser's homebuyer. Seller shall fund all Homeowners Association budget deficits.

(d)    Seller will convey to the Homeowners Association the common areas, which are not subdivided into Lots, not later than the date the first Lot or group of Lots shown on the subdivision plat(s), is conveyed to Purchaser. Purchaser agrees that each Lot purchased will be required to become a member of the Homeowners Association. Seller shall bear the cost of preparing and recording the deed conveying the common area to the Homeowners Association.

12. <u>MISCELLANEOUS.</u>

(a)    During the time this Agreement remains in full force and effect, Seller agrees that Purchaser, its agents and representatives, may enter upon the Lots for the purpose of making surveys, test borings, soil analyses and engineering studies, and to perform all other activities as Purchaser may deem necessary in connection with feasibility studies.

(b)    Purchaser shall be responsible for the removal of dirt, mud and debris only from the streets fronting the Lots where dwellings are under construction. Seller shall be responsible for performing those tasks plus snow removal on all streets until public dedication or acceptance by the Homeowners Association thereof. The terms "streets" and "roads" shall mean all streets and roads shown on <u>Exhibit "A"</u>, as well as any access roads connecting those roads shown on the Subdivision Plats to any other road, highway or thoroughfare.

(c)    All notices and other communications hereunder shall be in writing, and be deemed duly given when given, if personally delivered, sent via facsimile with confirmation of transmittal, or three (3) days after mailing, if mailed by certified mail, return receipt requested, postage prepaid:

If to Purchaser:          RYAN HOMES
                          300 Bilmar Drive, Suite 200
                          Pittsburgh, PA 15205
                          Attention: Peter Seirsdale
                          Fax: 412-922-6858


with a copy to:           RYAN HOMES
                          300 Bilmar Drive
                          Suite 290
                          Pittsburgh, PA 15205
                          Attn: Tom DiOrio
                          Fax: 412-922-3811

Seller's initials: _____
Purchaser's initials: _____



with a copy to:

RYAN HOMES
300 Bilmar Drive
Suite 290
Pittsburgh, PA  15205
Attn: Brian Moyer
Fax: 412-922-3811

with a copy to:

Sack Harris & Martin, P.C.
8270 Greensboro Drive
Suite 630
McLean, Virginia  22102
Attn: James M. Sack, Esq.
Fax: _____

and a copy to:

Shulman, Rogers, Gandal, Pordy
    & Ecker, P.A.
11921 Rockville Pike, Third Floor
Rockville, MD  20852
Attn: Michelle R. Curtis, Esq.
Fax: 301-230-2891

and if to Seller,
        to:

Majestic Hills, LLC
3625 Washington Pike
Bridgeville, PA  15017
Attention: Joseph N. DeNardo
Fax: 412-221-2569

with a copy to:

Park Ridge, LLC
411 McMurray Road, Suite 200
Bethel Park, PA   15102-1165
Attention:  Nicholas Garrubba
Fax:  412-409-3291

        The parties hereto shall be responsible for notifying each other of any
change of address.

        (d)     If any term, covenant or condition of this Agreement, or the application
thereof to any party or circumstance, shall be invalid or unenforceable, this Agreement shall not be
affected thereby, and each term shall be valid and enforceable to the fullest extent permitted by law.

        (e)     It is the intention of the parties hereto that all questions with respect to the
construction of this Agreement, and the rights or liabilities of the parties hereunder, shall be
determined in accordance with the laws of the Commonwealth of Pennsylvania without regard to
conflict of law principles.

        (f)     Any date specified in this Agreement which is a Saturday, Sunday or legal
holiday shall be extended to the first regular business day after such date, which is not a Saturday,
Sunday or legal holiday.

        (g)     This Agreement, together with the Exhibits attached hereto, including the
Purchaser/Seller Responsibility Checklist attached hereto as Exhibit "F" ("Checklist"), contains the
final and entire agreement between the parties hereto.  In any discrepancy between the Checklist
and this Agreement, the terms of this Agreement shall prevail. No change or modification of this
Agreement, or any waiver of the provisions hereof, shall be valid unless the same is in writing and

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's initials: _____
Purchaser's initials: _____



signed by the parties hereto. Waiver from time to time of any provision hereunder will not be deemed to be a full waiver of such provision, or a waiver of any other provisions hereunder.

(h)     Titles to Paragraphs and Subparagraphs are for convenience only, and are not intended to limit or expand the covenants and obligations expressed thereunder.

(i)     Prior to any Lot closings, Seller shall deliver to Purchaser a "Certification of Non-Foreign Status" which meets the requirements of Section 1445 of the Internal Revenue Code and Internal Revenue Regulations for the purpose of informing the transferee that withholding of Federal taxes is not required.

(j)     Seller recognizes that Purchaser is subject to the requirements of Interpretation No. 46 ("FIN 46"), *Consolidation of Variable Interest Entities*, an authoritative accounting pronouncement issued by the Financial Accounting Standards Board. Seller confirms that it has an affirmative obligation to timely cooperate in all material respects with Purchaser's obligation to comply with the financial reporting requirements of FIN 46, including providing Seller's financial statements (i.e., balance sheet, income statement and statement of cash flows) prepared in accordance with generally accepted accounting principles on a quarterly basis as established by Purchaser and certain other information such as, but not limited to, asset values, development stage, cost estimation, etc. Purchaser agrees that such information shall be used only to prepare financial statements in accordance with generally accepted accounting principles to comply with Purchaser's legal financial reporting obligations to the Securities and Exchange Commission and other users of Purchaser's audited financial statements. Such information shall not be distributed individually to any other third party nor used for any other purposes. Financial information provided will be consolidated with other information from multiple entities and will not be identified in any of Purchaser's public financial reports on an individual or specific attribution basis. The information will be collected, controlled and kept confidential by Purchaser's Chief Accounting Officer, or his designee, and will not be shared or distributed to Purchaser's operations personnel in any form, oral or written.

13.     ASSIGNMENT; SURVIVAL. Seller may not assign this Agreement to any party other than affiliated entities controlled by Seller. This Agreement shall be binding upon the parties hereto and each of their respective heirs, executors, administrators, successors and assigns. The provisions hereof shall survive the execution and delivery of the deed(s) executed hereunder and shall not be merged therein.

14.     RULE AGAINST PERPETUITIES. To avoid the rule against perpetuities, the final closing under this Agreement shall take place no later than twenty (20) years from the Effective Date.

15.     FORCE MAJEURE. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of labor difficulties, inability to procure materials, restrictive governmental laws or regulations, insurrection, war, acts of God, or other reason of like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for the lesser or (i) a period equivalent to the period of such delay or (ii) twelve (12) months. If upon the expiration of the extension period the required performance remains unperformed, Purchaser may either waive said performance and forthwith continue to settle Lots as provided herein, or Purchaser may at its option declare this Agreement null and void and in such event the Deposit shall be returned to Purchaser and there shall be no further liability on the part of either party to the other.

16.     EFFECTIVE DATE. This Agreement shall become effective on the date last signed ("Effective Date"). In addition, this Agreement will only be effective if signed by the Area President of Purchaser and at least two (2) other officers of Purchaser.

WITNESS, the following signatures and seals.

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's Initials: 
Purchaser's Initials:

SELLER:

ATTEST/WITNESS:                          MAJESTIC HILLS, LLC

By: _____
Name:  Joseph N. DeNardo
Title:   Manager
Date:   12-08-04

PURCHASER:

ATTEST:                                  NVR, INC.

By: _____
Name:  Donald B. Ashbaugh
Title:   Area President
Date:  12/23/04

By: _____
Name:  Thomas J. DiOrio
Title:   Vice President-Operations
Date:

By: Brian D. Moyer
Name:  Brian D. Moyer
Title:   Senior Vice President –
           Land
Date:  12/15/04

By: _____
Name:  Grady Gaspar
Title:   Vice President and
           Market Manager
Date:  12/15/04

By: _____
Name:  Peter Seirsdale
Title:   Vice President and
           Division Manager
Date:  12/15/04

Seller's initials:
Purchaser's initials:

STATE OF <u>PENNSYLVANIA</u>          )
                                      ) ss:
COUNTY OF <u>ALLEGHENY</u>            )

    I HEREBY CERTIFY that on the 8th day of <u>  December  </u>, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Joseph N. DeNardo, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Manager of MAJESTIC HILLS, LLC and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this 8th day of <u>  December  </u>, 2004,

```
┌─────────────────────────────────────┐
│            Notarial Seal             │
│  Kimberly M. Keenan, Notary Public   │
│  South Fayette Twp., Allegheny County│
│  My Commission Expires Nov. 12, 2006 │
└─────────────────────────────────────┘
Member, Pennsylvania Association Of Notaries
```
                                        Notary Public

My Commission Expires: <u>  November 12, 2006  </u>


STATE OF <u>MD</u>          )
                           ) ss:
COUNTY OF <u>Mont.</u>      )

    I HEREBY CERTIFY that on the 23 day of <u> Dec. </u>, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Donald B. Ashbaugh, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Area President of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this 23 day of <u>  Dec.  </u>, 2004.

                                        Jennifer McCreary
                                        Notary Public

My Commission Expires: <u>  10/12/08  </u>


STATE OF <u>Pennsylvania</u>      )
                                  ) ss:
COUNTY OF <u>Allegheny</u>        )

    I HEREBY CERTIFY that on the 17th day of <u> December </u>, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Thomas J. DiOrio, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President-Operations of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this 17th day of <u>December</u>, 2004.

```
COMMONWEALTH OF PENNSYLVANIA
┌─────────────────────────────────────┐
│            Notarial Seal             │
│    Lisa A. Horne, Notary Public      │
│  Robinson Twp., Allegheny County     │
│  My Commission Expires Sept. 21, 2007│
└─────────────────────────────────────┘
Member, Pennsylvania Association Of Notaries
```
                                        Notary Public

My Commission Expires: <u>  9-21-07  </u>

Seller's initials: _____
Purchaser's initials: _____

STATE OF *Pennsylvania* )
                 ) ss:
COUNTY OF *Allegheny* )

      I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Brian D. Moyer, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Senior Vice President-Land of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

      GIVEN my hand and official seal this *15th* day of *December*, 2004.

           Notarial Seal
           Lisa A. Horne, Notary Public
           Robinson Twp., Allegheny County
           My Commission Expires Sept. 21, 2007
           Member: Pennsylvania Association Of Notaries

                                Notary Public

My Commission Expires: *9/21/07*

STATE OF *Pennsylvania* )
                 ) ss:
COUNTY OF *Allegheny* )

      I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Grady Gaspar, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President and Market Manager of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

      GIVEN, my hand and official seal this *15th* day of *December*, 2004.

           COMMONWEALTH OF PENNSYLVANIA
           Lisa A. Horne, Notary Public
           Robinson Twp., Allegheny County
           My Commission Expires Sept. 21, 2007
           Member: Pennsylvania Association Of Notaries

                                Notary Public

My Commission Expires: *9-21-07*

STATE OF *Pennsylvania* )
                 ) ss:
COUNTY OF *Allegheny* )

      I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Peter Scirsdale, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President and Division Manager of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

      GIVEN, my hand and official seal this *15th* day of *December*, 2004.

           COMMONWEALTH OF PENNSYLVANIA
           Notarial Seal
           Lisa A. Horne, Notary Public
           Robinson Twp., Allegheny County
           My Commission Expires Sept. 21, 2007
           Member: Pennsylvania Association Of Notaries

                                Notary Public

My Commission Expires: *9-21-07*

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's initials: _____
Purchaser's initials: _____

## LIST OF EXHIBITS

A.          Record Plat(s)

B.          Environmental Study

C.          Mortgage

D-1        Development Standards

D-2        Grading Plan

D-3        Clearing Plan

E-1.        Lot Inspection Report

E-2.        Lot Completion Report

F.          Purchaser/Seller Responsibility Checklist

EXHIBIT "C"

MORTGAGE

*MADE THE* _____ *day of* ____ _____ *, 200_.*

*FROM:* **MAJESTIC HILLS, LLC** *(Mortgagor)*

*TO:* **NVR, INC.** *(Mortgagee)*

*WHEREAS, Mortgagor pursuant to that certain Lot Purchase Agreement dated _____ _____, as may be amended from time to time (hereinafter the "Agreement") is indebted to Mortgagee in the principal amount of **Four Hundred Forty Nine Thousand Two Hundred and NO/100 DOLLARS ($449,200.00)** advanced or to be advanced by Mortgagee to Mortgagor together with interest thereon at the rates provided herein until the indebtedness is paid in full in the manner and at the times set forth in the Agreement, with the final payment of principal and interest, if not sooner paid, due and payable at the maturity date set forth in the Agreement, as the same may be amended, and containing other terms and conditions, all of which are specifically incorporated herein by reference; and*

*WHEREAS, the principal amount due under this Mortgage shall automatically increase or decrease, as the case may be, pursuant to the terms of the Agreement and/or upon execution by all parties of any amendment(s) to the Agreement which change the amount of the Deposit, as that term is defined in the Agreement.*

*NOW, THEREFORE, Mortgagor, in consideration of the indebtedness and as security for the payment of the same, does hereby mortgage, grant and convey to the Mortgagee, its successors and assigns;*

*SEE ATTACHED EXHIBIT "A"*

*TOGETHER with the improvements now and hereafter erected thereon, and all easements, rights, appurtenances, rents, reversions, remainders, profits, royalties, mineral, oil and gas rights and profits, and all fixtures now or hereafter located thereon. All replacements and additions shall also be secured by this Mortgage. All of the foregoing is collectively referred to in this Mortgage as the "Mortgaged Premises".*

*TO HAVE and to hold the Mortgaged Premises unto the Mortgagee, its successors and assigns, forever.*

*PROVIDED, however, that if the Mortgagor shall pay to the Mortgagee the indebtedness and shall fully perform each of the other covenants and agreements hereinafter set forth, then this Mortgage and the estate hereby granted and conveyed shall become void.*

*AND FURTHER PROVIDED, that the principal amount due under this Mortgage shall be that amount of the Deposit paid by Mortgagee to Mortgagor under the Agreement.*

*THIS MORTGAGE is executed and delivered subject to the following covenants and agreements.*

*1. Mortgagor shall promptly pay when due the indebtedness according to the Agreement and this Mortgage.*

*2. Until the indebtedness is fully paid, Mortgagor shall:*

*(a) pay and discharge, when the same shall become due and payable, all taxes, assessments, sewer and water rents and all other charges and claims assessed or levied from*

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

time to time by any lawful authority upon any part of the Mortgaged Premises and which shall or might have priority in lien or payment to the indebtedness secured hereby, such payments to be made directly to the persons or entity to which payment is owned;
and

(b) pay and discharge all liens, claims or encumbrances which may be filed against the Mortgaged Premises and which might have priority in lien or payment to the indebtedness secured hereby;

(c) not sell or otherwise transfer the Mortgaged Premises or any interest therein without Mortgagor's prior written consent, except for the priority interests allowed pursuant to paragraph 3 below.

3. Mortgagee agrees that this mortgage is subordinate to all existing and future loans of Mortgagor for development of the Majestic Hills community.

4. The covenants in this Mortgage shall bind, and its benefits shall inure to, the Mortgagor and the Mortgagee and their respective successors and assigns, subject to the provisions of the Agreement.

5. Any notice which is mailed certified mail to Mortgagor or to the person(s) who is/are the then owners of the Mortgaged Premises at the address of the Mortgagor as provided in the Agreement or at such other address as Mortgagor shall designate to Mortgagee in writing, shall be sufficient notice when required under this Mortgage.

6. Mortgagee's rights and remedies as provided herein or in the Agreement shall be cumulative and concurrent, and may be pursued singly, successively or together, at the sole discretion of Mortgagee, and may be exercised as often as the occasion therefor shall occur; and the failure to exercise any right or remedy shall in no event be construed as a waiver by Mortgagee or release of the same.

7. In the event any term or provision of this Mortgage or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Mortgage, or its application other than to that which is held invalid or unenforceable, shall not be affected thereby, and each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

8. This Mortgage shall be governed by the laws of Pennsylvania, in which the Mortgaged Premises are located. This provision shall not limit the applicability of federal law to this Mortgage.

9. In the event of default which continues for a period of fifteen (15) days after receipt by Mortgagor of written notice from Mortgagee, foreclosure proceedings may be brought forthwith on this Mortgage and prosecuted to judgment, execution and sale for the collection of the same together with costs of suit. Interest on the unpaid balance shall accrue at the rate of eleven percent (11%) annually from the date of such default until the entire principal balance is paid in full.

**WITNESS** the due execution hereof the day and year first above written.

Witness:                                        MAJESTIC HILLS, LLC

_Shirl S. Lauda_                    BY: _____
                                                     Joseph N. DeNardo
                                                     Manager

*COMMONWEALTH OF PENNSYLVANIA* )
                             )   *ss:*

*COUNTY OF* __ _____ )

    *On this \_\_\_\_ day of _____ \_\_\_, 2004, before me, a Notary Public, the undersigned officer, personally appeared Joseph N. DeNardo, Manager of Majestic Hills, LLC a Pennsylvania limited liability company, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same as Manager of Majestic Hills, LLC, for the purposes therein.*

    *IN WITNESS WHEREOF, I hereunto set my hand and official seal.*


                                     _____
                                     *Notary Public*

*MY COMMISSION EXPIRES:*   _____

### CERTIFICATE OF RESIDENCE

*I hereby certify that the precise address of the mortgagee, NVR, INC., herein is as follows:* \_\_\_\_

_____

                                    _____

## EXHIBIT "D-1"
### RYAN HOMES
### PITTSBURGH REGION
### SINGLE FAMILY DETACHED DEVELOPMENT STANDARDS

**A.  CLEARING AND GRUBBING**

1.  NATURAL VEGETATION SHALL BE PRESERVED wherever possible throughout the site.  Wooded homesites will be reviewed on an individual basis.

2.  All wood chips produced from the clearing will be collected and removed by the developer.  Under no circumstances will the wood chips be mixed with topsoil or scattered through out the community.

3.  All timber, logs, trees, stumps, bushes, rubbish and other debris will be removed and properly disposed of, and not pushed into the natural vegetation of the lot.  Under no condition shall this material be buried on the building pad of the homesite. A bury pit will be considered if mapped, acceptable to local authorities and not located within any recorded lot areas that will be deeded as a homesite.

4.  All timber, logs and trees not fallen by natural causes, but falling in natural vegetation as a result of clearing and grubbing shall be removed and disposed of properly.

**B.  GRADING**

1.  Topsoil shall be removed from all disturbed areas and stockpiled in an accessible location agreed to by Ryan Homes for use on the lots after the homes are constructed.  A minimum numer of lots are to be utilized to stockpile topsoil.  The Developer may use stockpile to fill at toe of slope if bench is deep enough.  No other material shall be mixed with topsoil pile (e.g. keyway material, utility ditch excess material, etc.).  Developer shall make every effort to stock topsoil in dry conditions.  Ryan requires 120 yards of stockpiled topsoil per lot.  The developer will be responsible to remove all excess topsoil from the community at a time agreed upon by both parties.

2.  All rear cut or fill slopes that are three (3) feet horizontal to one (1) foot vertical or steeper shall be seeded with crown vetch, or an approved local slope mix or erosion and sedimentation blankets as required by local authorities.  All remaining disturbed areas shall be seeded with perennial rye grass.  Developer is responsible for achieving 90% vegetation growth on slopes.

3.  All grading and excavation shall be accomplished in a manner that complies and conforms to local soil erosion and sedimentation protection standards.  Developer shall be responsible for filling in all temporary sediment traps and erosion ditches upon completion of necessary vegetation.  Developer shall be responsible for maintaining all erosion and sediment protection measures except "on lot" controls as specified by Department of Environmental Protection (D.E.P.).

4.  Should water be encountered during grading, the affected areas must be dewatered using accepted long term engineering practices.  Surface drainage must be maintained to eliminate ponding of water.  Developer will inform Ryan Homes as to the exact location and cause of water on the site.

5.  In situations where the dirt does not balance in the community, a designated dumpsite will be provided for losing the excess dirt.

6.  All wetland areas must be clearly marked on the site and site plans per Department of Environmental Protection.

7.  Building pad areas and any sediment traps located in building pad areas, shall be properly prepared and established to allow Ryan Homes to install a standard footing at a minimum frost depth.  Spreading lifts shall not exceed eight (8) inches in depth and compacted at the specified moisture content until the maximum density attainable using ASTM test No. D1557 is 95% of maximum.  All fills must be compacted using vibratory or sheep's foot rollers only, and documented by a registered engineer's correspondence.

8. Developer shall also notify Ryan of any rock conditions they have encountered which would affect excavation or utility trenches and identify any subgrade water conditions they have encountered on site.

9. **SINGLE FAMILY DETACHED – HIGH SIDE LOTS.**

   The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

   a. The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

   b. Starting at the street right of way line, an inclined grade is established to the building line at a maximum height as shown on the high side lot table for the corresponding building line. (See sketch below)

   c. Beginning at the building line and extending towards the rear of the lot, the height of the bench is maintained to the toe of slope for the distance shown on the high side lot table.

   d. There shall be a maximum slope of two (2) feet horizontal to one (1) foot vertical from the toe of the slope to the top of the slope. (See sketch below)

### TABLE FOR SINGLE FAMILY DETACHED HIGHSIDE LOTS

| BUILDING LINE | MAXIMUM HEIGHT OF BENCH ABOVE STREET CENTERLINE | | MINIMUM DEPTH OF BENCH BUILDING LINE TO TOE SLOPE |
|---|---|---|---|
| ░░ Feet | Plus | ░░ Feet | ░░ Feet |
| ░░ Feet | Plus | ░░ Feet | ░░ Feet |

### TYPICAL HIGHSIDE BENCH—SINGLE FAMILY DETACHED



10. **SINGLE FAMILY DETACHED – LOW SIDE LOTS**

    The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

    a. The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

    b. Starting at the street right of way and extending to the building line, a straight grade is established as shown on the table below for the corresponding building line. (See sketch below)

    c. Beginning at the building line, a slope is established 15' in length to an elevation of the bench height as shown on the table below for the corresponding building line. The bench height is maintained from this point towards the rear of the lot for a distance as shown on the low side lot table.

    d. The slope extending towards the rear of the property cannot exceed the maximum slope of two (2) feet horizontal to one (1) foot vertical.

**TABLE FOR SINGLE FAMILY DETACHED LOW SIDE LOTS**

| BUILDING LINE | ELEVATION OF BUILDING BENCH TO STREET CENTERLINE | DEPTH OF BENCH BUILDING LINE TO TOP OF SLOPE |
|---|---|---|
| 25 Feet | Minus 7 Foot | 75 Feet |
| 30 Feet | Minus 7 Foot | 70 Feet |

TYPICAL LOW SIDE BENCH-SINGLE FAMILY DETACHED LOTS



11.  TOWNHOMES - HIGH SIDE LOTS WITH AN INTEGRAL GARAGE.

The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

a.   The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

b.   Starting at the street right of way line, an inclined grade is established to the building line at a maximum height as shown on the high side lot table for the corresponding building line. (See sketch below)

c.   Beginning at the building line and extending towards the rear of the lot, the height of the bench will be as shown on the high side table.

d.   There shall be a maximum slope of two (2) feet horizontal to one (1) foot vertical from the toe of slope to the top of slope.  (See sketch)

e.   Steps between units within a building will be a maximum of 16". No more than a four (4) feet transition in the street from one end of the building pad to the other.

**TABLE FOR TOWNHOME HIGHSIDE LOTS** *PATIO*

| BUILDING LINE | MAXIMUM HEIGHT OF BENCH ABOVE STREET CENTERLINE | MINIMUM DEPTH OF BENCH BUILDING LINE TO TOE SLOPE |
|---|---|---|
| 25 Feet | Plus 3 Feet | 72 Feet |
| Feet | Plus Feet | Feet |



**TYPICAL HIGHSIDE BENCH—SINGLE FAMILY ATTACHED**



12. **TOWN HOME - LOW SIDE LOTS WITH AN INTEGRAL GARAGE.**
The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

   a. The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.
   b. Starting at the street right of way and extending to the building line, a straight grade is established as shown. (See sketch below)
   c. Beginning at the building line, a slope is established 10' in length to an elevation of the bench height as shown on the table below for the corresponding building line. The bench height is maintained from this point for a distance as shown on the low side attached lot table.
   d. The slope extending towards the rear of the property cannot exceed the maximum slope of two (2) feet horizontal to one (1) foot vertical.
   e. Steps between units within a building will be a maximum of 16". No more than four (4) feet transition in the street from one end of the building pad to the other.

**TABLE FOR TOWN HOME LOW SIDE LOTS** *PATIO*

| BUILDING LINE | ELEVATION OF BUILDING BENCH TO STREET CENTERLINE | | DEPTH OF BENCH BUILDING LINE TO TOP OF SLOPE |
|---|---|---|---|
|  Feet | Minus | Foot | Feet |
| Feet | Minus | Foot | Feet |

TYPICAL LOW SIDE BENCH—SINGLE FAMILY ATTACHED LOTS



C. **SANITARY SEWERS**

   1. A sanitary sewer wye shall be provided for each single family detached and attached homesite. The end of all sewer wyes or laterals shall be properly plugged.



2.  All sanitary sewer laterals shall be extended to a point at least
    five (5) feet beyond the right of way or easement line (see Fig. #1)
    running at 22° with the top of riser to be four (4) feet below the
    finished grade (see Fig. #2) and marked with a **4x4** post painted
    green.



Fig.#1                Fig. #2    Row    Fin. Grade

EASEMENT OR R.O.W.

AERIAL VIEW              SIDE VIEW

3.  All sanitary sewer laterals shall be extended to a point beyond all
    proposed utility lines at a depth not to exceed eleven (11) feet
    below finished grade (see Fig. #2). Sanitary sewer laterals must
    permit gravity flow to the lateral utilizing the minimum sewer depth
    builder requirement.

4.  Sanitary Sewers that are constructed within or below a low side fill
    slope in excess of four (4) feet shall have the laterals extended to
    the top of the fill slope and marked with a **4x4** post painted green.

5.  Should development restrictions prohibit gravity sewers as described
    above, developer must clearly identify those lots as a "hung sewer
    lot" on site plans. Engineers are to mark minimum basement elevations
    on hung sewer building lots and identify any possible hung sewer
    conditions and restrictions to gravity flow.

6.  As-built plans shall be submitted to Ryan, within three weeks after
    installation of sewer lines, which clearly show and designate the
    locations of all wyes and laterals.  The locations shall be
    designated by the station distance from the downstream manhole.  The
    length of any lateral from the sewer main shall also be designated.
    As-builts shall be of sufficient detail and quality so as to satisfy
    specific municipal and/or sewer and water authority requirements.
    Developer shall also submit at this time copies of the electric,
    CATV, gas, water and telephone line plans to Ryan.

7.  The top of all manhole covers shall be constructed to an elevation
    that conforms to the proposed finished grade.  In the case of
    manholes within the street R.O.W., the manhole tops shall conform to
    the finish grade at the top of the curb or the sidewalk elevation if
    applicable prior to Ryan's acceptance.  Developer will make
    adjustments to manhole covers not properly installed.

8.  All main sewer trenches that cross under proposed paved areas (i.e.
    Townhouse rear turn-tables and parking areas and single family rear
    turn-tables shall be filled with stone or select backfill material.

D.  **STORM SEWERS**

1.  (a) A secondary storm sewer system shall be constructed to provide
        for collection of all roof drains and footing drains in all
        areas where the downspouts and footing drains cannot be drained
        to (a) main storm sewer system, (b) natural water course, (c)
        sumped into original ground or (d) to the street, unless the use
        of splash blocks are permitted by the municipality.

    (b) In the event a secondary storm sewer is cost prohibitive, the
        developer may install individual sumps in original ground below
        a fill slope running a lateral to the top of the fill slope on
        each lot that extends to a minimum of four (4) feet below the
        finished grade, clearly marked with a **4x4** post painted orange.

    (c) The end of all storm sewer wyes or laterals shall be properly
        plugged and clearly marked with a **4x4** post painted orange; and
        extend to a minimum of four (4) feet below the finished grade.

    (d) Storm sewers that are constructed within or below a low side
        fill slope in excess of four (4) feet shall have the laterals

extended to the top of the fill slope and marked with a **4x4** post painted orange.

2.  The top of all storm sewer manhole covers, end wall, or head wall structures shall be constructed to conform to the proposed finished grade.  In the case of manholes within the street R.O.W., the manhole tops shall conform to the finish grade at the top of the curb or the sidewalk elevation, if applicable, prior to Ryan's acceptance.

3.  All storm sewer trenches that cross under proposed paved areas (i.e. townhouse rear turntables and parking areas and single family rear turntables shall be filled with stone or select backfill material.

4.  All permanent storm water systems will be complete, including detention ponds, retention ponds, access roads or other local requirements.

E.  **UTILITIES**

1.  Developer shall ensure that gas, water, electric, phone and cable TV lines are installed in a sequence related to their depth below finished grade so that the shallowest utility is closest to the curb and the deepest is closest to the homesite.  Utility mains shall not be stacked below each other.  In the case of single family attached product Ryan and Developer will agree to location of all sewer taps and utilities.

2.  All main utility trenches (i.e. Townhouse rear turn-tables and parking areas and single family rear turn-tables shall be filled with an approved, suitable material to avoid settlement.

3.  All electrical transformers, CATV, and phone above ground boxes should be located on property lines or as designed by utility, and at an elevation that conforms with proposed finish grades.

F.  **SURVEYING**

1.  Developer shall supply Ryan with the following:

    a.  Six (6) complete sets of plans (plan of record, construction drawings, grading, soil and erosion, profiles and detail sheets).  Prints are to be provided within seven days of completion from Engineer.

    b.  Control points within the current phase of development for the purpose of completing house stakeouts.

    c.  Painted lot lines and lot numbers on curbs with a permanent paint within 15 days of completion of paving.

**EXHIBIT "E-1"**

**LOT INSPECTION REPORT**

In accordance with the Lot Purchase Agreement dated
_____ between NVR, Inc. and Majestic Hills, LLC, an
inspection was held on the _____ day of _____, 200  .

All installed improvements including curbs, gutters,
clearing, rough grading, storm sewers, and paved streets, on the
following lots were found to be complete and free of defects or
damages, except as noted below.

Section      Lot Number                  Remarks

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

APPROVED:

_____
Representative, NVR, Inc.

_____
Representative, Majestic Hills, LLC

**EXHIBIT "E-2"**

**LOT COMPLETION REPORT**

In accordance with the Lot Purchase Agreement dated
_____ between NVR, Inc. and Majestic Hills,
LLC, an inspection was held on the _____ day of
_____ _____, 200__.

All site work and house construction have been completed on
the following lots and all installed improvements including curbs,
gutters, storm sewers and paved streets were found to be free of
damages except as noted below.

Section        Lot Number            Remarks _____

_____     _____  _____

_____

_____

_____

_____ _____

_____

_____     _

_____

_____

_____

_____

_____

_____

_____

_____     _____

_____

APPROVED:

_____
Representative, NVR, Inc.

_____
Representative, Majestic Hills, LLC

**EXHIBIT "F"**
**PURCHASER/SELLER RESPONSIBILITY CHECKLIST**

| Description | PURCHASER | SELLER |
|---|---|---|
| Boundary Survey | | X |
| Improvement Plans and Proposed Grading Plans | | X |
| Preparation of Preliminary Plan | | X |
| Record Plat | | X |
| Subdivision Bonds (related to site improvements) | | X |
| Maintenance Bonds | | X |
| Bond & Inspection Fees | | X |
| Grade Establishment (ROW) | | X |
| Grade Establishment (Lot) | X | |
| Flood Plain Management | | X |
| Earthwork Computations (ROW) | | X |
| Earthwork Computations (Lots) | | X |
| Preparation Water & Sewer Plans | | X |
| Preparation of Drainage & Paving Plans | | X |
| Plot Plans with houses sited | X | |
| Clearing | | X |
| Excavation Stakeout - Streets Only | | X |
| House Stakeout | X | |
| Electric & Telephone Control Stakeout | | X |
| Curb & Gutter Stakeout | | X |
| Lot Stakeout - Controls (Provide to Builder's Engineer | | X |
| Computations - House Stakeout | X | |
| Wall Checks | X | |
| Final Lot Survey | X | |
| Description & Easements | | X |
| Covenants & HOA | | X |
| Common Areas turned over to HOA or dedicated | | X |
| Reproduction & Blueprinting (6 sets only of approved plans) | | X |
| VA/FHA documents subdivision approval | X | |
| Landscaping - On-lot, including street trees | X | |
| Landscaping - all other | | X |
| Offsite Public Improvements | | X |
| Entrance Feature (as negotiated) | | X |
| Retaining Walls (on lot)(if required to render Lot buildable) | | X |
| Retaining Walls (on lot)(if required for house design) | X | |
| Monuments (N/I House Corners) | | X |
| Compaction and Certification (ROW & fill pads) | | X |
| Paving | | X |
| Curb and Gutter | | X |
| Sewer (Builder installs line from tap to house) | X | X |
| Water (Builder installs line from tap to house) | X | X |
| Site Drainage | | X |
| Sewer Laterals/Development Plans | | X |
| Water Meters Vault | X | |
| Mass Excavation - Lots | | X |
| Finish Fine Grading Lots | X | |
| Main Underground Telephone Transformers | | X |
| Main Underground Electric, Transformers | | X |
| Processing & Coordination of Underground Utilities | | X |
| Primary Electric Connection Fees & Deposits | | X |
| Secondary Electric Connection Fees | X | |
| Building & Plumbing Permit Fees | X | |
| Sewer & Water House Connection Fees | X | |
| Offsite Contribution | | X |
| Traverse Controls & Bench Marks(furnish to Builder's Engineer) | | X |
| Street Signs | | X |
| Public Works Agreement | | X |
| Sidewalk (fronting the lots) | X | |
| Sidewalk (all other) | | X |
| Basement Excavation | X | |
| ROW access prior to base paving | | X |
| Stockpile Topsoil (if available) | | X |
| Erosion Control and Maintenance and Storm Water Management: | | |
| Off Lot (public streets & ROW) | | X |
| Lot Area | X | |

**EXHIBIT "F" (cont.)**
**PURCHASER/SELLER RESPONSIBILITY CHECKLIST**

| Description | PURCHASER | SELLER |
|---|---|---|
| Erosion Control and Maintanance & Storm Water Management (cont.): | | |
| Erosion Control Initial Installation | | X |
| Storm Water Management | | X |
| Storm Drain Stakeout | | X |
| Storm Outfall Fencing | | X |
| Backfill Sediment Basins | | X |
| Repairs caused by Builder are Builder's responsibility or reimbursed to Developer | | |
| Public Street Lights (per county requirements) | | X |

## LOT PURCHASE AGREEMENT

### MAJESTIC HILLS

THIS LOT PURCHASE AGREEMENT (the "Agreement") is entered into this 23 day of December 2004, by and between MAJESTIC HILLS, LLC, a Pennsylvania limited liability company (the "Seller") and NVR, INC., a ~~Pennsylvania limited liability company~~ d/b/a **RYAN HOMES** (the "Purchaser"). Virginia Corporation BM YD

**WHEREAS,** Seller is the owner or contract purchaser of certain real property in North Strabane Township, Washington County, Pennsylvania, as more particularly described in <u>Exhibit "A"</u> attached hereto and made a part hereof (hereinafter, the "Property"); and

**WHEREAS,** Seller desires to sell, and Purchaser wishes to purchase, the Property in the form of one hundred seventy nine (179) developed single family lots of which ninety nine (99) will be ninety feet (90') wide (the "90' Lots") and eighty (80) will be sixty five feet (65') to seventy feet wide (the 65' - 70' Lots"), (the 90' Lots and the 65' - 70' Lots, collectively the "Lots", individually a "Lot"), pursuant to the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** for and in consideration of the mutual promises of the parties as set forth herein, Seller does hereby grant to Purchaser the right to purchase and Purchaser agrees to purchase in fee simple the Property pursuant to the following covenants, conditions, terms and obligations:

1.  FEASIBILITY PERIOD.  Purchaser shall have a thirty (30) day feasibility period, commencing upon the Effective Date (as hereinafter defined) (the "Feasibility Period"), to undertake at Purchaser's sole expense, such engineering, development, marketing and other studies as Purchaser may desire. Seller shall provide to Purchaser true and complete copies of any and all subdivision plans, plats and deeds, surveys, specifications, public works agreements, other architectural and engineering data, soil borings and environmental reports, current title reports with supporting documents and documentation relating to the Homeowners Association including articles, by-laws, declaration of covenants, supplemental declarations and builder's information package available at the time of execution. If Purchaser is not satisfied with the Lots for any reason or no reason at all, Purchaser may as a matter of right, terminate this Agreement at any time prior to the end of the Feasibility Period.  Such termination shall be in writing and delivered to Seller by no later than the last day of the Feasibility Period.

2.  ENVIRONMENTAL STUDY.  Seller shall deliver to Purchaser within thirty (30) days from the Effective Date (as hereinafter defined) a Phase I Environmental Assessment of the Property which (i) has been prepared within the six (6) months prior to the Effective Date, (ii) has been prepared in accordance with ASTM standards, and (iii) includes a reliance letter to Purchaser from the certifying engineer (the "Environmental Study"). A copy of the Environmental Study shall be attached hereto and made a part hereof as <u>Exhibit "B"</u>. In the event the Environmental Study produces results which are not acceptable to Purchaser in its sole discretion, Purchaser, at its option, may, within ten (10) days from the date Purchaser receives the Environmental Study, declare this Agreement to be null and void, receive back its Deposit (as hereinafter defined) and the parties hereto shall be relieved of further liability for performing hereunder.  Notwithstanding the results of the Environmental Study, should Purchaser elect to proceed under this Agreement, Purchaser shall not be required to purchase any Lots which are identified in the Environmental Study as being affected by any environmental issue. In the event Purchaser terminates this Agreement because of the results of the Environmental Study, it covenants and agrees to treat the results of the Environmental Study as confidential and not to reveal the results either verbally or in writing to anyone other than Seller.

3.  PURCHASE OF LOTS.  Seller shall sell, and Purchaser agrees to purchase the Lots in accordance with the terms and schedule described more particularly below:

    (a)     Purchaser agrees to purchase a minimum of five (5) 90' Lots and seven (7) 65'- 70' Lots per quarter, or such smaller number as may remain available subject to this

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc



Seller's initials: _____
Purchaser's initials: _____

Agreement, the first quarter to commence upon receipt by Purchaser of written notice from Seller that the Lots are fully improved and finished in accordance with this Agreement, that building permits are available to be applied for the Lots in Phase I, and all utilities serving such Lots including, but not limited to, electricity, are complete and functional (the "Completion Notice") then continuing on a quarterly basis until all of the Lots are sold. Quarters shall consist of ninety (90) consecutive calendar days.

(b)    At all times after the first quarter, Seller shall have met the Conditions Precedent to Closing, as defined in Paragraph 6, for no fewer than the number of Lots equal to the minimum number of Lots Purchaser is required to purchase over two quarters pursuant to Paragraph 3(a) above (the "Available Lots"). Purchaser may choose which of the Available Lots it will purchase to meet the quarterly Lot closing requirement. Seller shall notify Purchaser of the location of the Available Lots upon completion of Seller's improvements to such Lots. In the event Seller fails to meet the minimum Available Lot requirement above, Purchaser, in addition to the other rights and remedies available under this Agreement, shall have the option of postponing the minimum Lot settlement requirement and any increases in the Purchase Price for the period Seller is delayed.

(c)    Purchaser shall have the right in any quarter to settle on more than the minimum number of Lots required to be purchased in such quarter at the Purchase Price then in effect as stated in Paragraph 3(f). Purchaser shall receive credits toward the minimum number of Lots required to be purchased in succeeding quarters in excess of the minimum required, and such credits shall be cumulative.

(d)    Purchaser shall be entitled to more than one (1) closing per month and shall further be entitled to settle on one (1) or more Lots at a time. All closings shall be held at the offices of NVR Settlement Services, Inc., 300 Bilmar Drive, Suite 250, Pittsburgh, Pennsylvania 15205 (via overnight delivery if the parties so agree) or of a title company within the Pittsburgh metropolitan area as Purchaser shall choose, at such time or times as Purchaser shall designate.

(e)    Purchaser's option to purchase Lots hereunder shall be in full force and effect so long as Purchaser fulfills its obligations hereunder. Should Purchaser fail to purchase the minimum number of Lots as required herein during any one quarter i.e. five (5) 90' Lots and seven (7) 65' – 70' Lots, then Seller shall give written notice to Purchaser that purchase of such number shall occur within fifteen (15) days of Purchaser's receipt of such written notice or Seller shall consider Purchaser to be in default hereof. Purchaser may cure the default by electing to defer settlement on some or all of the Lots subject to the default provided, however that Purchaser may not defer settlement on the minimum required Lots to be purchased in any one quarter i.e. five (5) 90' Lots and seven (7) 65' – 70' Lots for more than two (2) 90-day periods ("Grace Periods") during any four (4) quarters. In the event Purchaser has not cured the default within the Grace Periods, Purchaser may elect to continue deferral of the minimum Lot settlement requirement (the "Deferred 90' Lots" and the "Deferred 65' – 70' Lots," collectively the "Deferred Lots") by written notice to Seller (the "Deferral Election Notice"). Purchaser shall pay to Seller a deferral fee per Deferred 90' Lot of Six Hundred Dollars ($600.00) and a deferral fee of Four Hundred Fifty Dollars ($450.00) per Deferred 65' – 70' Lot (the "Deferral Fee") payable with the Deferral Election Notice and each month thereafter until such time as Purchaser settles on the Deferred Lots. The Deferral Fee shall be due and payable the first of each quarter following the date of the Deferral Election Notice. Purchaser shall not receive any pro rata reduction in the Deferral Fee if settlement on any number of the Deferred Lots shall occur during any one month but the total Deferral Fee which is due the next month shall be reduced for the number of Deferred Lot settled upon during such month. During the period the Deferral Election Notice is in effect, Purchaser shall not be in default as to the Deferred Lots. However, if Purchaser fails to settle on any Lots in addition to the maximum allowed Deferred Lots Purchaser shall be in default hereof and Seller shall have the right to terminate this Agreement and retain the Deposit as provided in Paragraph 9(a).

(f)    The total purchase price for each 90' Lot purchased hereunder shall be Fifty Six Thousand Dollars ($56,000.00) and Forty Three Thousand Dollars ($43,000.00) for each 65' – 70' Lot purchased hereunder (the "Purchase Price"). The Purchase Price shall increase three

Seller's initials: _____
Purchaser's initials: _____ 

percent (3%) simple interest per annum commencing one (1) year after the first (1st) closing hereunder.

(g) The sum of Four Hundred Forty Nine Thousand Two Hundred Dollars ($449,200.00) as a good faith deposit (the "Deposit") shall be delivered by Purchaser to Seller to be held and applied in accordance with this Agreement as follows: (i) Ten Thousand Dollars ($10,000.00) of the Deposit will be delivered within five (5) business days after the Effective Date (as hereinafter defined); (ii) Two Hundred Nineteen Thousand Six Hundred Dollars ($219,600.00) of the Deposit will be delivered within five (5) business days after receipt by Purchaser of written notice from Seller that the first phase of Lots has received non-appealable subdivision approval; and (iii) Two Hundred Nineteen Thousand Six Hundred Dollars ($219,600.00) of the Deposit will be delivered to Seller's settlement agent no more than five (5) business days prior to Seller's acquisition of the Property to be applied towards Seller's purchase price when settlement agent is in a position to record the Mortgage (as defined below).

The return of the Deposit, as provided herein, shall be secured by a mortgage on the Property, subordinate only to Seller's acquisition and development loan in the form attached hereto as Exhibit "C" (the "Mortgage"). The Mortgage shall provide for partial releases in the amount of the Deposit Credit (as hereinafter defined).

4.    SELLER'S DEVELOPMENT OBLIGATIONS.

(a)    Seller covenants and agrees to proceed with due diligence to develop and improve the Lots into fully improved building lots, all in accordance with the development plans approved by the North Strabane Township and/or Washington County, Pennsylvania, the Development Standards attached hereto as Exhibit "D-1", other required governmental and quasi-governmental agencies and this Agreement, including the installation of streets, curbs, storm and sanitary sewers, gutters, water lines, including fittings and hydrants, gas lines and all other public utilities, including underground electrical wiring, adjacent to the Lot lines , street signs and street lights. Seller further covenants and agrees that all improvements will be of good quality, installed in good and workmanlike manner and suitable for their intended purposes. Seller shall complete all of said work for the first section of Lots on or before August 31, 2005.

(b)    Seller covenants and agrees that each Lot, at the time of settlement hereunder, shall be buildable and abut and have access to a public street that is fully improved with a permanent surfacing; shall have available to each Lot a completed and operational public sanitary sewer main line, by a lateral that is installed to the property line; shall have available to each Lot a completed and operating public water supply distribution system by a lateral installed to the property line.

(1)    The sanitary sewer lateral shall be placed at a depth to allow Purchaser to construct gravity flow basement homes on each Lot in accordance with the Development Standards attached as Exhibit "D-1".

(2)    Each Lot shall be cleared in accordance with the grading and utility plan to be approved by North Strabane Township and/or Washington County in accordance with the Development Standards attached as Exhibit "D-1".

(c)    (i) Grading. Seller shall grade the Lot pursuant to the grading plan to be approved by the North Strabane Township and/or Washington County, which upon approval shall be attached hereto as Exhibit "D-2" (the "Grading Plan") in accordance with the Development Standards attached as Exhibit "D-1". Seller shall provide engineering certificates for all fill Lots. Seller shall guarantee that the main structure of each house, including attached/contiguous garages and detached garages, porches, patios and decks constructed by Purchaser, exclusive of outbuildings, shall be built on solid soil and not fill, provided the structure constructed by Purchaser has not less than eleven (11) course of block or a maximum basement depth of seven feet four inches (7'4").

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

3



Seller's initials:
Purchaser's initials:

(ii) Lots Cleared. Clearing shall be performed pursuant to the clearing plan to be approved by the North Strabane Township and/or Washington County, which upon approval shall be attached hereto as Exhibit "D-3" (the "Clearing Plan") in accordance with the Development Standards attached as Exhibit "D-1". Seller shall clear and grub each Lot, including removal of stumps and chips. Purchaser shall be responsible for the removal of all dirt excavated for the construction of the residential structure. Seller shall be responsible for the clearing related to any improvements within the common areas or other areas required by North Strabane Township and/or Washington County.

(d) Seller covenants and agrees that Seller will pay for all of said improvements, that no mechanics' liens will be filed by reason of the development work to be performed by Seller. If any such liens are filed against the Lots, Seller will forthwith bond same in order to release the Lots from the operation and effect of such lien. On request, Seller will furnish evidence that all material and labor is paid for. Seller shall hold Purchaser harmless for any and all such claims, including reasonable attorneys' fees and any costs incurred by Purchaser to defend any such claims or liens.

(e) Seller covenants and agrees that all improvements contemplated hereunder will be done in accordance with applicable requirements, statutes, ordinances and regulations of all applicable governmental and municipal bodies and agencies. Where applicable and customary, Seller will dedicate such improvements and cause them to be accepted for permanent maintenance by the applicable governmental or quasi-governmental bodies no later than twelve (12) months after the date of conveyance of the last Lot described herein. Seller will post and maintain all forms of surety bonds as may be required by the applicable governmental authorities for development of the Lots, whether such facilities are on or off the Lots.

(f) Seller shall be responsible for landscaping and trees in all areas outside the parameters of the individual Lots. Seller shall be responsible for the design and installation of a permanent entry feature, including landscape, and maintenance until such time as the entry feature is dedicated to the Homeowners Association. The permanent entry feature shall be completed by the later to occur of one hundred twenty (120) days from the date Purchaser settles on the Model Lot or by the time of Purchaser's model grand opening. The cost of the permanent entry feature, including landscape, shall be no less than Twenty-five Thousand Dollars ($ 25,000.⁰⁰ _____). Purchaser shall have the right to review and reasonably approve of the plans for the entry feature.

(g) Seller shall remove all gas and other storage tanks located on the Property, such removal to be conducted in accordance with all applicable local, State and Federal laws.

(h) If, after settlement on any Lot hereunder, Purchaser is unable to obtain a building permit for the construction of a detached single family dwelling on any lot due to any cause, fault or act of Seller, or Seller's lack of performance under this Agreement, Seller shall be required to accept a reconveyance of such Lot at Seller's sole cost and expense. Upon such reconveyance, Seller shall return all money paid by Purchaser to Seller hereunder for such Lot including the Deposit Credit (as hereinafter defined).

(i) In the event Hazardous Materials (as defined below) are found on any of the Lots after conveyance of such Lot by Seller to Purchaser, Seller shall have the option of (i) remediating such Hazardous Materials in accordance with applicable laws and regulations, or (ii) repurchasing such affected Lot(s) for the Purchase Price paid by Purchaser, plus the costs of such transaction, plus the costs of any improvements installed on such Lot by Purchaser. The term "Hazardous Materials" means (A) hazardous wastes, hazardous substances, and toxic materials prohibited or regulated by federal, state or local law, regulation or order, (B) asbestos, (C) oil petroleum products and their byproducts, and (D) Polychlorinated Biphenyls ("PCBs").

5. INSPECTION - BONDED IMPROVEMENTS.

Upon completion of the items set forth in Paragraph 4 (except final course of paving on streets), Seller shall notify Purchaser, in writing.

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

4

Seller's initials: _____
Purchaser's initials: _____

Prior to closing on any of the Lots pursuant to this Agreement, representatives of Seller and Purchaser shall inspect the improvements relating to this Agreement and establish a list of deficiencies hereinafter referred to as the "Lot Inspection Report" (Exhibit "E-1"). Seller shall repair all deficiencies (except final paving) within thirty (30) days of said Lot Inspection Report or complete said deficiencies upon conclusion of Purchaser's house construction in a timely manner to insure issuance of occupancy permits as agreed by and between Purchaser and Seller. Subsequent to closing, Purchaser shall be responsible for damages to the improvements serving the Lot or Lots not detailed on the Lot Inspection Report. Upon completion of home construction activity in a given phase or section, Purchaser and Seller, upon notification of the other, shall meet to complete the Lot Completion Report (Exhibit "E-2") to list all deficiencies not listed on the Lot Inspection Report (Exhibit "E-1") for which Purchaser is responsible to repair. Upon request, Purchaser shall repair all deficiencies listed on the Lot Completion Report within thirty (30) days of notification, weather permitting, at its expense, or at such other time as shall be agreed upon between Purchaser and Seller. In the event Purchaser shall fail to make repairs so as to satisfy the City and Seller, then Seller shall make such repairs and charge Purchaser and Purchaser shall pay Seller's costs for such repairs.

6.    CONDITIONS PRECEDENT TO CLOSING.  The obligations of Purchaser to purchase the Lots shall be conditioned upon the satisfaction of the following (the "Conditions Precedent to Closing"):

(a)    Permits must be available for immediate issuance upon proper application by Purchaser therefor for the construction of Purchaser's improvements on each of the Lots.

(b)    Purchaser must have completed its feasibility studies pursuant to Paragraph 1 hereof and notified Seller of the acceptability of the Lots.

(c)    Purchaser must have accepted the results of the Environmental Study pursuant to Paragraph 2 hereof.

(d)    Seller must have completed its improvements as to the Lots to be settled on by Purchaser as required by this Agreement. Purchaser and Seller must have completed a Lot Inspection Report, as defined above, prior to Closing.

(e)    All conditions of title have been met pursuant to Paragraph 7(b) hereof.

(f)    Neither Seller nor Purchaser is in material default of this Agreement.

(g)    The Homeowners Association (as hereinafter defined) shall be established pursuant to Paragraph 11.

(h)    The representations and warranties by Seller and Purchaser contained in this Agreement must be true, correct and valid as of the date of each closing.

7.    CLOSING, CONVEYANCE AND TITLE, DEPOSIT CREDITS.

(a)    The Purchase Price for each Lot shall be payable to the settlement agent by check or wire transfer of funds from Purchaser at the time of closing. Upon consummation of closing, the Purchase Price, less the Deposit Credit, shall be released and delivered to Seller. Purchaser shall receive a credit towards the Purchase Price of each 90' Lot at the time of closing in the amount of Two Thousand Eight Hundred Dollars ($2,800.00) and a credit towards the Purchase Price of each 65' – 70' Lot at the time of closing in the amount of Two Thousand One Hundred Fifty Dollars ($2,150.00) (the "Deposit Credit").

(b)    Seller covenants that at closing it will have, full legal, beneficial and equitable ownership of the Property, and that it has the right and power to convey the Property. Indefeasible fee simple title to the Lots is to be conveyed hereunder, free of liens, encumbrances, judgments, tenancies, reservations, easements and rights-of-way, subject, however, to those

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

5

Seller's initials: _____
Purchaser's initials: _____

easements, rights-of-way and restrictions required by public utilities and/or the local governmental authority. Title is to be marketable and insurable at standard rates by a recognized title insurance company of Purchaser's choice, licensed to do business in the Commonwealth of Pennsylvania, without exceptions except as provided herein. If Seller cannot convey title as aforesaid, this entire Agreement, or the portion thereof in connection with such Lot(s) whose title cannot be conveyed, may be declared null and void, at the option of Purchaser, unless title defects are such as may be readily remedied by legal or other action. If legal or other action is necessary to cure title defects, Seller must promptly undertake such action, at its own expense, whereupon the time for closings, running of quarters, payment escalation schedule, and all other items hereunder, shall be extended for the reasonable period of time necessary for such prompt action. If title defects are not cured within such reasonable period of time, Purchaser shall have the right to declare the sale null and void or Purchaser may elect to extend the time within which to cure title defects. In no event shall Purchaser be obligated to take title and pay the Purchase Price for any of the Lots if title thereto cannot be conveyed in accordance with the provisions hereof.

(c)    Examination of title, title insurance, and title certificate shall be at the expense of Seller. Preparation and filing of Deeds are to be at the cost of Purchaser. Cost of Lot transfer taxes are to be shared equally by Purchaser and Seller. Any filing and recording fees associated with Seller's financing are to be paid by Seller. Any escrow fee shall be equally shared between Purchaser and Seller. Any filing fees and costs associated with Purchaser's financing shall be at Purchaser's expense. Seller agrees to close at NVR Settlement Services, Inc. and shall pay a settlement fee not to exceed One Hundred Twenty Five Dollars $125.00 per settlement.

(d)    Seller shall be responsible for all real estate taxes, assessments or other charges accruing prior to the date of each Lot Closing and Purchaser shall be responsible for such real estate taxes, assessments and other charges accruing after the date of each Lot closing. Assessments for improvements to the Property prior to the date of Lot closing even if payable thereafter, shall be paid in full by Seller unless payment in annual or periodic installments is approved in writing by Purchaser.

(e)    At Closing(s), the Lots being acquired shall be conveyed by Seller to Purchaser or Purchaser's designee by General Warranty Deed, containing the usual covenants of title, in proper form for recording in Washington County, Pennsylvania. At Purchaser's option, Seller shall place the deeds into escrow at the time of settlement and Purchaser shall determine whether or not such deeds shall be recorded. In this event, at the time of settlement by Purchaser with a third-party homebuyer, such deeds shall convey title from Seller directly to the third-party homebuyer. However, for any deeds placed into escrow as provided under this Subparagraph, Purchaser shall have the option of recording any such deeds at any time until conveyance of the Lot(s) to the third party homebuyer(s).

(f)    Possession of the Lots shall be given to Purchaser at the time of closing.

(g)    All notices of violations of local ordinances or requirements issued by legal authorities or prosecutions in any Court on account thereof affecting, or against, any of the Lots, except for violations by Purchaser, shall be defended and complied with by Seller prior to the time of closing hereunder, and the Lots conveyed free thereof.

8.    POST CLOSING OBLIGATIONS.

The following obligations of the parties shall survive closing of the Lots by Purchaser:

(a)    Maintenance of the Property pursuant to Paragraph 12(b);

(b)    All of Seller's responsibilities pursuant to the organization and management of the Homeowners Association as required under Paragraph 11 which are not completed by the time Purchaser settles on the Lots;

(c)    Liability for bonded improvements pursuant to Paragraph 9(c);

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

6

Seller's initials: _____
Purchaser's initials: _____

(d)      Liability for brokerage commissions as set forth in Paragraph 9(b);

(e)      Seller's representations and warranties provided in Paragraph 10; and

(f)      Seller and Purchaser indemnifications as stated in Paragraph 9.

9.      DEFAULT; LIABILITY OF PARTIES.

(a)      In the event of any breach, failure or default by Purchaser under the terms of this Agreement (which breach, failure or default is not remedied or cured by Purchaser pursuant to any other provisions hereof), Seller's sole and exclusive right and remedy shall be to retain the Deposit, or so much as shall be remaining after application of the Deposit Credit(s), as full, fixed and liquidated damages, not as a penalty, whereupon this Agreement shall terminate and thereafter Purchaser and Seller shall be relieved of further liability hereunder, at law or in equity.  In no event shall Seller be entitled to specific performance of this Agreement, or any other equitable remedy.

(b)      Seller and Purchaser agree to indemnify and hold each other harmless from any and all liability, loss or damage, including reasonable attorneys' fees and related costs and expenses arising out of, or resulting from, any and all brokerage claims that may be made against Seller or Purchaser or their successors or assigns arising from this Agreement.  Purchaser warrants that it has made no commitments of any kind regarding brokerage fees, finder's fees or commissions relative to this Agreement which could incur liability to either party hereto.  Seller agrees to pay in full any and all real estate brokerage fees or commissions due licensed real estate brokers as a result of this Agreement.

(c)      The risk of loss, damage or destruction for bonded improvements or common area improvements installed by Seller shall be upon Seller until such time as the improvements are accepted and dedicated to the appropriate governmental jurisdiction or the Homeowners Association.

(d)      Seller agrees to indemnify and hold Purchaser harmless from any liability, loss, damage and expense including judgments, costs and attorneys' fees by reason of injuries to or death of any person or persons, expressly including therein employees of Purchaser, its subcontractors, employees and agents, or loss of or damage to their property or that of any person, firm, association or corporation, however the same shall occur or be caused or by reason of claim of any and every character whatsoever in any manner resulting from, arising out of, or connected with Seller's work, or undertaking, or acts or omissions of Seller or its employees and agents, whether such acts or omissions be claimed to be negligent or not, except that this indemnification provision shall not cover the negligence of Purchaser or its subcontractors, employees and agents. Seller shall maintain in full force and effect liability insurance covering damage to property and persons resulting from or connected with such activity.

(e)      Purchaser agrees to indemnify and hold Seller harmless from any liability, loss, damage and expense including judgments, costs and attorneys' fees by reason of injuries to or death of any person or persons, expressly including therein employees of Seller, its subcontractors, employees and agents, or loss of or damage to their property or that of any person, firm, association or corporation, however the same shall occur or be caused or by reason of claim of any and every character whatsoever in any manner resulting from, arising out of, or connected with Purchaser's work, or undertaking, or acts or omissions of Purchaser or its employees and agents, whether such acts or omissions be claimed to be negligent or not, except that this indemnification provision shall not cover the negligence of Seller or its subcontractors, employees and agents. Purchaser shall maintain in full force and effect liability insurance covering damage to property and persons resulting from or connected with such activity.

(f)      No failure or default by Purchaser or Seller, including failure to timely exercise options, shall result in the termination of limitation of any right hereunder or the exercise of any rights or remedies with respect to such failure or default unless and until Seller or Purchaser shall have been notified in writing and shall have failed to remedy said failure within fifteen (15)



days after the receipt of said written notice or if the cure thereof cannot be completed within fifteen (15) days, then a reasonable period of time not to exceed an additional thirty (30) days provided the party diligently and continuously pursues such cure.

10.    SELLER'S REPRESENTATIONS AND WARRANTIES.

Seller hereby represents, warrants and covenants to Purchaser that:

(a)    Seller has not made, and will not make, any commitments or representations to the applicable governmental authorities, or to adjoining or surrounding property owners, which would, in any manner, be binding upon Purchaser, or interfere with Purchaser's ability to improve the Lots with the construction thereon of residential dwellings built according to Purchaser's standard design for the same.

(b)    Seller has granted no person any contract right or other right to the use of any portion of the Lots, or the furnishing or use of any facility or amenity on, or relating to, the Lots.

(c)    Seller will, during the term of this Agreement, keep any mortgage(s) against the Property current and not in default, and pay taxes and other public charges against the Property so as to avoid forfeiture of Purchaser's rights under this Agreement.

(d)    Seller represents and warrants to Purchaser that Seller is a limited liability company, duly organized and validly existing, licensed under the laws of the Commonwealth of Pennsylvania, and qualified to do business in the Commonwealth of Pennsylvania, in good standing, and that Seller has the authority to execute and perform this Agreement.

(e)    Seller represents and warrants that it has done nothing to introduce any Hazardous Materials, as defined in Subparagraph 4(i), onto the Property. In addition, to the best of Seller's knowledge, no Hazardous Materials exist on the Property or affect the Property.

Seller agrees to indemnify Purchaser and its subsidiary and affiliated corporations and the directors, officers and employees of any of them (collectively called "Indemnitees") for, and to save all of them harmless against, any and all damages, costs, liabilities, judgments, proceedings and other obligations and claims of any kind which may be imposed on, or asserted against, any of the Indemnitees at any time because of, or in connection with, the ownership, condition and/or use of the Property, or of any portion of the Property, at any time prior to the closing of this transaction. The indemnity and save harmless obligations will include (without limitation) liabilities and obligations of any kind which may arise out of, or pertain to, alleged and/or actual environmental contamination of any kind which may exist in, or on, or which may affect any portion of the Property on and/or prior to the date of conveyance of the Lots from Seller to Purchaser, or which contamination may develop in the future as a result of any condition or substance existing in, on, or affecting the Property on or prior to the date of said conveyance. The indemnity and save harmless obligations will also include, without limitation, providing legal representation to defend against the liabilities provided above, and/or indemnification to Purchaser for its reasonable attorneys' fees incurred either in defense of any such claim, and/or in enforcing the provisions of this indemnity.

(f)    The warranties set forth above in Subparagraphs (a) through (e) will survive the conveyance of the Lots, and will be for the benefit of Purchaser and its successors and assigns. In addition to the other remedies available to Purchaser under this Agreement, Seller will indemnify Purchaser for, and will save it harmless from, all claims for damages, suits for injunctive relief, and other proceedings and costs of any kind which may be asserted or incurred at any time hereafter by reason of any breach of any of the warranties provided above, or any allegation or occurrence which is proven to be true.

All of the foregoing covenants, warranties and representations will be effective, repeated and true at the time of closing on each Lot.

8

Seller's initials: _____
Purchaser's initials: _____

11. HOMEOWNERS ASSOCIATION.

(a) Seller shall establish an incorporated homeowners association, pursuant to applicable law, to own and maintain the common areas of the subdivision (the "Homeowners Association"). The documents prepared by Seller for the establishment of the Homeowners Association shall comply with all applicable requirements of the Veteran's Administration and Federal Housing Administration ("VA/FHA").

(b) Seller shall, at Seller's sole expense, be responsible for the proper annexation of any Lots purchased pursuant to this Agreement into the Homeowners Association, if applicable, and to subject any Lots purchased hereunder to any protective covenants and declarations requested by Purchaser pursuant to this Agreement.

(c) Seller, through its designees, shall administer the affairs of the Homeowners Association until such time as control is assumed by the individual members of the Homeowners Association who have purchased dwelling units from Purchaser. Purchaser shall have no liability for annual assessments during Purchaser's ownership of any of the Lots; Purchaser shall not make any capital contributions, which shall be assessed to Purchaser's homebuyer. Seller shall fund all Homeowners Association budget deficits.

(d) Seller will convey to the Homeowners Association the common areas, which are not subdivided into Lots, not later than the date the first Lot or group of Lots shown on the subdivision plat(s), is conveyed to Purchaser. Purchaser agrees that each Lot purchased will be required to become a member of the Homeowners Association. Seller shall bear the cost of preparing and recording the deed conveying the common area to the Homeowners Association.

12. MISCELLANEOUS.

(a) During the time this Agreement remains in full force and effect, Seller agrees that Purchaser, its agents and representatives, may enter upon the Lots for the purpose of making surveys, test borings, soil analyses and engineering studies, and to perform all other activities as Purchaser may deem necessary in connection with feasibility studies.

(b) Purchaser shall be responsible for the removal of dirt, mud and debris only from the streets fronting the Lots where dwellings are under construction. Seller shall be responsible for performing those tasks plus snow removal on all streets until public dedication or acceptance by the Homeowners Association thereof. The terms "streets" and "roads" shall mean all streets and roads shown on Exhibit "A", as well as any access roads connecting those roads shown on the Subdivision Plats to any other road, highway or thoroughfare.

(c) All notices and other communications hereunder shall be in writing, and be deemed duly given when given, if personally delivered, sent via facsimile with confirmation of transmittal, or three (3) days after mailing, if mailed by certified mail, return receipt requested, postage prepaid:

If to Purchaser:          RYAN HOMES
                          300 Bilmar Drive, Suite 200
                          Pittsburgh, PA 15205
                          Attention: Peter Seirsdale
                          Fax: 412-922-6858


with a copy to:           RYAN HOMES
                          300 Bilmar Drive
                          Suite 290
                          Pittsburgh, PA 15205
                          Attn: Tom DiOrio
                          Fax: 412-922-3811

Seller's initials: _____
Purchaser's initials: _____

with a copy to:

RYAN HOMES
300 Bilmar Drive
Suite 290
Pittsburgh, PA 15205
Attn: Brian Moyer
Fax: 412-922-3811

with a copy to:

Sack Harris & Martin, P.C.
8270 Greensboro Drive
Suite 630
McLean, Virginia 22102
Attn: James M. Sack, Esq.
Fax: _____

and a copy to:

Shulman, Rogers, Gandal, Pordy
& Ecker, P.A.
11921 Rockville Pike, Third Floor
Rockville, MD 20852
Attn: Michelle R. Curtis, Esq.
Fax: 301-230-2891

and if to Seller,
to:

Majestic Hills, LLC
3625 Washington Pike
Bridgeville, PA 15017
Attention: Joseph N. DeNardo
Fax: 412-221-2569

with a copy to:

Park Ridge, LLC
411 McMurray Road, Suite 200
Bethel Park, PA 15102-1165
Attention: Nicholas Garrubba
Fax: 412-409-3291

The parties hereto shall be responsible for notifying each other of any change of address.

(d) If any term, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be invalid or unenforceable, this Agreement shall not be affected thereby, and each term shall be valid and enforceable to the fullest extent permitted by law.

(e) It is the intention of the parties hereto that all questions with respect to the construction of this Agreement, and the rights or liabilities of the parties hereunder, shall be determined in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of law principles.

(f) Any date specified in this Agreement which is a Saturday, Sunday or legal holiday shall be extended to the first regular business day after such date, which is not a Saturday, Sunday or legal holiday.

(g) This Agreement, together with the Exhibits attached hereto, including the Purchaser/Seller Responsibility Checklist attached hereto as Exhibit "F" ("Checklist"), contains the final and entire agreement between the parties hereto. In any discrepancy between the Checklist and this Agreement, the terms of this Agreement shall prevail. No change or modification of this Agreement, or any waiver of the provisions hereof, shall be valid unless the same is in writing and

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's Initials: 
Purchaser's Initials:

signed by the parties hereto. Waiver from time to time of any provision hereunder will not be deemed to be a full waiver of such provision, or a waiver of any other provisions hereunder.

(h)     Titles to Paragraphs and Subparagraphs are for convenience only, and are not intended to limit or expand the covenants and obligations expressed thereunder.

(i)     Prior to any Lot closings, Seller shall deliver to Purchaser a "Certification of Non-Foreign Status" which meets the requirements of Section 1445 of the Internal Revenue Code and Internal Revenue Regulations for the purpose of informing the transferee that withholding of Federal taxes is not required.

(j)     Seller recognizes that Purchaser is subject to the requirements of Interpretation No. 46 ("FIN 46"), *Consolidation of Variable Interest Entities*, an authoritative accounting pronouncement issued by the Financial Accounting Standards Board. Seller confirms that it has an affirmative obligation to timely cooperate in all material respects with Purchaser's obligation to comply with the financial reporting requirements of FIN 46, including providing Seller's financial statements (i.e., balance sheet, income statement and statement of cash flows) prepared in accordance with generally accepted accounting principles on a quarterly basis as established by Purchaser and certain other information such as, but not limited to, asset values, development stage, cost estimation, etc. Purchaser agrees that such information shall be used only to prepare financial statements in accordance with generally accepted accounting principles to comply with Purchaser's legal financial reporting obligations to the Securities and Exchange Commission and other users of Purchaser's audited financial statements. Such information shall not be distributed individually to any other third party nor used for any other purposes. Financial information provided will be consolidated with other information from multiple entities and will not be identified in any of Purchaser's public financial reports on an individual or specific attribution basis. The information will be collected, controlled and kept confidential by Purchaser's Chief Accounting Officer, or his designee, and will not be shared or distributed to Purchaser's operations personnel in any form, oral or written.

13.     ASSIGNMENT; SURVIVAL. Seller may not assign this Agreement to any party other than affiliated entities controlled by Seller. This Agreement shall be binding upon the parties hereto and each of their respective heirs, executors, administrators, successors and assigns. The provisions hereof shall survive the execution and delivery of the deed(s) executed hereunder and shall not be merged therein.

14.     RULE AGAINST PERPETUITIES. To avoid the rule against perpetuities, the final closing under this Agreement shall take place no later than twenty (20) years from the Effective Date.

15.     FORCE MAJEURE. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of labor difficulties, inability to procure materials, restrictive governmental laws or regulations, insurrection, war, acts of God, or other reason of like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Agreement, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for the lesser or (i) a period equivalent to the period of such delay or (ii) twelve (12) months. If upon the expiration of the extension period the required performance remains unperformed, Purchaser may either waive said performance and forthwith continue to settle Lots as provided herein, or Purchaser may at its option declare this Agreement null and void and in such event the Deposit shall be returned to Purchaser and there shall be no further liability on the part of either party to the other.

16.     EFFECTIVE DATE. This Agreement shall become effective on the date last signed ("Effective Date"). In addition, this Agreement will only be effective if signed by the Area President of Purchaser and at least two (2) other officers of Purchaser.

WITNESS, the following signatures and seals.

Seller's Initials: _____
Purchaser's Initials: _____ 

SELLER:

ATTEST/WITNESS:

MAJESTIC HILLS, LLC

By: _____
Name:   Joseph N. DeNardo
Title:   Manager
Date:   11-05-04

PURCHASER:

ATTEST:

NVR, INC.

By: _____
Name:   Donald B. Ashbaugh
Title:   Area President
Date:   12/23/04

By: _____
Name:   Thomas J. DiOrio
Title:   Vice President-Operations
Date:   10-19-04

By: _____
Name:   Brian D. Moyer
Title:   Senior Vice President –
    Land
Date:   12/15/04

By: _____
Name:   Grady Gaspar
Title:   Vice President and
    Market Manager
Date:   12/15/04

By: _____
Name:   Peter Seirsdale
Title:   Vice President and
    Division Manager
Date:   12/15/04

Seller's initials: _____
Purchaser's initials: _____

STATE OF <u>PENNSYLVANIA</u> )
                       ) ss:
COUNTY OF <u>ALLEGHENY</u> )

    I HEREBY CERTIFY that on the <u>8t</u>day of <u>December</u> , 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Joseph N. DeNardo, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Manager of MAJESTIC HILLS, LLC and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this 8th day of <u>December</u> , 2004.

<div style="border:1px solid">
Kimberly M. Keenan, Notary Public<br>
South Fayette Twp., Allegheny County<br>
My Commission Expires Nov. 12, 2006<br>
Member, Pennsylvania Association Of Notaries
</div>

                                       Notary Public

My Commission Expires:    November 12, 2006

STATE OF <u>MD</u> )
                  ) ss:
COUNTY OF <u>Mont.</u> )

    I HEREBY CERTIFY that on the 23day of <u>Dec</u> , 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Donald B. Ashbaugh, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Area President of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this 23 day of <u>Dec.</u> , 2004.

                                  Jennifer McCreary
                                  Notary Public

My Commission Expires:      10/12/08

STATE OF <u>Pennsylvania</u> )
                  ) ss:
COUNTY OF <u>Allegheny</u> )

    I HEREBY CERTIFY that on the 17th day of <u>December</u> , 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Thomas J. DiOrio, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President-Operations of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

<div style="border:1px solid">
COMMONWEALTH OF PENNSYLVANIA<br>
Notarial Seal<br>
Lisa A. Horne, Notary Public<br>
Robinson Twp., Allegheny County<br>
My Commission Expires Sept. 21, 2007<br>
Member, Pennsylvania Association Of Notaries
</div>

    GIVEN, my hand and official seal this 17th day of <u>December</u> , 2004.

                                  Lisa A. Horne
                                  Notary Public

My Commission Expires: <u>9 21 07</u>

Seller's initials: _____
Purchaser's initials: _____

STATE OF *Pennsylvania* )
                      ) ss:
COUNTY OF *Allegheny* )

    I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Brian D. Moyer, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Senior Vice President-Land of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this *15th* day of *December*, 2004.

                                            _____
                                            Notary Public

My Commission Expires: *9-21-07*

---

STATE OF *Pennsylvania* )
                      ) ss:
COUNTY OF *Allegheny* )

    I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Grady Gaspar, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President and Market Manager of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this *15th* day of *December*, 2004.

COMMONWEALTH OF PENNSYLVANIA
Lisa A. Horne, Notary Public
Robinson Twp., Allegheny County
My Commission Expires Sept. 21, 2007
Member, Pennsylvania Association Of Notaries

                                            _____
                                            Notary Public

My Commission Expires: *9-21-07*

---

STATE OF *Pennsylvania* )
                      ) ss:
COUNTY OF *Allegheny* )

    I HEREBY CERTIFY that on the *15th* day of *December*, 2004, before the subscriber, a Notary Public in and for the above jurisdiction, personally appeared Peter Seirsdale, who has satisfactorily been proven to be the person whose name is subscribed to the within instrument, who acknowledged himself to be the Vice President and Division Manager of NVR, Inc. and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself.

    GIVEN, my hand and official seal this *15th* day of *December*, 2004.

COMMONWEALTH OF PENNSYLVANIA
Lisa A. Horne, Notary Public
Robinson Twp., Allegheny County
My Commission Expires Sept. 21, 2007
Member, Pennsylvania Association Of Notaries

                                            _____
                                            Notary Public

My Commission Expires: *9-21-07*

C:\Documents and Settings\jquigley\My Documents\LPA.Majestic Hills.doc

Seller's initials: _____
Purchaser's initials: _____

## LIST OF EXHIBITS

A.          Record Plat(s)

B.          Environmental Study

C.          Mortgage

D-1         Development Standards

D-2         Grading Plan

D-3         Clearing Plan

E-1.        Lot Inspection Report

E-2.        Lot Completion Report

F.          Purchaser/Seller Responsibility Checklist

## EXHIBIT "C"

## MORTGAGE

*MADE THE* _____ *day of* _____ *, 200_.*

*FROM:*        **MAJESTIC HILLS, LLC** *(Mortgagor)*

*TO:*            *NVR, INC. (Mortgagee)*

      *WHEREAS, Mortgagor pursuant to that certain Lot Purchase Agreement dated _____ _____ , as may be amended from time to time (hereinafter the "Agreement") is indebted to Mortgagee in the principal amount of **Four Hundred Forty Nine Thousand Two Hundred and NO/100 DOLLARS ($449,200.00)** advanced or to be advanced by Mortgagee to Mortgagor together with interest thereon at the rates provided herein until the indebtedness is paid in full in the manner and at the times set forth in the Agreement, with the final payment of principal and interest, if not sooner paid, due and payable at the maturity date set forth in the Agreement, as the same may be amended, and containing other terms and conditions, all of which are specifically incorporated herein by reference; and*

      *WHEREAS, the principal amount due under this Mortgage shall automatically increase or decrease, as the case may be, pursuant to the terms of the Agreement and/or upon execution by all parties of any amendment(s) to the Agreement which change the amount of the Deposit, as that term is defined in the Agreement.*

      *NOW, THEREFORE, Mortgagor, in consideration of the indebtedness and as security for the payment of the same, does hereby mortgage, grant and convey to the Mortgagee, its successors and assigns:*

### SEE ATTACHED EXHIBIT "A"

*TOGETHER with the improvements now and hereafter erected thereon, and all easements, rights, appurtenances, rents, reversions, remainders, profits, royalties, mineral, oil and gas rights and profits, and all fixtures now or hereafter located thereon. All replacements and additions shall also be secured by this Mortgage. All of the foregoing is collectively referred to in this Mortgage as the "Mortgaged Premises".*

*TO HAVE and to hold the Mortgaged Premises unto the Mortgagee, its successors and assigns, forever.*

*PROVIDED, however, that if the Mortgagor shall pay to the Mortgagee the indebtedness and shall fully perform each of the other covenants and agreements hereinafter set forth, then this Mortgage and the estate hereby granted and conveyed shall become void.*

*AND FURTHER PROVIDED, that the principal amount due under this Mortgage shall be that amount of the Deposit paid by Mortgagee to Mortgagor under the Agreement.*

*THIS MORTGAGE is executed and delivered subject to the following covenants and agreements.*

*1. Mortgagor shall promptly pay when due the indebtedness according to the Agreement and this Mortgage.*

*2. Until the indebtedness is fully paid, Mortgagor shall:*

      *(a) pay and discharge, when the same shall become due and payable, all taxes, assessments, sewer and water rents and all other charges and claims assessed or levied from*

time to time by any lawful authority upon any part of the Mortgaged Premises and which shall or might have priority in lien or payment to the indebtedness secured hereby, such payments to be made directly to the persons or entity to which payment is owned; and

     (b) pay and discharge all liens, claims or encumbrances which may be filed against the Mortgaged Premises and which might have priority in lien or payment to the indebtedness secured hereby;

     (c) not sell or otherwise transfer the Mortgaged Premises or any interest therein without Mortgagor's prior written consent, except for the priority interests allowed pursuant to paragraph 3 below.

3. Mortgagee agrees that this mortgage is subordinate to all existing and future loans of Mortgagor for development of the Majestic Hills community.

4. The covenants in this Mortgage shall bind, and its benefits shall inure to, the Mortgagor and the Mortgagee and their respective successors and assigns, subject to  the provisions of the Agreement.

5. Any notice which is mailed certified mail to Mortgagor or to the person(s) who is/are the then owners of the Mortgaged Premises at the address of the Mortgagor as provided in the Agreement or at such other address as Mortgagor shall designate to Mortgagee in writing, shall be sufficient notice when required under this Mortgage.

6. Mortgagee's rights and remedies as provided herein or in the Agreement shall be cumulative and concurrent, and may be pursued singly, successively or together, at the sole discretion of Mortgagee, and may be exercised as often as the occasion therefor shall occur; and the failure to exercise any right or remedy shall in no event be construed as a waiver by Mortgagee or release of the same.

7. In the event any term or provision of this Mortgage or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Mortgage, or its application other than to that which is held invalid or unenforceable, shall not be affected thereby, and each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

8. This Mortgage shall be governed by the laws of Pennsylvania, in which the Mortgaged Premises are located.  This provision shall not limit the applicability of federal law to this Mortgage.

9. In the event of default which continues for a period of fifteen (15) days after receipt by Mortgagor of written notice from Mortgagee, foreclosure proceedings may be brought forthwith on this Mortgage and prosecuted to judgment, execution and sale for the collection of the same together with costs of suit.  Interest on the unpaid balance shall accrue at the rate of eleven percent (11%) annually from the date of such default until the entire principal balance is paid in full.

**WITNESS** the due execution hereof the day and year first above written.

Witness:

MAJESTIC HILLS, LLC

BY: _____

Joseph N. DeNardo
Manager

*COMMONWEALTH OF PENNSYLVANIA* )
)    *ss:*
*COUNTY OF* _____ )

     *On this ____ day of _____, 2004, before me, a Notary Public, the undersigned officer, personally appeared Joseph N. DeNardo, Manager of Majestic Hills, LLC a Pennsylvania limited liability company, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same as Manager of Majestic Hills, LLC, for the purposes therein.*

     *IN WITNESS WHEREOF, I hereunto set my hand and official seal.*

                          _____
                          *Notary Public*

*MY COMMISSION EXPIRES:* _____

### CERTIFICATE OF RESIDENCE

*I hereby certify that the precise address of the mortgagee, NVR, INC., herein is as follows:* ____

_____

                      _____  _____

## EXHIBIT "D-1"
### RYAN HOMES
### PITTSBURGH REGION
### SINGLE FAMILY DETACHED DEVELOPMENT STANDARDS

**A.   CLEARING AND GRUBBING**

1.   NATURAL VEGETATION SHALL BE PRESERVED wherever possible throughout
     the site.  Wooded homesites will be reviewed on an individual basis.

2.   All wood chips produced from the clearing will be collected and
     removed by the developer.  Under no circumstances will the wood chips
     be mixed with topsoil or scattered through out the community.

3.   All timber, logs, trees, stumps, bushes, rubbish and other debris
     will be removed and properly disposed of, and not pushed into the
     natural vegetation of the lot.   Under no condition shall this
     material be buried on the building pad of the homesite. A bury pit
     will be considered if mapped, acceptable to local authorities and not
     located within any recorded lot areas that will be deeded as a
     homesite.

4.   All timber, logs and trees not fallen by natural causes, but falling
     in natural vegetation as a result of clearing and grubbing shall be
     removed and disposed of properly.

**B.   GRADING**

1.   Topsoil shall be removed from all disturbed areas and stockpiled in
     an accessible location agreed to by Ryan Homes for use on the lots
     after the homes are constructed.  A minimum numer of lots are to be
     utilized to stockpile topsoil.  The Developer may use stockpile to
     fill at toe of slope if bench is deep enough.  No other material
     shall be mixed with topsoil pile (e.g. keyway material, utility ditch
     excess material, etc.).  Developer shall make every effort to stock
     topsoil in dry conditions.  Ryan requires 120 yards of stockpiled
     topsoil per lot.  The developer will be responsible to remove all
     excess topsoil from the community at a time agreed upon by both
     parties.

2.   All rear cut or fill slopes that are three (3) feet horizontal to one
     (1) foot vertical or steeper shall be seeded with crown vetch, or an
     approved local slope mix or erosion and sedimentation blankets as
     required by local authorities.  All remaining disturbed areas shall
     be seeded with perennial rye grass.  Developer is responsible for
     achieving 90% vegetation growth on slopes.

3.   All grading and excavation shall be accomplished in a manner that
     complies and conforms to local soil erosion and sedimentation
     protection standards.  Developer shall be responsible for filling in
     all temporary sediment traps and erosion ditches upon completion of
     necessary vegetation.  Developer shall be responsible for maintaining
     all erosion and sediment protection measures except "on lot" controls
     as specified by Department of Environmental Protection (D.E.P.).

4.   Should water be encountered during grading, the affected areas must
     be dewatered using accepted long term engineering practices.  Surface
     drainage must be maintained to eliminate ponding of water.  Developer
     will inform Ryan Homes as to the exact location and cause of water on
     the site.

5.   In situations where the dirt does not balance in the community, a
     designated dumpsite will be provided for losing the excess dirt.

6.   All wetland areas must be clearly marked on the site and site plans
     per Department of Environmental Protection.

7.   Building pad areas and any sediment traps located in building pad
     areas, shall be properly prepared and established to allow Ryan Homes
     to install a standard footing at a minimum frost depth.  Spreading
     lifts shall not exceed eight (8) inches in depth and compacted at the
     specified moisture content until the maximum density attainable using
     ASTM test No. D1557 is 95% of maximum.  All fills must be compacted
     using vibratory or sheep's foot rollers only, and documented by a
     registered engineer's correspondence.

8. Developer shall also notify Ryan of any rock conditions they have encountered which would affect excavation or utility trenches and identify any subgrade water conditions they have encountered on site.

9. **SINGLE FAMILY DETACHED – HIGH SIDE LOTS**

The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

a. The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

b. Starting at the street right of way line, an inclined grade is established to the building line at a maximum height as shown on the high side lot table for the corresponding building line. (See sketch below)

c. Beginning at the building line and extending towards the rear of the lot, the height of the bench is maintained to the toe of slope for the distance shown on the high side lot table.

d. There shall be a maximum slope of two (2) feet horizontal to one (1) foot vertical from the toe of the slope to the top of the slope. (See sketch below)

### TABLE FOR SINGLE FAMILY DETACHED HIGHSIDE LOTS

| BUILDING LINE | MAXIMUM HEIGHT OF BENCH ABOVE STREET CENTERLINE | | MINIMUM DEPTH OF BENCH BUILDING LINE TO TOE SLOPE | |
|---|---|---|---|---|
| ▓▓ Feet | Plus | ▓▓ Feet | ▓▓▓ Feet | |
| ▓▓ Feet | Plus | ▓▓ Feet | ▓▓▓ Feet | |

### TYPICAL HIGHSIDE BENCH—SINGLE FAMILY DETACHED



10. **SINGLE FAMILY DETACHED – LOW SIDE LOTS**

The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

a. The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

b. Starting at the street right of way and extending to the building line, a straight grade is established as shown on the table below for the corresponding building line. (See sketch below)

c. Beginning at the building line, a slope is established 15' in length to an elevation of the bench height as shown on the table below for the corresponding building line. The bench height is maintained from this point towards the rear of the lot for a distance as shown on the low side lot table.

d. The slope extending towards the rear of the property cannot exceed the maximum slope of two (2) feet horizontal to one (1) foot vertical.

## TABLE FOR SINGLE FAMILY DETACHED LOW SIDE LOTS

| BUILDING LINE | ELEVATION OF BUILDING BENCH TO STREET CENTERLINE | DEPTH OF BENCH BUILDING LINE TO TOP OF SLOPE |
|---|---|---|
| ▓ Feet | Minus ▓ Foot | ▓ Feet |
| ▓ Feet | Minus ▓ Foot | ▓ Feet |

TYPICAL LOW SIDE BENCH-SINGLE FAMILY DETACHED LOTS



11.  **TOWNHOMES – HIGH SIDE LOTS WITH AN INTEGRAL GARAGE.**

The following grading standards are to be used when the natural topography exceeds the maximum and minimum elevations stated in these specifications.

a.   The area between the back of the curb and the street right of way line shall be graded with a +/- 1/4" per foot fall from the top of the curb.

b.   Starting at the street right of way line, an inclined grade is established to the building line at a maximum height as shown on the high side lot table for the corresponding building line. (See sketch below)

c.   Beginning at the building line and extending towards the rear of the lot, the height of the bench will be as shown on the high side table.

d.   There shall be a maximum slope of two (2) feet horizontal to one (1) foot vertical from the toe of slope to the top of slope. (See sketch)

e.   Steps between units within a building will be a maximum of 16". No more than a four (4) feet transition in the street from one end ot the building pad to the other.

### TABLE FOR TOWNHOME HIGHSIDE LOTS – *Patio*

| BUILDING LINE | MAXIMUM HEIGHT OF BENCH ABOVE STREET CENTERLINE | MINIMUM DEPTH OF BENCH BUILDING LINE TO TOE SLOPE |
|---|---|---|
|  Feet | Plus  Feet |  Feet |
| ▓ Feet | Plus ▓ Feet | ▓ Feet |

### TYPICAL HIGHSIDE BENCH—SINGLE FAMILY ATTACHED



12. **TOWN HOME  - LOW SIDE LOTS WITH AN INTEGRAL GARAGE.**
    The following grading standards are to be used when the natural
    topography exceeds the maximum and minimum elevations stated in
    these specifications.

    a.   The area between the back of the curb and the street right of way line shall be graded with a
         +/- 1/4" per foot fall from the top of the curb.
    b.   Starting at the street right of way and extending to the building line, a straight grade is
         established as shown. (See sketch below)
    c.   Beginning at the building line, a slope is established 10' in
         length to an elevation of the bench height as shown on the
         table below for the corresponding building line.  The bench
         height is maintained from this point for a distance as shown on
         the low side attached lot table.
    d.   The slope extending towards the rear of the property cannot
         exceed the maximum slope of two (2) feet horizontal to one (1)
         foot vertical.
    e.   Steps between units within a building will be a maximum of 16".
         No more than four (4) feet transition in the street from one
         end of the building pad to the other.

### TABLE FOR TOWN HOME LOW SIDE LOTS *PATIO*

| BUILDING LINE | ELEVATION OF BUILDING BENCH TO STREET CENTERLINE | DEPTH OF BENCH BUILDING LINE TO TOP OF SLOPE |
|---|---|---|
| ▩▩▩ Feet | Minus ▩▩ Foot | ▩▩ Feet |
| ▩▩▩ Feet | Minus ▩▩ Foot | ▩▩ Feet |

TYPICAL LOW SIDE BENCH—SINGLE FAMILY ATTACHED LOTS



C.   **SANITARY SEWERS**

    1.   A sanitary sewer wye shall be provided for each single family
         detached and attached homesite.  The end of all sewer wyes or
         laterals shall be properly plugged.

2. All sanitary sewer laterals shall be extended to a point at least five (5) feet beyond the right of way or easement line (see Fig. #1) running at 22° with the top of riser to be four (4) below the finished grade (see Fig. #2) and marked with a **4x4** post painted green.



**Fig.#1**     **Fig. #2**     Row     **Fin. Grade**

EASEMENT OR R.O.W          22°∠     Min 22°∠

11'

MAIN LINE

**AERIAL VIEW**          **SIDE VIEW**

3. All sanitary sewer laterals shall be extended to a point beyond all proposed utility lines at a depth not to exceed eleven (11) feet below finished grade (see Fig. #2). Sanitary sewer laterals must permit gravity flow to the lateral utilizing the minimum sewer depth builder requirement.

4. Sanitary Sewers that are constructed within or below a low side fill slope in excess of four (4) feet shall have the laterals extended to the top of the fill slope and marked with a **4x4** post painted green.

5. Should development restrictions prohibit gravity sewers as described above, developer must clearly identify those lots as a "hung sewer lot" on site plans. Engineers are to mark minimum basement elevations on hung sewer building lots and identify any possible hung sewer conditions and restrictions to gravity flow.

6. As-built plans shall be submitted to Ryan, within three weeks after installation of sewer lines, which clearly show and designate the locations of all wyes and laterals. The locations shall be designated by the station distance from the downstream manhole. The length of any lateral from the sewer main shall also be designated. As-builts shall be of sufficient detail and quality so as to satisfy specific municipal and/or sewer and water authority requirements. Developer shall also submit at this time copies of the electric, CATV, gas, water and telephone line plans to Ryan.

7. The top of all manhole covers shall be constructed to an elevation that conforms to the proposed finished grade. In the case of manholes within the street R.O.W., the manhole tops shall conform to the finish grade at the top of the curb or the sidewalk elevation if applicable prior to Ryan's acceptance. Developer will make adjustments to manhole covers not properly installed.

8. All main sewer trenches that cross under proposed paved areas (i.e. Townhouse rear turn-tables and parking areas and single family rear turn-tables shall be filled with stone or select backfill material.

**D.   STORM SEWERS**

1. (a) A secondary storm sewer system shall be constructed to provide for collection of all roof drains and footing drains in all areas where the downspouts and footing drains cannot be drained to (a) main storm sewer system, (b) natural water course, (c) sumped into original ground or (d) to the street, unless the use of splash blocks are permitted by the municipality.

(b) In the event a secondary storm sewer is cost prohibitive, the developer may install individual sumps in original ground below a fill slope running a lateral to the top of the fill slope on each lot that extends to a minimum of four (4) feet below the finished grade, clearly marked with a **4x4** post painted orange.

(c) The end of all storm sewer wyes or laterals shall be properly plugged and clearly marked with a **4x4** post painted orange; and extend to a minimum of four (4) feet below the finished grade.

(d) Storm sewers that are constructed within or below a low side fill slope in excess of four (4) feet shall have the laterals



extended to the top of the fill slope and marked with a **4x4** post painted orange.

2. The top of all storm sewer manhole covers, end wall, or head wall structures shall be constructed to conform to the proposed finished grade. In the case of manholes within the street R.O.W., the manhole tops shall conform to the finish grade at the top of the curb or the sidewalk elevation, if applicable, prior to Ryan's acceptance.

3. All storm sewer trenches that cross under proposed paved areas (i.e. townhouse rear turntables and parking areas and single family rear turntables shall be filled with stone or select backfill material.

4. All permanent storm water systems will be complete, including detention ponds, retention ponds, access roads or other local requirements.

**E.   UTILITIES**

1. Developer shall ensure that gas, water, electric, phone and cable TV lines are installed in a sequence related to their depth below finished grade so that the shallowest utility is closest to the curb and the deepest is closest to the homesite. Utility mains shall not be stacked below each other. In the case of single family attached product Ryan and Developer will agree to location of all sewer taps and utilities.

2. All main utility trenches (i.e. Townhouse rear turn-tables and parking areas and single family rear turn-tables shall be filled with an approved, suitable material to avoid settlement.

3. All electrical transformers, CATV, and phone above ground boxes should be located on property lines or as designed by utility, and at an elevation that conforms with proposed finish grades.

**F.   SURVEYING**

1. Developer shall supply Ryan with the following:

   a. Six (6) complete sets of plans (plan of record, construction drawings, grading, soil and erosion, profiles and detail sheets). Prints are to be provided within seven days of completion from Engineer.

   b. Control points within the current phase of development for the purpose of completing house stakeouts.

   c. Painted lot lines and lot numbers on curbs with a permanent paint within 15 days of completion of paving.

**EXHIBIT "E-1"**

**LOT INSPECTION REPORT**

In accordance with the Lot Purchase Agreement dated
_____ between NVR, Inc. and Majestic Hills, LLC, an
inspection was held on the _____ day of _____, 200__.

All installed improvements including curbs, gutters,
clearing, rough grading, storm sewers, and paved streets, on the
following lots were found to be complete and free of defects or
damages, except as noted below.

| Section | Lot Number | Remarks |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

APPROVED:

_____
Representative, NVR, Inc.

_____
Representative, Majestic Hills, LLC

**EXHIBIT "E-2"**

**LOT COMPLETION REPORT**

In accordance with the Lot Purchase Agreement dated
_____ between NVR, Inc. and Majestic Hills,
LLC, an inspection was held on the _____day of
_____, 200__.

All site work and house construction have been completed on
the following lots and all installed improvements including curbs,
gutters, storm sewers and paved streets were found to be free of
damages except as noted below.

Section        Lot Number                    Remarks
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____
_____  _____  _____  _____

APPROVED:


_____
Representative, NVR, Inc.


_____
Representative, Majestic Hills, LLC

## EXHIBIT "F"
## PURCHASER/SELLER RESPONSIBILITY CHECKLIST

| Description | PURCHASER | SELLER |
|---|:---:|:---:|
| Boundary Survey | | X |
| Improvement Plans and Proposed Grading Plans | | X |
| Preparation of Preliminary Plan | | X |
| Record Plat | | X |
| Subdivision Bonds (related to site improvements) | | X |
| Maintenance Bonds | | X |
| Bond & Inspection Fees | | X |
| Grade Establishment (ROW) | | X |
| Grade Establishment (Lot) | X | |
| Flood Plain Management | | X |
| Earthwork Computations (ROW) | | X |
| Earthwork Computations (Lots) | | X |
| Preparation Water & Sewer Plans | | X |
| Preparation of Drainage & Paving Plans | | X |
| Plot Plans with houses sited | X | |
| Clearing | | X |
| Excavation Stakeout - Streets Only | | X |
| House Stakeout | X | |
| Electric & Telephone Control Stakeout | | X |
| Curb & Gutter Stakeout | | X |
| Lot Stakeout - Controls (Provide to Builder's Engineer | | X |
| Computations - House Stakeout | X | |
| Wall Checks | X | |
| Final Lot Survey | X | |
| Description & Easements | | X |
| Covenants & HOA | | X |
| Common Areas turned over to HOA or dedicated | | X |
| Reproduction & Blueprinting (6 sets only of approved plans) | | X |
| VA/FHA documents subdivision approval | | X |
| Landscaping - On-lot, including street trees | X | |
| Landscaping - all other | X | X |
| Offsite Public Improvements | | X |
| Entrance Feature (as negotiated) | | X |
| Retaining Walls (on lot)(if required to render Lot buildable) | | X |
| Retaining Walls (on lot)(if required for house design) | X | |
| Monuments (N/I House Corners) | | X |
| Compaction and Certification (ROW & fill pads) | | X |
| Paving | | X |
| Curb and Gutter | | X |
| Sewer (Builder installs line from tap to house) | X | X |
| Water (Builder installs line from tap to house) | X | X |
| Site Drainage | | X |
| Sewer Laterals/Development Plans | | X |
| Water Meters Vault | X | |
| Mass Excavation - Lots | | X |
| Finish Fine Grading Lots | X | |
| Main Underground Telephone Transformers | | X |
| Main Underground Electric, Transformers | | X |
| Processing & Coordination of Underground Utilities | | X |
| Primary Electric Connection Fees & Deposits | | X |
| Secondary Electric Connection Fees | X | |
| Building & Plumbing Permit Fees | X | |
| Sewer & Water House Connection Fees | X | |
| Offsite Contribution | | X |
| Traverse Controls & Bench Marks(furnish to Builder's Engineer) | | X |
| Street Signs | | X |
| Public Works Agreement | | X |
| Sidewalk (fronting the lots) | X | |
| Sidewalk (all other) | | X |
| Basement Excavation | X | |
| ROW access prior to base paving | | X |
| Stockpile Topsoil (if available) | | X |
| Erosion Control and Maintenance and Storm Water Management: | | |
| Off Lot (public streets & ROW) | | X |
| Lot Area | X | |

**EXHIBIT "F" (cont.)**
**PURCHASER/SELLER RESPONSIBILITY CHECKLIST**

| Description | PURCHASER | SELLER |
|---|---|---|
| Erosion Control and Maintenance & Storm Water Management (cont.): | | |
| Erosion Control Initial Installation | | X |
| Storm Water Management | | X |
| Storm Drain Stakeout | | X |
| Storm Outfall Fencing | | X |
| Backfill Sediment Basins | | X |
| Repairs caused by Builder are Builder's responsibility or reimbursed to Developer | | |
| Public Street Lights (per county requirements) | | X |

## VERIFICATION

I, Christopher Phillips, verify that the statements made in this Complaint are true and correct.

I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §4904, relating

to unsworn falsification to authorities.

_____1/22/2019_____

Date

Christopher Phillips

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of January, 2019, a true and correct

copy of the foregoing Plaintiffs' Declaratory Judgment and Complaint in Equity was served to:

*Via Regular Mail and Email*
Kathleen A. Gallagher, Esquire
Porter Wright Morris & Arthur LLP
6 PPG Place; Suite 830
Pittsburgh, Pennsylvania 15222
*EMAIL: KGallagher@porterwright.com*

Respectfully submitted:

Jeffrey P. Myers, Esquire
Pa. I.D.# 90677
Joshua D. Brown Esquire
Pa. I.D. #315339

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Counsel for Plaintiffs

Signature: _____

Name: Joshua D. Brown, Esquire

Attorney No. (if applicable): 315339

Rev. 7/2018

4501